UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

STILLWATER MARKET NEUTRAL FUND II LP,

       Plaintiff,

       -against-

BEAR STEARNS ASSET MANAGEMENT INC.,
RALPH CIOFFI, MATTHEW TANNIN,
RAYMOND MCGARRIGAL, THE BEAR
STEARNS COMPANIES, INC., BEAR STEARNS
SECURITIES CORPORATION, BEAR STEARNS
& CO. INC., BARRY JOSEPH COHEN,
GERALD R. CUMMINS, DAVID
SANDELOVSKY, GREG QUENTAL,
WALKERS FUND SERVICES LIMITED,
SCOTT LENNON, MICHELLE WILSON-
CLARKE, and DELOITTE & TOUCHE LLP,

       Defendants,

       -and-

BEAR STEARNS HIGH-GRADE STRUCTURED
CREDIT STRATEGIES FUND, LP,

       Nominal Defendant.

Case No. 09 Civ 4223 (AKH)

ECF Case

**AMENDED COMPLAINT**

(Jury trial demanded)

RECEIVED
09 OCT -6  PM 7:49
U.S. DISTRICT COURT
S.D.N.Y.

# TABLE OF CONTENTS

**Page**

I.    NATURE AND SUMMARY OF THE ACTION ........................................................... 2

    A.    The Management Defendants ................................................................ 2

    B.    Deloitte and Walkers Defendants ........................................................ 8

II.    PARTIES ......................................................................................................... 12

    A.    Plaintiff ................................................................................................ 12

    B.    Management Defendants ..................................................................... 15

    C.    Corporate Defendants ......................................................................... 18

    D.    Affiliated Director Defendants ........................................................... 20

    E.    Walkers and the "Independent Director" Defendants.......................... 21

    F.    Director Defendants ............................................................................ 24

    G.    Auditor Defendant .............................................................................. 25

    H.    Nominal Defendant ............................................................................. 26

    I.    Other Related Entities ........................................................................ 26

III.    FACTUAL BACKGROUND ............................................................................ 27

    A.    Bear Stearns' Illustrious Past.............................................................. 27

    B.    The Boom in Debt Securitization ....................................................... 27

    C.    Bear Stearns' CDO Business.............................................................. 30

IV.    THE FUND ..................................................................................................... 31

    A.    Creation of the  Master Fund ............................................................. 31

    B.    The Investment Strategy Promised to Limited Partners ..................... 34

        1.    The Investment Strategy Focuses on Structured Finance Securities ....... 35

        2.    The Promised Use of Leverage................................................ 39

i

## TABLE OF CONTENTS
### (continued)

Page

3.   Proclaimed Hedging and Risk Management Strategy ............................ 42

C.   The High-Grade Master Fund's Transactions with Bear Stearns Entities ........... 44

V.   FIDUCIARY DUTIES AND OBLIGATIONS OF THE MANAGEMENT
DEFENDANTS ................................................................................. 46

A.   The Management Defendants' Fiduciary Duties and Contractual
Obligations to Limited Partners ......................................................... 46

1.   The Management Defendants' Duty to Diligently Monitor the
High-Grade Master Fund's Credit Risk ..................................... 47

2.   The Management Defendants' Duty to Value Portfolio Assets
Fairly ............................................................................ 48

3.   The Management Defendants' Duty to Accurately Disclose the
High-Grade Master Fund's Performance ................................. 50

4.   The Management Defendants' Duty to Fairly Assess Fees and
Profit Shares Paid to Them by the Fund ................................. 52

5.   The Management Defendants' Duty to Obtain Approvals for the
Related-Party Transactions Involving the High-Grade Master Fund ...... 53

B.   Rights of Limited Partners ................................................................. 55

1.   Each Limited Partner Had the Right to Rely on the Affiliated and
Independent Directors to Oversee the High-Grade Master Fund ............ 55

2.   Each Limited Partner Had the Right to Accurate and Complete
Disclosures Regarding the Operation and Performance of the High-
Grade Master Fund and the Fund............................................ 56

VI.   THE RISE AND FALL OF THE FUND ..................................................... 57

A.   The Fund's Early Putative Returns ..................................................... 57

B.   Bear Stearns' Self-Dealing ............................................................... 59

1.   The Management Defendants Failed to Obtain Required and
Promised Approvals for a Multitude of Related-Party Transactions....... 61

# TABLE OF CONTENTS
## (continued)

Page

2.   The Independent Directors Were Not Truly Independent ...................... 66

C.   The Enhanced Fund is Formed to Conceal and Defray Liquidity Problems Within the Fund and the Master Fund ................................................................ 67

D.   The Management Defendants Create Everquest as an Additional Mechanism to Conceal Liquidity Problems at the Fund and the Master Fund ..................................................................................................................... 68

E.   The Management Defendants' Misconduct and Breaches Devastated the Business and Financial Condition of the Fund and the Master Fund ................ 69

1.   The Management Defendants Falsely Assure Investors that the Fund and the Master Fund Would Benefit from the Deteriorating Subprime Market ............................................................................................. 70

2.   The Management Defendants Fight Massive Redemptions ................... 74

3.   The Fund 2006 Audit Report for the Fund Describes Bear Stearns' Self-Dealing ........................................................................................... 76

4.   The Truth Becomes Known ...................................................................... 77

5.   Defendants Are Forced to Admit That the Fund and the Master Fund are Worthless ................................................................................... 80

VII.   THE MANAGEMENT DEFENDANTS BREACHED THEIR DUTIES ..................... 82

A.   The Management Defendants Deliberately Abandoned the Stated Fund Investment Strategy ........................................................................................... 84

B.   The Management Defendants Made Grossly Negligent Bets on Subprime Mortgages .......................................................................................................... 85

C.   The Management Defendants Benefited Themselves by Consistently Overvaluing the Fund's Assets .......................................................................... 89

D.   The Management Defendants' Gross Negligence Created a Constant Liquidity Crisis .................................................................................................. 92

E.   The Management Defendants Failed to Adequately Hedge the Fund's Investments ........................................................................................................ 94

## TABLE OF CONTENTS
### (continued)

Page

VIII.   THE SEVERE REPERCUSSIONS OF THE MASTER FUND'S IMPLOSION .......... 95

IX.   DELOITTE'S UNIQUE ROLE IN THE WRONGDOING ........................................... 96

A.   Deloitte and the Bear Stearns Parties' Mutually-Beneficial Relationship .......... 96

B.   Bear Stearns Selected Deloitte to Audit the Fund, the Master Fund and All Other Related Entities ........................................................................................ 98

C.   Deloitte's Issued False and Misleading Audit Opinions ..................................... 99

1.   Standards for a Proper Audit .................................................................. 100

2.   Deloitte Failed to Comply with Applicable Auditing Standards ........... 102

D.   The 2003 Audits and Financial Statements ...................................................... 104

1.   Deloitte Ignored Flaws Regarding Manager Marks ............................... 105

2.   Deloitte Ignored Flaws Regarding Approval of Related Party Transactions and Illegal Acts Related Thereto ..................................... 107

3.   Deloitte Ignored Material Weaknesses in Internal Controls .................. 110

4.   Deloitte Failed to Obtain Competent Evidential Matter (AU § 326) ..... 111

5.   Deloitte Did Not Have a Reasonable Basis to Conclude That The Financial Statements Conformed with GAAP ...................................... 114

E.   The 2004 Audits and Financial Statements ...................................................... 115

F.   The 2005 Fiscal Year Audits and Financial Statements ................................... 117

G.   The 2006 Audits and Financial Statements ...................................................... 120

1.   The Everquest Debacle and the Overstatement of Year End 2006 NAVs ..................................................................................................... 125

2.   Subsequent Events (AU § 560) ............................................................. 129

3.   The Overstatement of Assets in the 2006 Financial Statements ............ 132

4.   The ABX Index ..................................................................................... 133

iv

# TABLE OF CONTENTS
## (continued)

Page

5. Subprime Lenders Face Significant Problems ........................................ 134

6. Deloitte Failed to Advise That the Fund and Master Fund Lacked the Ability to Continue as Going Concerns (AU § 341) ....................... 137

7. Deloitte Was Familiar With the Requirements of AU § 560 ................ 139

X. THE WALKERS DEFENDANTS' UNIQUE ROLE IN THE WRONGDOING ........ 140

XI. DERIVATIVE ACTION ALLEGATIONS ................................................... 144

XII. DEMAND EXCUSED ALLEGATIONS ..................................................... 144

A. BSAM is Neither Disinterested nor Independent .............................. 145

1. Demand is Excused Because BSAM Faces Substantial Likelihood of Liability for Its Breaches of Fiduciary Duties ................................... 145

2. Demand is Excused Because BSAM Received Substantial Financial Benefit From its Breaches of Fiduciary Duties ..................... 148

3. Demand is Excused Because BSAM Engaged in Self-Dealing Transactions ........................................................................... 150

4. Demand is Excused Because BSAM is Not Independent ..................... 151

B. The Fund's Joint Liquidators Are Neither Disinterested Nor Independent ....... 152

XIII. JURISDICTION AND VENUE ............................................................. 156

XIV. CAUSES OF ACTION ....................................................................... 156

Count I:  Derivative Claim for Breach of Fiduciary Duties Against the Management Defendants ....................................................... 156

Count II:  Derivative Claim for Breach of Fiduciary Duties Against the Director Defendants ............................................................... 158

Count III:  Derivative Claim for Breach of Fiduciary Duties Against The Walkers Defendants ............................................................... 160

Count IV:  Derivative Claim for Aiding and Abetting Breach of Fiduciary Duties Against the Corporate Defendants .............................. 162

# TABLE OF CONTENTS
## (continued)

Page

Count V:  Derivative Claim for Aiding and Abetting Breach of Fiduciary Duties Against Deloitte ................................................................................................ 164

Count VI:  Derivative Claim for Gross Negligence Against the Management Defendants ......................................................................................................... 166

Count VII:  Derivative Claim for Breach of Contract Against BSAM.......................... 167

Count VIII:  Gross Negligence Against the Walkers Defendants ................................. 168

Count IX:  Unjust Enrichment Against the Walkers Defendants ................................. 170

XV.    PRAYER FOR RELIEF ................................................................................ 170

XVI.    JURY DEMAND ........................................................................................ 171

Plaintiff Stillwater Market Neutral Fund II LP[1] (*plaintiff*) brings this action derivatively on behalf of Bear Stearns High-Grade Structured Credit Strategies Fund, LP (the *Fund*) against, among others, Bear Stearns Asset Management Inc. (*BSAM*), which was the General Partner and Investment Manager of the Fund, and the managers and operators of the Fund -- namely, Ralph Cioffi, Matthew Tannin, and Raymond McGarrigal (collectively, *Management Defendants*). Plaintiff brings this action to recover damages based on, among other things, the Management Defendants' extensive pattern of misconduct and their complete abandonment of fiduciary duties. As set forth in detail below, the Management Defendants improperly used the Fund as a dumping ground for other Bear Stearns entities to unload troubled assets that were dragging down their balance sheets, and caused the Fund to acquire these toxic assets at inflated prices as well as artificially inflating the net asset value of the Fund (allowing the Management Defendants to reap substantial fees in the process). These related party transactions were completed without approval by any independent representative of the Fund. Ultimately, the Fund imploded, culminating in at least $1 billion in investor losses, the demise of Bear Stearns (the country's fifth largest investment bank), and a global credit crisis that has yet to ease.

Co-defendants Deloitte & Touche LLP (*Deloitte*) as well as Walkers Fund Services Limited (*Walkers FS*), Scott Lennon and Michele Wilson-Clarke (*Independent Directors*, collectively *Walkers Defendants*) each materially participated in and facilitated the Bear Stearns Defendants' violation of their fiduciary duties.

---

[1] Plaintiff was previously identified as Stillwater Capital Partners LP, which is the general partner of Stillwater Market Neutral Fund II, LP. Stillwater Market Neutral Fund II LP is the real party in interest.

The allegations in this Complaint are based on plaintiff's personal knowledge as to itself, and on information and belief (including the investigation of counsel and the review of publicly available information) as to all other matters stated herein.

I.    **NATURE AND SUMMARY OF THE ACTION**

    A.    **The Management Defendants**

    1.    The Management Defendants destroyed the value of the Fund.  What was a $1.5 billion dollar hedge fund is now worthless.  Neither the creative design of subprime mortgages, nor the inability of subprime borrowers to fully understand the consequences of what they signed up for, nor the laxness in regulatory oversight ought to be mistaken for why the Fund lost its entire value: ***greed and ignorance***.

    2.    In stark violation of their fiduciary duties, the Management Defendants used the Fund and the Bear Stearns High-Grade Structured Credit Strategies Master Fund, Ltd. (the *Master Fund*), through which the Fund invested, to purchase overpriced and risky subprime mortgage-backed securities that had primarily been issued ***by the Management Defendants themselves***.  Indeed, while the Management Defendants created the false impression that the Fund would have minimal exposure to subprime residential mortgages, and that they would utilize their substantial, industry-leading risk management expertise and experience to ensure that the Fund was a relatively safe, conservative investment vehicle, the Management Defendants engaged in rampant self-dealing and systematically exposed plaintiff and other holders (*Limited Partners*) of *Limited Partnership Interests* to ever-increasing concentrations of aggressive and risky investments -- far beyond the exposure that was permitted under the *Partnership Documents*,[2] or that which was disclosed to investors.

_____

[2] The *Partnership Documents* include, but are not limited to, the form of Subscription Agreement For Limited Partnership Interests (*Subscription Agreement*), the August 31, 2006 Amended and

3.      As set forth in detail below, the Management Defendants told investors from the outset that the Fund would invest in broadly diversified pools of credit-related investment instruments, including (among other things) favorably risk-rated tranches of collateralized debt obligations (*CDOs*).   The Management Defendants represented that at least 90% of all investments would be rated AAA or (at worst) AA.

4.      However, from the outset, the Management Defendants were systematically engaging in undisclosed related-party transactions, exposing the Fund and its Limited Partners to ever-increasing concentrations of re-assembled CDO tranches and mortgage pools, as well as multiple *CDOs-Squared* (CDOs comprised of slices of other CDOs).  Unbeknownst to investors, from its inception, the Fund was exposed to high concentrations of these types of risky investments.

5.      The Management Defendants consistently attempted to hide the disastrous effects of their self-dealing.   For example, although they represented in monthly Preliminary Performance Profiles (*Monthly Profiles*) that only 6-8% of the Fund's portfolio was invested in subprime mortgage-backed securities, the Management Defendants failed to inform plaintiff and the Limited Partners that investments within the Fund that were collateralized by subprime mortgages constituted as much as *60%* of the Fund's assets.

6.      The Management Defendants also caused the Fund to use dramatically more borrowed capital (leverage) to multiply the size -- and therefore the risk -- of its investments than that which was disclosed to the Limited Partners.  This was done through greater than disclosed (or prudent, by any measure) use of short-term financings -- known as *repo* or repurchase

---

Restated Limited Partnership Agreement (*Partnership Agreement*), and the Private Placement Memorandum for Limited Partnership Interests dated August 2006 (*PPM*).

transactions, and through the leveraged purchase of re-assembled investment pools and CDOs-Squared that already included significant multiples of leverage.

7.      Toward the end of the summer of 2006, and as a result of the massive volume of related-party transactions in which the Management Defendants engaged without obtaining approval from an independent representative at the Fund, Bear Stearns suspended the Management Defendants' ability to transact with other Bear Stearns entities in connection with the Master Fund and Fund.

8.      The Management Defendants did this without disclosing to the Limited Partners that the massive number of related party transactions which occurred without independent director approval called into question the true net asset value of the Fund.

9.      Moreover, this "moratorium" on related party transactions restricted access to a critical liquidity source and placed the Master Fund and the Fund in further jeopardy.  Rather than disclose these constraints and associated risks to Limited Partners, the Management Defendants concealed these facts by cobbling together an alternative fund -- the Bear Stearns High-Grade Structured Credit Strategies Enhanced Leverage Master Fund (*Enhanced Master Fund*), which was launched together with a domestic and an overseas feeder fund on or about August 1, 2006 (collectively, the *Enhanced Funds*) -- into which the Management Defendants attempted to shuffle all the Limited Partners in order to close down the Master Fund and the Fund.

10.      For example, according to a September 17, 2006 email exchange between defendants Cioffi and Tannin with the subject line "Liquidity Game Plan," Cioffi wrote:

> What I was thinking was to build up 6 mos. of returns then send a letter to all the remaining investors and tell them we are closing the [Fund] and ask everyone to convert to the [Enhanced Master Fund]. We'd have to handle it like we did a thru exchange of assets I would not want to have to sell everything. This is the riskiest

> way to go because you know some LPs will not convert but I feel comfortable
> that we can get almost all of them to.

This demonstrates not only that the Management Defendants knew that they had assigned unsupportable and inaccurate prices and carrying values (*marks*) to Fund assets, but also clearly shows the Management Defendants' intention to beat the clock by closing the Fund down before having to reveal its true performance and asset composition to Limited Partners.

11.     Fueled by misrepresentations concerning the putative performance of the Fund, the Management Defendants convinced a number of Limited Partners to convert their Fund holdings into investments in the Enhanced Funds. Moreover, approximately 36.74% of the assets of the Master Fund were transferred to comprise the assets of the newly created Enhanced Master Fund, which would eventually suffer the same fate as the Fund and the Master Fund.

12.     However, the Master Fund and the Fund's liquidity and performance problems were so severe that even the Management Defendants' plan to *roll everything* into the new Enhanced Funds structure was not enough to conceal the severity of their problems. As a result, the Management Defendants consistently misrepresented to investors during the end of 2006 and early 2007, among other things: (i) the performance and net asset value (*NAV*) of the Fund; (ii) the effectiveness of putative hedges; (iii) the extent of leverage; and (iv) the Fund's exposure to subprime mortgages. Moreover, when Limited Partners became increasingly concerned about the impact of the downturn in the subprime mortgage market on their investments, the Management Defendants sought to allay any fears by lying about the number of redemption requests, as well as the level of new investments in the Fund.

13.     Tellingly, in the midst of making these misrepresentations, defendant Cioffi secretly withdrew $2 million -- one third of his entire investment -- from the Enhanced Funds while at the same time both he and defendant Tannin told plaintiff and Limited Partners that they

were *increasing* their investments in the High-Grade and Enhanced structures and were encouraging others that it was the right time for them to do the same.  For example, in a March 17, 2007 email to plaintiff's portfolio manager, Tannin states:

> As far as I'm concerned, my professional opinion is that this is a time for us to be committing capital.  If someone were to ask me – I would tell them that this is a very good time to add money to our Funds.  My opinion is that this is a good time to invest.  I am investing myself.

14.     Cioffi made his redemption despite having been warned previously that it would be inappropriate for him to pledge his interest in any of the funds to secure a personal loan.

15.     Moreover, after reviewing an internal BSAM risk-exposure report on April 19, 2007 (*CDO Report*) showing that the Master Fund's overall collateral was approximately "60% subprime" as of March 2007, Tannin fired off panicked emails (from a personal email account) to Cioffi and McGarrigal suggesting that the Master Fund and the Fund be closed immediately:

> [T]he subprime market ***looks pretty damned ugly*** . . . [I]f we believe [the CDO Report] is ANYWHERE CLOSE to accurate I think we should close the funds now. The reason for this is that if the [CDO Report] is correct then the entire subprime market is ***toast*** . . . there is simply no way for us to make money – ever.

Tannin concluded that "caution would lead us to conclude the [CDO Report] is right and we're in bad shape."

16.     However, rather than disclose the truth, defendants Cioffi and Tannin told the Limited Partners during a conference call three days later (April 25, 2007) that the Fund had "significant amounts of liquidity," "margin calls had easily been met," there were only a "couple of million [dollars] of redemptions," and they were "very comfortable" with the Fund's "portfolio construction."  Moreover, even though Tannin had just acknowledged to Cioffi in the above-referenced email that the subprime market looked "pretty damn ugly" and argued for closing and liquidating the Fund, he told investors during his opening remarks on the April 25 conference call that "the key sort of big picture point for us at this point is our *confidence that the structured*

*credit market and the subprime market in particular, has not systematically broken down . . . . So from a structural point of view, from an asset point of view, from a surveillance point of view, we're very comfortable with exactly, you know, where we are.*"

17.     Through the remainder of the spring of 2007, the Management Defendants continued to make false statements in an effort to conceal their wholesale mismanagement of the Fund.  Defendants, however, could not escape the inevitable impact of their grossly negligent and/or bad faith failures to act in the best interests of the Limited Partners and the Fund.  Indeed, Bear Stearns, through its top executives (including Co-President Warren Spector, who was ultimately sacked in August 2007), stepped in and attempted to sell the Master Fund and Enhanced Fund portfolios to outside investors.  When these last-ditch efforts failed, Bear Stearns announced on June 22, 2007 that it would provide up to $3.2 billion in financing to the Master Fund.  However, Bear Stearns eventually only provided approximately $1.4 billion to the Master Fund.

18.     On July 18, 2007, Jimmy Cayne (then Chairman and CEO of Bear Stearns) announced to the Limited Partners that there was "very little value left for the investors in the High-Grade Fund as of June 30, 2007" and that "[i]n light of these returns, we will seek an orderly wind-down of the Funds over time."  The letter also noted that the Fund had "sufficient assets" to pay off the $1.4 billion it had borrowed from a creditor.  That creditor was Bear Stearns.

19.     At the time of its collapse at the hands of the Management Defendants, whose multiple transgressions were aided and abetted by the other named defendants in this case, the Fund had approximately $1 billion in capital that was lost.

20.     On July 30, the Fund's directors authorized it to file a petition for liquidation under the Cayman Islands' Companies Law under the supervision of the Cayman Grand Court. Subsequently, a U.S. Bankruptcy Court struck down the legitimacy of the Cayman Islands venue for the filing.  As a consequence of the filing, Bear Stearns seized $1.3 billion of underlying collateral -- the Management Defendants' panoply of illiquid mortgage-backed securities -- that it had been financing for all of one month and absorbed it onto the firm's balance sheet.

21.     The Management Defendants breached their duties to the Fund and Limited Partners so that they could serve their own financial interests.  For example, the Management Defendants were able to earn substantial fees by selling Bear Stearns' most troubled securities into the Master Fund and the Fund at inflated prices. In addition, pursuant to the Partnership Documents, the Management Defendants earned Advisory Fees and a Profit Share based largely upon the NAV of the Fund.

**B.     Deloitte and Walkers Defendants**

22.     In addition to the various *Bear Stearns Defendants* (defined below), plaintiff brings this action against Deloitte, which was engaged to act as the purportedly independent auditor of the Fund and Master Fund.

23.     Deloitte, (the *friendly* auditor for all Bear Stearns-related parties) which was hired in order to lend credibility and thus marketability to the fund, issued faulty audits on the financial statements of the Fund and other funds, and provided "clean" or unqualified audit opinions year after year, assuring investors that it had conducted a thorough, independent, and objective audit, including (among other things) testing the Bear Stearns Defendants' estimates of the fair value of the assets in the Fund and testing that the Fund's purportedly independent directors (discussed below) performed the scrutiny over insider transactions between the Fund and other Bear Stearns entities, as investors expected.  Deloitte issued these opinions even in the face of information

8

which clearly and unequivocally demonstrated the numerous problems with those financial statements.

24.     Plaintiff is also seeking damages from the Walkers Defendants for breaches of fiduciary duty and aiding and abetting in the breaches of fiduciary duty by other defendants that brought down the Fund.  As set forth in detail below, the Walkers Defendants -- which have a long-standing and extensive relationship with Bear Stearns -- willfully disregarded their duties to provide independent review and approval of the vast majority of insider transactions executed between and among the Fund and other Bear Stearns-related entities.  Indeed, the Walkers Defendants completely abdicated their role as supposedly Independent Directors of the Fund and/or failed to properly oversee the operation of the Fund as required.

25.     Both Deloitte and the Walkers Defendants owed fiduciary, contractual and/or other duties to the Fund, and breached those duties in order to protect their own self-interest while harming the Fund.

26.     In June 2008, defendants Cioffi and Tannin were indicted by the U.S. Attorney for the Eastern District of New York for securities fraud, wire fraud, and conspiracy.  Cioffi was also indicted on charges of insider trading relating to his undisclosed decision to move $2 million of his own money out of the Enhanced Funds into another hedge fund he managed that had, to that point, superior returns.  The indictment alleged that by March 2007, both Cioffi and Tannin:

> believed that the [f]unds were in grave condition and at risk of collapse. However, rather than alerting the Funds' investors and creditors to the bleak prospects of the [funds] and facilitating an orderly wind-down, the defendants made misrepresentations to stave off withdrawal of investor funds and increased margin calls from creditors in the ultimately futile hope that the [f]unds' prospects would improve and that the defendants' incomes and reputations would remain intact.

*The indictment also revealed that both Cioffi's notebook and Tannin's tablet computer had disappeared after federal authorities had asked for them to be produced.*  The criminal case is

tentatively scheduled to go to trial in October 2009.

27.     On the same day that Cioffi and Tannin were indicted in the Eastern District, the SEC filed civil charges against both individuals for violating Sections 17(a) of the Securities Act of 1933 and Section 10(b) of the Securities Exchange Act of 1934 for their conduct in connection with the Fund, the Master Fund, and the Enhanced Fund (*SEC Complaint*).

28.     State regulators in Massachusetts have also pursued charges against defendant BSAM.  For example, on November 14, 2007, the Enforcement Section of the Massachusetts Securities Division of the Office of the Secretary of the Commonwealth filed an *Administrative Complaint* against BSAM.   The Administrative Complaint focuses upon the Management Defendants' and the Independent Directors' wholesale disregard for the approval process in connection with related-party transactions/principal trades, which was a key component of the Management Defendants' rampant self-dealing at inflated prices.  The Administrative Complaint attaches documents establishing that hundreds of related-party "principal transactions" -- including 78.95% of 342 principal transactions that took place in 2006 -- were processed without prior approval by the Independent Directors.

29.     Accordingly, plaintiff brings this action against the Management Defendants for breaching their fiduciary and contractual duties, with the knowing participation of the other named defendants, by engaging in a variety of misconduct that directly caused the Fund to suffer damages, including, but not limited to:

>    (a)     causing the Fund and the Master Fund to make investments that were inconsistent with the terms of the Partnership Documents;

>    (b)     failing to sufficiently monitor and adequately assess the credit risk inherent in the Fund's investments, as provided in the Partnership Documents;

(c)     causing the Fund to enter into harmful and self-interested principal trades with other Bear Stearns entities without obtaining the promised and legally required approvals from the Independent Directors;

(d)     assigning inflated values to the Fund assets to increase their own fees and to falsely portray positive performance;

(e)     providing financial statements and updates to Limited Partners that did not accurately reflect the Fund's investments or financial condition;

(f)     failing to adequately hedge the Fund's investments, as provided for in the Partnership Documents;

(g)     failing to manage or monitor (and, in fact, benefiting from) acknowledged conflicts of interest;

(h)     misrepresenting and failing to disclose facts to Limited Partners that were material to the performance of the Fund;

(i)     concealing and/or misrepresenting facts related to the liquidity of the Fund; and

(j)     violating the law and the promises made to Limited Partners in the Partnership Documents in connection with, among other things, related-party transactions.

30.     On June 30, 2008, plaintiff's general partner, Stillwater Capital Partners LP, was named as a plaintiff (together with Geoffrey Varga and William Cleghorn, the joint voluntary liquidators of the related offshore hedge funds) in a federal class action and derivative complaint in the Southern District of New York.  This Court coordinated the *Varga Action* with two other class/derivative actions involving related funds: *FIC, LP v. Bear Stearns Asset Management, Inc.*, 07 Civ. 11633 (*FIC Action*) and *Navigator Capital Partners, LP, v. Bear Stearns Asset Management Inc.*, 07 Civ. 7783 (*Navigator Action*).  On February 24, 2009, the Court heard oral argument on motions to dismiss in all three of the cases (*Varga*, *FIC*, and *Navigator*).  The Court concluded that the various plaintiffs' claims were more properly brought on a derivative basis (rather than as class actions).  The Court denied defendants' motions to dismiss the *Navigator* and *FIC* complaints and held that demand was excused.  With respect to the *Varga* complaint,

the Court identified certain pleading issues that had to be remedies in an amended complaint. The Court also stated during the hearing that counsel for the *Varga* plaintiffs would no longer be able to represent plaintiff's general partner *and* the joint liquidators of the *offshore* funds because of an apparent conflict of interest. The *Varga* plaintiffs (including plaintiff's general partner) were permitted to file an amended complaint in order to remedy these issues.

31.     Thereafter, plaintiff's general partner retained new counsel to file a separate complaint. On March 27, 2009, plaintiff's general partner filed a complaint in the Supreme Court of the State of New York , New York County. On April 29, 2009, defendants removed this action to this Court. On May 20, 2009, plaintiff filed a motion to remand the action to state court. On August 25, 2009, the Court denied the remand motion and directed the parties to in the related actions to coordinate discovery with the parties to this action.

## II.     PARTIES

### A.     Plaintiff

32.     Plaintiff Stillwater Market Neutral Fund II L.P. is a Delaware limited partnership with its principal place of business at 41 Madison Avenue, New York, NY 10010. Plaintiff has approximately 250 investors. Plaintiff's manager and general partner is Stillwater Capital Partners LLC ("*Stillwater Capital*"). Stillwater Capital is a Delaware limited liability company with its principal place of business also at 41 Madison Avenue, New York, NY 10010. Stillwater Capital and its various subsidiaries are in the investment management business, with over 400 clients and approximately $900 million under management.

33.     Plaintiff was a substantial investor in the Fund having invested and lost $2.6 million dollars ($2,600,000) in the Fund. In addition, Stillwater Capital as manager for several

funds, including plaintiff, invested and ultimately lost a total of approximately $27 million ($27,000,000) in all of the various and related Domestic and Overseas Funds.[3]

34.     BSAM sent plaintiff a Confidential Private Placement Memorandum dated September 4, 2003 prior to plaintiff's first purchase of the fund.  As was its custom, BSAM identified each PPM with a number and the potential investor's name.  In this case, the PPM identified plaintiff as the potential investor with the following stamp: "30-Stillwater."

35.     On or about September 30, 2004, plaintiff made a direct investment of $1.6 million ($1,600,000) in the Fund.  Plaintiff held that investment through July 1, 2006, at which time plaintiff pledged its interest in the Fund as collateral for a loan from KBC Financial Products (Cayman Islands) Ltd. (*KBC*).  KBC was a leverage provider that regularly provided leverage to hedge funds through this type of transaction.  Plaintiff pledged other assets to KBC as well to create a basket of securities that plaintiff could then use as collateral for loans from KBC to invest in additional hedge funds.  The terms of the agreement between KBC and plaintiff provided that KBC would honor all instructions given to it by plaintiff including voting instructions (as long as such instructions resulted in the basket's compliance with the Investment Guidelines as set forth in the contract).[4]

---

[3] These funds include the Fund; the Bear Stearns High-Grade Structured Credit Strategies Fund, LP (overseas); Bear Stearns High-Grade Structured Credit Strategies Enhanced Leverage Fund, LP; and the Bear Stearns High-Grade Structured Credit Strategies Fund, LP (overseas).

[4] Such agreements are very common in the hedge fund industry.  For example, Bear Stearns offered the same leverage provider service to another hedge fund that Stillwater Capital managed.  On or about February 2004, Stillwater Capital as general partner and manager of another hedge fund, invested $1.5 million ($1,500,000) in the Bear Stearns High Grade Structured Credit Strategies Fund (Offshore).  This interest was eventually pledged to Bear Stearns which then acted as a leverage provider for that fund.  Subsequently, that particular fund made two more purchases of the High Grade Fund (offshore) using leverage provided by Bear Stearns for a total investment of approximately $5.7 million ($5,700,000).  That same Stillwater fund also made one purchase of Bear Stearns High Grade Structured Credit Strategies Fund Enhanced Leverage (Offshore) of $2 million ($2,000,000) on or about January 2007 also using

13

36.     Plaintiff at all times retained beneficial and equitable ownership of the limited partnership interest in the Fund, and all investment risk was borne by plaintiff.  BSAM was well aware that plaintiff remained an investor in the Fund, but had merely arranged with KBC to provide leverage to its entire portfolio.  In that regard, BSAM required plaintiff and KBC to execute a new subscription agreement that specifically set forth the relationship.  The revised subscription agreement stated under the name of the investor: "Citco Global Custody (NA) N.V. as custodian for KBC Financial Products (Cayman Islands) Ltd. as nominee for Stillwater Market Neutral Fund II LP."  The revised subscription agreement also listed plaintiff's tax identification number on the subscription document, so there would be no doubt as to the ultimate investor in the Fund.

37.     At all times, plaintiff bore the risk of loss of all investments in the basket including its investment in the Fund.  Ultimately, plaintiff alone suffered a total loss of its investment in the Fund.

38.     Based on representations made by defendants, on or about March 7, 2007, plaintiff purchased an additional $750,000 interest in the Fund from Bear Stearns through a leverage provider affiliated with Credit Suisse International (*Credit Suisse*) under similar terms as those used for the KBC transaction.  On or about April 1, 2007, plaintiff purchased an additional $250,000 interest in the Fund from Bear Stearns through the Credit Suisse leverage provider.

39.     Prior to plaintiff's initial investment and until the collapse of the Fund, BSAM treated plaintiff the same as any other investor in the Fund.  BSAM regularly corresponded directly with plaintiff regarding fund performance, and arranged group and individual

Bear Stearns' leverage provider services.

14

conferences calls with plaintiff's managers regarding the status of the Fund and all of the related funds.  For example, On April 12, 2006, BSAM sent a letter to plaintiff captioned, "New Opportunity for Current Investors."  This letter invited investors such as plaintiff to invest in the ill-fated Enhanced Funds and was signed by defendants Ralph Cioffi, Raymond McGarrigal and Matthew Tannin.

40.     Other correspondence from defendants to plaintiff includes a notorious email dated March 17, 2007 from defendant Tannin to plaintiff's portfolio manager in which defendant Tannin encourages plaintiff to invest more in the Fund:

> As far as I'm concerned, my professional opinion is that this is a time for us to be committing capital.  If someone were to ask me – I would tell them that this is a very good time to add money to our Funds.  My opinion is that this is a good time to invest.  I am investing myself.[5]

Similar emails were sent to other Fund investors.  These emails were cited to in the criminal complaint filed against defendants Cioffi and Tannin by the U.S. Attorney.

41.     Moreover, plaintiff was treated as an investor and limited partner in the Fund for tax purposes.  For each tax year from 2004 to 2006, Deloitte prepared a Schedule K-1 (Partner's Share of Income, Deductions, Credits, etc.) for the investment with plaintiff's tax identification number.  The K-1 also stated that leverage provider KBC was merely the nominee for plaintiff.  Plaintiff used these K-1s to prepare its own tax returns and disseminated the K-1s to its own investors.

### B.     Management Defendants

42.     Defendant Bear Stearns Asset Management Inc. was at all relevant times a corporation organized under the laws of the State of New York with its principal office located at

---

[5] Plaintiff's representatives also corresponded and/or spoke with BSAM employees including James Marrone, Evan Kerr, Heather Malloy, Ken Mak, Max Corvin and Jane Digiacoma.

383 Madison Avenue, New York, New York.  BSAM was a wholly-owned subsidiary of defendant The Bear Stearns Companies Inc. that purportedly provided expert asset management and advisory services to high net-worth investors and managed hedge funds created by it or by affiliated Bear Stearns entities. BSAM created the Fund, was at all times its General Partner and Investment Manager, and was the General Partner and Investment Manager of the Master Fund, a "hedge fund" through which the Fund made all of its investments. Additionally, as discussed below, BSAM created and/or served as investment manager for many of the structured finance vehicles and securities in which it caused the Fund and the Master Fund to invest. BSAM was registered with the SEC as an investment adviser under the Investment Advisers Act.

43.     Defendant Ralph Cioffi is a resident of the State of New Jersey.  Cioffi was a Senior Managing Director of BSAM and a member of BSAM's Board of Directors who conceived of and founded the Fund and the Master Fund and was at all relevant times the Senior Portfolio Manager and investment team leader of both.  Additionally, through BSAM and along with defendants Tannin and McGarrigal, Cioffi developed and served as portfolio and collateral manager for a number of Bear Stearns-affiliated structured finance vehicles in which BSAM caused the Fund and the Master Fund to invest.  According to the Partnership Documents, Cioffi led the structured finance effort at BSAM and was the principal force behind Bear Stearns becoming a leading underwriter and trader of structured finance securities, including CDOs, which were central to the collapse of the Fund and the Master Fund.

44.     Cioffi made millions of dollars while at Bear Stearns and running the Fund.  He owned a $2.6 million home in Tenafly, New Jersey, a home in Naples, Florida valued at $933,000, a home in Ludlow, Vermont valued at $2.2 million, an apartment at the Stanhope on Fifth Avenue in Manhattan, and a $10.7 million, 6,500-square-foot home in Southampton, Long

Island, which had six bedrooms, seven baths, a pool, a tennis court, and a separate guesthouse on two and a half acres.  He also had a passion for Ferraris, at one point owning a $250,000 F430 convertible Spider and a $300,000 front-engine V-12 Superamerica.

45.    Defendant Matthew Tannin is a resident of the State of New York.  Tannin was a Senior Managing Director of BSAM and was at all relevant times the Chief Operating Officer of the Fund and a manager of the Master Fund.  Additionally, through BSAM and along with defendants Cioffi and McGarrigal, Tannin developed and served as portfolio and collateral manager for a number of Bear Stearns-affiliated structured finance vehicles in which BSAM caused the Fund and the Master Fund to invest.  According to certain Partnership Documents, Tannin had years of experience at Bear Stearns structuring CDOs, which were central to the collapse of the Fund and the Master Fund.

46.    Defendant Raymond McGarrigal is a resident of the State of New York. McGarrigal was a Managing Director of BSAM and served as a portfolio manager of the Fund and the Master Fund.  Additionally, through BSAM and along with defendants Cioffi and Tannin, McGarrigal developed and served as portfolio and collateral manager for a number of Bear Stearns-affiliated structured finance vehicles in which BSAM caused the Fund and the Master Fund to invest.  According to certain Partnership Documents, McGarrigal had years of experience at Bear Stearns structuring CDOs, which were central to the collapse of the Fund and the Master Fund.

47.    Defendants BSAM, Cioffi, Tannin, and McGarrigal are collectively referred to herein as the *Management Defendants*.

48.    BSAM, by virtue of its position as General Partner and Investment Manager of the Fund, and the other Management Defendants, by virtue of their positions as managers of the

17

Fund and BSAM's selected delegatees of certain duties to operate the Fund, were under Delaware law and the terms of the Partnership Documents in a fiduciary and contractual relationship with plaintiff and with other Limited Partners, and owed plaintiff and the Limited Partners the highest obligations of due care, good faith, candor, disclosure, loyalty, and fair dealing.  The Management Defendants owed similar, but not identical, duties directly to the Fund.

### C.    Corporate Defendants

49.    Defendant The Bear Stearns Companies Inc. (*BSC*) was at all relevant times a corporation organized under the laws of the State of Delaware with its principal office located at 383 Madison Avenue, New York, New York.  BSC was the parent of BSAM, Bear, Stearns Securities Corporation, and Bear, Stearns & Co. Inc. and, until May 30, 2008, BSC and its subsidiaries comprised one of largest global investment banks.  Among other things, BSC (with its subsidiary companies) held itself out to be an industry leader in the origination, underwriting, structuring, and trading of structured finance and mortgage securities, including CDOs.  During the relevant time period, BSC was the second largest underwriter of mortgage bonds in the US.  Additionally, BSC represented that it, along with its subsidiary companies, possessed and would apply specialized expertise in structuring CDOs, which were central to the collapse of the Fund and the Master Fund.

50.    In March 2008, largely due to the wrongdoing alleged herein, BSC experienced a liquidity crisis that brought it to the brink of bankruptcy.  In a bail-out transaction engineered by the Federal Reserve, JPMorgan Chase & Co. (*JPMorgan*) agreed to acquire the foundering BSC.  Pursuant to a merger agreement, on May 30, 2008, a merger subsidiary of JPMorgan joined with BSC, with BSC surviving as a wholly-owned subsidiary of JPMorgan.  Following the merger,

BSC and its subsidiaries are now subsidiaries of JPMorgan, a global investment bank with its principal office at 270 Park Avenue, New York, New York.

51.     Defendant Bear, Stearns Securities Corporation (*BSSC*) was at all relevant times a corporation organized under the laws of the State of Delaware with its principal office located at One Metrotech Center North, Brooklyn, New York, and was a subsidiary of BSC.  BSSC facilitated the investments and operation of the Fund and the Master Fund by acting as Prime Broker and Custodian for the Master Fund's trades and transactions, many of which violated the law and the terms of the Partnership Documents to the detriment of Limited Partners and the Fund.

52.     Defendant Bear, Stearns & Co. Inc. (*BS & Co.*) was at all relevant times a corporation organized under the laws of the State of Delaware with its principal office located at 383 Madison Avenue, New York, New York, and was a broker-dealer subsidiary of BSC and BSSC.  BS & Co. is registered with the SEC as a broker-dealer and as an investment adviser under the Investment Advisers Act.  BS & Co. facilitated the investments and operation of the Fund and the Master Fund by providing placement services to the Master Fund.  In addition, during the life of the Master Fund, BS & Co. was party to or facilitated thousands of related-party trades and transactions between it, other Bear Stearns entities, and the Master Fund, many of which violated the law and the terms of the Partnership Documents to the detriment of the Limited Partners and the Fund.

53.     BSC, BSSC, and BS & Co. (collectively, the *Corporate Defendants*) aided and abetted the Management Defendants' and Director Defendants' (defined below) various breaches of fiduciary duties and gross negligence.  The Corporate Defendants had knowledge of the various breaches of fiduciary duties and gross negligence by the Management Defendants and

Director Defendants, and substantially assisted in the conduct by, among other things, failing to monitor the activities of the Management Defendants with respect to their management and investments of the Fund and the Master Fund, failing to ensure that the Director Defendants were adequately dispatching their duties to oversee all aspects of the operation of the Master Fund, and providing brokerage and placement services to the Master Fund without which the breaches of fiduciary duty and gross negligence could not have occurred.

54.    In many cases, the Corporate Defendants entered into repurchase agreements and other related-party trades and transactions with the Master Fund that furthered the wrongdoing with the knowledge that the Management Defendants were not causing or working with the Independent Directors to have such transactions independently reviewed.

55.    The Corporate Defendants profited in a number of ways from their misconduct and the misconduct of the other defendants, including, but not limited to, earning massive fees and commissions from trades and transactions entered into between and among the Master Fund and Bear Stearns, including, but not limited to, the sale of Bear Stearns-created and Bear Stearns-issued securities to the Master Fund at prices inflated by the Management Defendants.

### D.    Affiliated Director Defendants

56.    Defendant Barry Cohen is a resident of the State of New York.  Cohen is or was a Senior Managing Director and Director of Alternative Investments (hedge funds) at BSAM and a member of the Board of Directors of BS & Co.  Cohen was at all relevant times one of three affiliated directors of the Master Fund.

57.    Defendant Gerard Cummins is a resident of the State of New York.  Cummins is or was a Managing Director of BSAM responsible for hedge fund middle-office support and firm-wide operations risk.  Cummins was at all relevant times one of three affiliated directors of the Master Fund.

58.     Defendant David Sandelovsky is a resident of the State of New Jersey. Sandelovsky is or was a Senior Managing Director of Alternative Investments (hedge funds) at BSAM and the Chief Operating Officer of BSAM's hedge fund business.  From at least August 2004 until on or about March 28, 2007, Sandelovsky was one of three affiliated directors of the Master Fund.

59.     Defendant Gregory Quental is a resident of the State of Connecticut.  Quental is or was a Senior Managing Director of BSAM and co-head of BSAM's HedgeSelect and Due Diligence Groups. Additionally, in 2005, Quental became Chairman of the Board of Directors of Bear Measurisk LLC, a subsidiary of BSAM that purportedly was an industry-leading provider of independent risk-transparency and risk-measurement solutions to investors.  On or about March 28, 2007, Quental became one of three affiliated directors of the Master Fund.

60.     Defendants Cohen, Cummins, Sandelovsky, and Quental are referred to herein as the *Affiliated Directors*.

61.     The Management Defendants, Corporate Defendants, and Affiliated Directors are referred to herein as the *Bear Stearns Defendants*.

**E.     Walkers and the "Independent Director" Defendants**

62.     Walkers Financial Services Limited (*Walkers FS*) is a Cayman Islands company with its principal office located at Walker House, 87 Mary Street, George Town, Grand Cayman, Cayman Islands.  Walkers is a licensed trust company and investment fund administrator, which provides a full range of services to offshore investment funds, including but not limited to providing directors, and administrative and trustee services.

63.     Walkers SPV Limited (*Walkers SPV*) is a Cayman entity with its principal place of business also located at Walker House, 87 Mary Street, George Town, Grand Cayman, Cayman Islands.  As discussed below, Walkers SPV contracted with BSAM to provide the

services of Lennon and Wilson-Clarke as the Independent Directors of the Fund and Master Fund.  Upon information and belief Walkers FS was formed in or about April of 2007.  Prior to that time, Walkers SPV provided director and other fund services through its Fund Services division until approximately April of 2007, when Walkers FS was formed as a separate entity. (hereafter all references to *Walkers* shall include Walkers SPV through March of 2007 and Walkers FS thereafter).

64.     Walkers provided services to the Master Fund, including but not limited to providing the Independent Directors (defined below) and performing administrative tasks such as collecting and disseminating valuation information to the Limited Partners.  Walkers was, for all intents and purposes, an extension of BSAM and the Corporate Defendants as it provided supposedly independent directorial and oversight services and/or other services during the period alleged herein to at least nine BSAM hedge funds other than the Master Fund.  In addition, its affiliated law firm served as legal counsel to at least sixteen Bear Stearns hedge funds that BSAM advised, including the Master Fund.  Moreover, Walkers knew it was providing directors to the Master Fund who would be named in the PPM issued to investors in the U.S. to serve as directors for the Master Fund that they knew or should have known was partially owned by U.S. investors, and that their employees were intended at all times relevant hereto to be in contact by phone, regular and electronic mail, and/or were intended to or did meet with the BSAM employees located in New York regarding related-party transactions between the Master Fund and Bear Stearns entities located in New York.

65.     Walkers was compensated for services rendered to the Fund directly by the Limited Partners and for services rendered to the Master Fund indirectly pro rata by the Limited

Partners.  As described more fully below, Walkers breached duties owed to the Fund and to the Limited Partners.

66.     In addition, Walkers aided and abetted the Management Defendants' breaches of fiduciary duties by knowingly and substantially assisting in those breaches.

67.     Defendant Scott Lennon is a citizen of Canada and resident of the Cayman Islands.  Lennon was at all relevant times a Senior Vice President of Walkers.  Beginning in or about August 2006, Lennon was one of two purportedly independent directors of the Master Fund responsible for, among other things, objectively evaluating related-party trades and transactions on behalf of the Fund and the Master Fund -- a responsibility that he either ignored or was unable to perform based upon the Management Defendants' knowing failure to provide required documentation.

68.     Defendant Michelle Wilson-Clarke is a citizen of the United States and a resident of the Cayman Islands.  Wilson-Clarke was at all relevant times a Vice President of Walkers.  Beginning in or about August 2006, Wilson-Clarke was one of two purportedly independent directors of the Master Fund responsible for, among other things, objectively evaluating related-party trades and transactions on behalf of the Fund, the Limited Partners, and the Master Fund -- a responsibility that she either ignored or was unable to perform based upon the Management Defendants' knowing failure to provide required documentation.

69.     Defendants Lennon and Wilson-Clarke are referred to herein as the *Independent Directors*.  The Independent Directors were named as directors in the PPM, which they knew or should have known would be distributed to investors in the US, were named directors for the Master Fund that they knew or should have known was partially owned by US investors, and they were intended at all times relevant hereto to be in contact by phone, regular and electronic

mail, and/or were intended to or did meet with the BSAM employees located in New York regarding related-party transactions between the Master Fund and Bear Stearns entities located in New York.

70.     Walkers and the Independent Directors are referred to herein as the *Walkers Defendants*.

**F.     Director Defendants**

71.     Pursuant to the Partnership Documents, the Affiliated Directors and Independent Directors (collectively, the *Director Defendants*) had ultimate authority over the Master Fund's operations.  Even though they were entitled to and did delegate authority to manage the day-to-day operations and investment decisions of the Master Fund, the Director Defendants were duty-bound to oversee all of its operations and to supervise its designees to ensure that the Master Fund and its managers complied with the Partnership Documents, applicable laws, and duties owed to its investors such as the Limited Partners. The Affiliated Directors and the Independent Directors breached their respective duties.

72.     In addition to their general responsibility to oversee operations of the Master Fund with the Affiliated Directors, the Independent Directors were responsible for approving all *principal trades* as defined by Section 206(3) of the Investment Advisers Act between the Master Fund and any Bear Stearns entity.  This legal responsibility was affirmed in the Partnership Documents.

73.     As a result of their positions as directors of the Master Fund, the Director Defendants were in a fiduciary relationship with plaintiff and the other Limited Partners in the Fund, and owed plaintiff, the other Limited Partners, and the Fund itself, the highest obligations of due care, good faith, candor, disclosure, loyalty, and fair dealing. The Director Defendants violated their duties in numerous respects, to the detriment of plaintiff, the other Limited

Partners, and the Fund, by, among other things, failing to oversee the operations of the Master Fund and failing to review and/or approve principal trades and transactions entered into between the Master Fund and other Bear Stearns entities as required by the Investment Advisers Act and affirmed by the Partnership Documents.

74.     In addition, the Director Defendants aided and abetted the Management Defendants' breaches of fiduciary duties by failing to adequately oversee the Master Fund. Moreover, by giving the Management Defendants unfettered discretion to value the Master Fund assets and investments and to cause the Master Fund to enter into principal trades and transactions without the required review, the Independent Directors facilitated the breaches of fiduciary duty that directly caused injuries to plaintiff, the Limited Partners, and the Fund.

### G.     Auditor Defendant

75.     Defendant Deloitte & Touche LLP is a Delaware limited liability partnership engaged in business as, among other things, an accounting and auditing firm with offices located in (among other places) New York, New York.  Deloitte was engaged as the independent outside auditor of the Fund, as well as its respective Master Fund and numerous other Bear Stearns-related entities, for each fiscal year between at least 2003 and 2006, and issued various certified audit reports to, and in respect of, these entities in connection with each of its engagements.  In addition to its services in connection with the Fund, Deloitte performed services for all of the Bear Stearns Parties.

76.     As discussed below, Deloitte aided and abetted the Management Defendants' breaches of fiduciary duties by failing to, among other things, conduct its audits in accordance with Generally Accepted Auditing Standards and properly evaluate manager marks and unapproved related party transactions.

### H.     Nominal Defendant

77.     Nominal Defendant Bear Stearns High-Grade Structured Credit Strategies, LP (the *Fund*) is a limited partnership organized under the laws of Delaware, with, prior to the events complained of herein, its principal place of business at the offices of 383 Madison Avenue, New York, NY 10179.

### I.     Other Related Entities

78.     Bear Stearns High-Grade Structured Credit Strategies Master Fund, Ltd. (the *Master Fund*) is a Cayman Islands exempted company organized under the Companies Law of the Cayman Islands.   BSAM was the investment manager for the Master Fund.   The Management Defendants all shared responsibility for the management of the Master Fund investment portfolio.   The Master Fund, at Bear Stearns' insistence, was placed into official court-directed liquidation in the Cayman Islands in August 2007, with KPMG Cayman Islands as Bear Stearns' designated liquidator.   That foreign liquidation was not recognized under Chapter 15 of the U.S. Bankruptcy Code in the United States Bankruptcy Court for the Southern District of New York because, by reason of domination of this Master Fund by Bear Steams and its agents, the center of main interest of the Master Fund has been held to be New York rather than the Cayman Islands.   *See In re Bear Steams High-Grade Structured Credit Strategies Master Fund, Ltd.*, 374 B.R. 122 (Bankr. S.D.N.Y. 2007), *aff'd*, Civ. Case. No. 07-8370, 2008 WL 2198272, at *1 (S.D.N.Y. May 27, 2008).

79.     The Walkers Group (*Walkers Group*) is an international organization with offices located in the Cayman Islands, London, Hong Kong, the British Virgin Islands, Jersey, and Dubai.   The principal place of business of the Walkers Group is located at Walkers House, 87 Mary Street, George Town, Grand Cayman, Cayman Islands.   The Walkers Group is comprised of the Walkers law firm, which provides legal services, and Walkers Management Services,

which provides corporate, special purpose vehicle, and fund services to the world's leading offshore jurisdictions.

## III.   FACTUAL BACKGROUND

### A.   Bear Stearns' Illustrious Past

80.     Bear Stearns was the fifth largest investment bank in the country before its stunning collapse in March 2008.  For decades, Bear Stearns had been known as one of the most conservative Wall Street firms because of its apparently cautious approach to risk.  In fact, Bear Stearns survived the Great Depression without laying off any of its employees and, until December 2007, had never posted a loss.

81.     In 1993, James Cayne succeeded Alan "Ace" Greenberg as CEO, although Greenberg stayed on as Chairman of the Board, and then as Chairman of Bear Stearns' Executive Committee starting in 2001.  While Bear Stearns under Cayne became a larger and more profitable firm, its business model was essentially unchanged.  Its time-tested businesses -- trading, mortgage underwriting, prime brokerage, and private client services -- still received the bulk of Bear Stearns' capital and management attention.

82.     By the turn of the century, with the economy weakening, Bear Stearns was in an increasingly precarious position.  And by mid-2000, Bear Stearns' stock price was in a two-year slump.  As one of Wall Street's last independent financial services firms, Bear Stearns struggled to keep up with its competitors.

### B.   The Boom in Debt Securitization

83.     Bear Stearns' fortunes quickly changed.   Persistently low interest rates and technical innovations led to a boom in debt issuance – *i.e.*, mortgages, credit card receivables, or leveraged buyouts.    As a result, Bear Stearns experienced explosive growth in the debt securitization business.

84.     As of 2003, Bear Stearns had long been known for its specialization and expertise in fixed-income securities, including mortgage-backed securities, and for its purportedly strict discipline in risk evaluation and management.  It was especially well-positioned to understand fully what was happening in the collateralized debt obligation (*CDO*), mortgage-backed securities and other asset-backed securities markets.  Moreover, its reach from retail and commercial mortgage originator, to servicer, to securitizer and beyond gave the Bear Stearns and its subsidiaries up-to-the-minute information about the nature and quality of assets going into mortgage-backed securities and into CDOs that included mortgage assets.

85.     Until the collapse of the Fund, BSAM was a market leader in the area of structured credit services and generally viewed as an expert in managing the risks of structured credit assets.

86.     Cioffi, in particular, had special expertise and deep ties to Bear Stearns' structured credit efforts.  He had been head of fixed income sales and the global product and sales manager for high-grade credit products during his first decade at Bear Stearns (1985 – 1994).  He was then involved in Bear Stearns' entry into structured credit work and was a principal force behind Bear Stearns' gaining its position as a leading underwriter and secondary trader of structured finance securities, specifically CDOs and esoteric asset-backed securities.

87.     Debt securitization involves pooling and repackaging of cash flow-producing financial assets into securities that are sold to investors.  The securities that are the outcome of this process are called asset-backed securities (*ABS*).  When mortgages are packaged together for securitization, they are referred to as Mortgage Backed Securities (*MBS*).  And when the mortgages are residential, those securities are referred to as Residential Mortgage Backed Securities (*RMBS*).

88.     The credit quality of asset-backed securities (such as RMBS) can be more volatile than general corporate debt.  If the value of the underlying assets declines, the affected securities can experience dramatic credit deterioration and loss.

89.     RMBS are divided into layers based on the credit ratings of the underlying assets. The *B-Pieces* of an RMBS (*i.e.*, its riskier parts) can be pooled together to form a kind of asset-backed security called a collateralized debt obligation.  CDOs are then once again divided by the CDO issuer into different tranches, or layers, based on gradations in credit quality.

90.     While the top tranche of a CDO may be rated AAA, CDOs are generally formed from RMBS that are rated BBB or lower.  Accordingly, even the best tranches of a CDO are a very risky form of security.  Lower-rated tranches of CDOs, such as the *mezzanine* tranches, bear even greater risk of loss. The most dangerous segment of a CDO is termed the *equity* tranche, and bears the first risk of loss.

91.     Through the first part of this decade, mezzanine CDOs offered for sale proliferated, making up more than 75% of the total CDO market by April 2007.  The mezzanine CDOs were stuffed with cash flows from especially risky types of residential mortgage loans, such as *subprime* or *Alt-A* loans.

92.     Subprime loans are made to borrowers who have a heightened risk of default, such as those who have a history of loan delinquency or default, those with a recorded bankruptcy, or those with limited debt experience.

93.     Alt-A loans, although considered less risky than subprime loans, are still more risky than prime loans.  Alt-A loans are typically made to borrowers with problems including lack of documentation of income and assets, high debt-to-income ratios, and troubled credit histories.  Subprime and Alt-A mortgages are referred to as *nonprime* mortgages.  Between 2003

and 2007, the total proportion of risky nonprime loans wrapped into the majority of all mezzanine CDOs increased dramatically marketwide.

94.     Bear Stearns was in an ideal position to benefit from the market for CDOs backed by higher-risk nonprime mortgages because it was vertically integrated in that business -- it originated and purchased risky home loans, packaged them into RMBS, collected these RMBS to form CDOs, then sold CDOs to investors.  In fact, through its subsidiaries, Bear Stearns had originated and purchased vast numbers of risky residential mortgage loans over the last several years.  Bear Stearns originated loans through two wholly-owned subsidiaries: the Bear Stearns Residential Mortgage Corporation, and later the Encore Credit Corporation (*ECC*), which Bear Stearns purchased in early 2007.  ECC was strictly a *subprime* lender -- *i.e.*, it specialized in providing loans to borrowers with compromised credit.

### C.     Bear Stearns' CDO Business

95.     Each CDO was set up as a new entity (typically an offshore limited liability entity) with its own assets and liabilities.  Nearly all of the CDOs Bear Stearns structured over the last several years were backed, in addition to RMBS, by derivatives or *synthetic securities*. These were, in effect, insurance contracts where the party buying the insurance paid a premium equivalent to the cash flow of an underlying RMBS that it was copying, and the counterparty insured against a decline or default in the underlying RMBS security.  In other words, a synthetic security is like a *side bet* on the performance of certain assets.  Such CDOs are called *Synthetic CDOs*.  A CDO backed by other CDO notes is called a *CDO-Squared*.

96.     One of Bear Stearns' primary functions as a CDO underwriter was determining the marketable size of each CDO.  This determination was based on: (a) the supply of collateral that would make up the assets of the CDO; (b) the market demand for the securities issued by the

CDO; and (c) the risk-taking ability of Bear Stearns -- that is, its ability to retain unsold CDO securities and to insure the CDO against losses.

97.     In order to sell CDOs that were as large as possible, Bear Stearns retained increasing amounts of the CDOs it packaged on its books.  By August 2007, this figure had reached *$2.072 billion*.

## IV.     THE FUND

98.     Bear Stearns' growing accumulation of subprime-backed RMBS and CDOs, combined with its leveraging practices, left it extraordinarily vulnerable to declines in the housing market.  This vulnerability was severely exacerbated by Bear Stearns' management and backing of two enormous hedge funds holding subprime-backed securities – one of these was the Master Fund.

### A.     Creation of the  Master Fund

99.     Defendant Cioffi joined Bear Stearns in 1985 as a fixed-income salesman. Beginning in 1991, Cioffi became sales manager for high-grade credit products, where he was involved in the creation of Bear Stearns' structured credit effort and was a principal force behind Bear Stearns' move to become a leading underwriter and secondary trader of structured finance securities, including CDOs.

100.    Starting in 1998, the global CDO market grew an estimated 150% per year, reaching approximately $750 billion in 2005. Further, because of diminishing IPO and mergers and acquisitions activity, CDOs became one of the most profitable products for investment banks.  This fact was not lost on the Management Defendants or the Corporate Defendants as BSC, with its subsidiaries, was by 2002 routinely among the leading issuers in the global CDO market.

101.    While Cioffi was leading Bear Stearns' move into the exploding structured finance and CDO market, the hedge fund industry was experiencing similarly robust growth. According to a September 2003 Staff Report to the SEC, between 1992 and 2002, the number of hedge funds operating in the U.S. increased from 400 to approximately 6,000.  Assets under hedge fund management increased from approximately $50 billion to $600 billion during the same period.

102.    Hedge fund growth was driven largely by increased participation of large institutional investors such as pension plans, foundations, and endowments seeking to reinforce their portfolios by investing in funds that diversified their investment strategies to seek returns in varying market conditions.  Defendant Cioffi had relationships with many such large institutional investors from his time in fixed-income sales at Bear Stearns.

103.    Cioffi eventually considered leaving Bear Stearns to form and manage his own hedge fund.  Naturally, the confluence of growth in the structured finance and hedge fund industries presented an enticing opportunity for someone with Cioffi's experience.

104.    Bear Stearns ultimately convinced Cioffi to stay at Bear Stearns and to run his hedge fund through BSAM.  By agreeing to run it through BSAM, Cioffi knew the fund would be atypical of normal hedge funds that are stand-alone entities often run by lesser-known money managers.  Cioffi knew his fund would carry the imprimatur of one of the largest and most venerated investment banks in the US.  Moreover, Bear Stearns' reputation as the savviest manager of credit-risk on Wall Street would be crucial to enticing investors into the newly-created fund and in convincing them to hold their positions once invested.

105.   Due to the tax advantages available to investment companies offshore, defendants BSAM, Cioffi, and Tannin chose to form their new hedge fund (the Master Fund) in the Cayman Islands.

106.   Along with Cioffi, the early management team for the Master Fund consisted of defendant Tannin (de facto co-creator of the fund) and Joanmarie Pusateri (a BSAM Vice President who was in charge of the in-house administrative operations of the Master Fund).  The Affiliated Directors were defendants Cohen, Cummins, and Sandelovsky, who were all Managing Directors in BSAM's hedge fund area.  Defendant McGarrigal later joined the team as a Portfolio Manager with Cioffi.

107.   As is typical of many offshore hedge funds, the Master Fund did not receive capital directly from investors.   Instead, in what is commonly called a *master-feeder* arrangement, investment in the Master Fund came through three *feeder-funds* created by Bear Stearns contemporaneously with the Master Fund, of which the Fund was one.

108.   The Fund was organized under the laws of the State of Delaware on August 26, 2003, subject to the provisions of the Delaware Limited Partnership Act.   Pursuant to the Partnership Agreement, the Fund is and was at all times "governed by and construed and administered in accordance with the internal substantive laws of the State of Delaware," which included, among other things, the axiom that a general partner of a limited partnership owes fiduciary duties to the limited partners and to the partnership itself.

109.   As a feeder-fund, the Fund conducted all of its investment and trading activities through capital contributions to the Master Fund in exchange for an ownership interest.  Thus, the value of the Fund reflected its pro rata co-ownership of the Master Fund (the other feeder-funds were also co-owners) and each Limited Partner's Interests reflected its individual pro rata

ownership of the Fund's portion.  As a result, the overall value of the Fund and each Limited Partner's ownership Interests were tied entirely to the performance and overall value of the Master Fund.

110.    In August 2004, in addition to the Fund, two other feeder-funds invested through the Master Fund: the Bear Stearns High-Grade Structured Credit Strategies (Overseas) Ltd. (*Offshore Feeder Fund*), an exempted company incorporated under the laws of the Cayman Islands to facilitate investment by non-US investors and tax-exempt US investors; and Bear Stearns High-Grade Structured Credit Strategies (Overseas) Yen Unit Trust (*Yen Feeder Fund*), a Cayman Islands unit trust, which facilitated Japanese investment in the Master Fund.  As of December 31, 2006, the Fund owned approximately 28% of the Master Fund.

**B.    The Investment Strategy Promised to Limited Partners**

111.    As set forth in more detail below, the Management Defendants told investors that the Fund would focus on using leverage to generate returns by borrowing money in the low-cost, short-term repo markets to buy higher yielding, long-term CDOs.  Specifically, the Partnership Documents provided that the Master Fund's investment portfolio would consist of approximately 90% low-risk investment-grade senior CDO classes rated AAA to AA.  The difference between the interest rate at which the fund could borrow money and the yield on the CDOs, enhanced by the use of borrowed money, would generate the Fund's profits.

112.    The Partnership Documents also promised Limited Partners, among other things, that the Fund's funds would be invested, monitored, and hedged consistent with the Management Defendants' structured finance expertise and the fiduciary duties they owed under the Partnership Documents and Delaware law.  In fact, an important selling point for investors in the Fund was its relationship with Bear Stearns.  Bear Stearns was known as a leader in CDOs and other exotic securities.  The Fund was marketed as a safe investment because of Bear Stearns'

expertise and the use of Bear Stearns' proprietary systems to identify and manage risk. Indeed, Bear Stearns was involved in virtually every part of the Master Fund's business. For example, BSSC, a wholly-owned subsidiary of BSC, served as the prime broker for the Master Fund, and BSAM was the investment manager for the Master Fund.

113. In addition, because there was no secondary market for the structured finance vehicles being purchased, the Partnership Documents assured Limited Partners that such securities would be purchased at fair prices and carried at fair value as reasonably determined in good faith by the Management Defendants (*i.e.*, using *manager marks*). Moreover, because certain Fund and Master Fund purchases were related-party transactions/principal trades, the approval of "Independent" Master Fund Directors (defendants Scott Lennon and Michelle Wilson-Clarke, both of who were at all relevant times officers of defendant Walkers) was required to comply with the Investment Advisers Act of 1940 and the terms of the Partnership Documents.

### 1.    The Investment Strategy Focuses on Structured Finance Securities

114. True to their structured finance backgrounds, defendants Cioffi and Tannin conceived of the Fund and the Master Fund to seek "high current income and capital appreciation with respect to LIBOR[6] . . . primarily through leveraged investments in investment-grade structured finance securities." The structured finance securities on which they focused were CDO securities.

115. As mentioned above, CDO securities are issued by special purpose vehicles (*SPVs*) created by banks and other financial institutions for the purpose of financing the purchase of diversified pools of assets such as mortgages and other debt obligations. The banks and

---

[6] *LIBOR*, the London Interbank Offered Rate, is the rate under which banks make loans to other banks and is often used as a benchmark in the financial community.

financial institutions generate fees by causing the SPVs to acquire pools of assets and dividing the pools into several classes of CDO securities, which are sold individually to investors. As explained in the Fund's August 2006 Private Placement Memorandum ("PPM")[7]:

> Structured finance securities are the securities of special purpose vehicles . . . that purchase diversified pools of assets. The assets held by the SPV are financed through the issuance of several classes, or tranches, of securities each of which has a specific right to the interests and principal payments from the underlying diversified pool of assets held by the SPV.[8]

116.    As stated by the PPM, each class of a CDO's securities typically has a credit rating based on its *seniority* -- *i.e.*, the relative right to payments from the underlying assets.  Any losses from payment defaults on the underlying assets are applied in reverse order of seniority. Senior classes are the mostly highly rated (often rated AAA) by rating agencies such as Moody's Investors Service, Standard & Poor's, and Fitch Ratings Ltd., and are protected by the subordinated security structure, but deliver the lowest returns.  Equity classes, also referred to as *junior interests*, are often unrated and are the first class to absorb losses, but offer higher returns to compensate for the higher risk.

117.    CDO securities are issued in different credit risk classes in this manner to cater to the various risk-return profiles of investors.  Senior CDO classes are attractive to investors because they can offer greater yields than more traditional fixed-income securities (like bonds) with similar credit ratings.  Often, senior classes pay a spread above LIBOR despite their AAA ratings.  Equity classes are attractive to investors because, while risky, they can offer large returns.

---

[7] The August 2006 PPM replaced the September 4, 2003 PPM which was sent to plaintiff and the August 2004 PPM.

[8] PPM at 11.

118.    According to the Partnership Documents, the Master Fund's putative investment strategy centered on leveraging the Management Defendants' purported structured finance and credit risk expertise to identify CDO securities assets offering high returns relative to their credit rating or risk profiles.  According to the August 2006 PPM, "[t]he Investment Manager [would] use its structuring and research experience to identify structured finance securities with fundamentally strong credit risk profiles that [were] priced attractively."  PPM at 11.

119.    The Master Fund's purported investment strategy was to achieve returns above LIBOR by making diversified purchases of CDO securities largely on the senior end of the ratings spectrum, but also on the unrated end that would offer higher corresponding returns.

120.    According to the *Permitted Investments* section of the PPM, the Master Fund would target a portfolio composition of approximately 90% (excluding investments in equity classes as discussed below) low-risk investment-grade senior CDO classes rated AAA to AA. PPM at 14.  The investment theory was that, if properly selected by the Investment Manager, these CDO securities could offer returns above LIBOR without subjecting the Master Fund to the increased credit risk that typically would accompany higher yields.  The 90% AAA/AA rating threshold was an important figure for the Limited Partners because it was an objective benchmark by which they could monitor the Master Fund's investment composition in an otherwise opaque hedge fund investment.

121.    In addition to direct investments in highly-rated investment-grade CDO securities, the Master Fund also intended to invest in non-investment grade unrated or underrated equity securities issued by both typical SPVs and a modified type of SPV that packaged together various types of existing CDO securities and reissued new CDO securities based on the newly *repackaged* assets.  These latter special SPVs were defined by the PPM as *Repackaging Vehicles*

(also known as *CDOs-Squared*), and the unrated or underrated equity securities they issue were termed *Repackaging Vehicle Junior Interests*.

122.    Each time a SPV or Repackaging Vehicle creates and issues a CDO, approximately 5% to 15% of its capital structure is issued as equity class securities.  This equity class is sometimes referred to as the *first-loss* or *toxic waste* class because it is always unsecured and has the lowest payment priority and thus the highest risk of default.  In addition, the equity classes are often populated by the riskiest debt, which during 2006-2007 often included subprime mortgages.

123.    As further discussed below, the Management Defendants' plan for the Master Fund included selling it securities issued by Repackaging Vehicles that Bear Stearns affiliates, including the Management Defendants, created from existing CDOs.

124.    For example, in April 2004, the Management Defendants created and acted as the collateral manager for Klio Funding Ltd. (*KLIO*), which was a Repackaging Vehicle constructed by combining existing CDOs into a pool and then causing the Repackaging Vehicle to issue *new* CDO securities in various classes, including non-rated equity securities. The Management Defendants caused the Master Fund to purchase equity securities from KLIO, as well as a number of additional *KLIO* entities they created over the life of the Master Fund.

125.    Similarly, on September 29, 2006, the Management Defendants created Parapet 2006, Ltd. (*Parapet*) and acted as its collateral manager.  Parapet was a prototypical BSAM Repackaging Vehicle in that it was created by purchasing various equity securities that had been issued by already existing CDOs and restructuring them into new CDO equity securities to be issued to investors (including the Master Fund) thereby creating a classic CDO-Squared.  As discussed below, the Master Fund purchased Parapet securities.

126.   Pursuant to the PPM, the Management Defendants intended to cause up to 40% of the Master Fund's NAV to be invested in Repackaging Vehicle Junior Interests.   PPM at 11. Theoretically, the risky nature of the Repackaging Vehicle Junior Interests would be mitigated by the investment-grade senior CDO classes in the Master Fund's investment portfolio.

127.   As discussed below, however, by at least August 2004, the Management Defendants had abandoned their obligations to carefully evaluate available investment-grade senior securities in terms of their potential risk versus returns, and instead began increasingly causing the Master Fund to invest primarily in high-risk unrated Repackaging Vehicle Junior Interests completely without regard to their credit risk profile.   The Management Defendants failed to disclose to plaintiff and to the other Limited Partners that they had abandoned the PPM's original strategy, and caused materials to be released to the Limited Partners that did not accurately reflect the true credit ratings breakdown of assets in the Master Fund's portfolio.

128.   Moreover, the Management Defendants failed to disclose that they were secretly causing the Master Fund to invest in CDO securities backed by subprime debt, and, in many cases, were buying the most risky investments from Bear Stearns' SPVs and Repackaging Vehicles that could not otherwise be sold to the public at large.   In other words, the Management Defendants caused the Master Fund and the Fund to become the marketplace for Bear Stearns' illiquid and otherwise immovable securities.

**2.      The Promised Use of Leverage**

129.   A central component of the Master Fund's investment strategy was to borrow money (*i.e.*, *leverage*) against assets purchased by the Master Fund to purchase even higher quantities of CDO securities selected by the Management Defendants.   By using leverage, the Management Defendants could enable the Master Fund to invest many times the amount of

capital actually contributed by Limited Partners in the Fund (as well as the Overseas Feeder Fund or the Yen Feeder Fund).

130.     Specifically, the Management Defendants intended to use leverage to purchase investment-grade securities with an aggregate value of up to ten times the NAV of the Master Fund.  PPM at 16.  By use of ten times leverage, the Investment Manager could, in theory, increase returns provided by the highly-rated CDO securities it selected, provided that they generated returns greater than the cost of borrowing.  However, the PPM contained no limit on the leverage the Master Fund could employ with respect to Junior Interests, except of course the Management Defendants' fiduciary duties of care.

131.     The Master Fund primarily gained leverage through repurchase agreements (*Repo Agreements*) -- *i.e*., loans under which the Master Fund transferred certain assets to a counterparty subject to an agreement by the counterparty to transfer the assets back to the Master Fund on demand or at a date certain for an adjusted amount.  In other words, the assets acted as the collateral for a loan and the adjustment to the amount repaid reflected interest on the transaction.  The Repo Agreements employed by the Master Fund were typically one, three, or six-month agreements, during which time the Master Fund could use proceeds to make additional investments in structured finance securities or to meet short-term operational liquidity needs.

132.     At least one or more of the Corporate Defendants was frequently the leverage counterparty for the Master Fund's Repo Agreements.  However, as discussed below, due to the failure of the Management Defendants to obtain required approvals for related-party trades and transactions, by September 2006, the Master Fund was prohibited from entering into Repo Agreements with Bear Stearns entities, further contributing to constant liquidity problems.  Of

course, the Management Defendants never told plaintiff or the Limited Partners that Bear Stearns could no longer be a source of liquidity and it made the Enhanced Funds even more vital to continuing to hide the Master Fund's liquidity problems.

133.    "Liquidity" here essentially means access to cash to meet the many cash needs of the Fund.  The Fund attempts to generate its return by securing a greater cash flow each month from the asset portfolio than the fund owes in interest and other borrowing costs to create such a portfolio.  The Fund used various kinds of borrowing, including Repo Agreements discussed above, to invest in total assets that are far greater than the money directly contributed by investors.  The Fund constantly needs cash to pay interest, to meet margin requests by repo counterparties or other lenders, to pay expense, to satisfy any investor redemptions, and to adjust the investment portfolio through new investments.

134.    Using Repo Agreements to leverage investment exposure, however, created considerable risk for the Master Fund.  *First*, if the collateral for the loan decreased in value during the term of agreement, the counterparty could require the Master Fund to post additional capital to cover the spread between the loan and the value of the collateral.  *Second*, while Repo Agreements were typically renewed (*rolled over*), a counterparty was under no obligation to do so when the term expired.  Thus, while Repo Agreements were a good source of leverage and short-term liquidity for the Master Fund, they could also cause liquidity problems if the Master Fund needed cash to post additional collateral or to satisfy an expiring Repo Agreement.  The Master Fund was particularly subject to liquidity concerns because many of its holdings were in the form of illiquid Repackaging Vehicle Junior Interests, which could not be sold to raise cash.

135.    The use of massive leverage through Repo Agreements presented an even more fundamental risk.  Investments that go up by their nature can also go down.  Thus, while greater

exposure to structured finance securities through leverage meant compounded returns, it also meant that any adverse changes to the value of investments, however slight, would be magnified.

136. Ultimately, as discussed below, the Management Defendants' overuse of leverage contributed to the collapse of the Master Fund. The Management Defendants were aware that massively leveraged investments were uniquely vulnerable to adverse events, yet the Management Defendants failed to invest with due care and continued to secretly cause the Master Fund to enter into reckless investments and to purchase illiquid and risky Repackaging Vehicle Junior Interests for which there was no public market and that could not be resold if liquidity needs arose.

### 3.    Proclaimed Hedging and Risk Management Strategy

137. Due to the risk in the Master Fund's leveraging strategy, an additional and central component of the Management Defendants' purported investment strategy was to hedge the Master Fund's risky investments in structured finance securities.

138. The August 2006 PPM stated that the Master Fund's investments always would be protected by credit enhancement mechanisms that would benefit the Master Fund during adverse credit events:

> [I]t is anticipated that substantially all of the structured finance securities purchased by the Master Fund will have credit enhancement mechanisms which, when the underlying pool of assets experiences credit degradation beyond objectively defined levels, cause cash flow to be diverted away from the more junior structured finance securities and towards the securities held by the Master Fund.[9]

139. In other words, when defaults or the risk of defaults caused the credit profiles of the assets underlying the Master Fund's structured finance securities to degrade, cash would be diverted to satisfy repayment obligations to the assets held by the Master Fund.

---

[9] PPM at 13.

140.    The PPM represented that the Management Defendants would cause the Master Fund's investments to be specifically hedged against losses by credit-default swaps (a type of insurance against adverse credit events):

> [T]he Master Fund will use credit-default swaps to hedge some of its credit exposure. A credit-default swap is a derivative contract where one party . . . pays an annual premium to another party . . . in exchange for the right to receive a compensatory payment if a specified credit suffers a default or credit event. Credit default swaps will be used by the Master Fund to hedge credit exposure.[10]

141.    The Management Defendants' responsibility to protect the Master Fund through hedges was reiterated in BSAM's August 30, 2005 Alternative Investment Management Association Ltd. Questionnaire for Due Diligence Review (*AIMA Questionnaire*), which was provided to Limited Partners:

> On a monthly basis, the portfolio managers meet with BSAM's CIO and hedge fund risk management team to discuss the portfolio and its performance. The team also meets with Bear Stearns' global credit department to discuss their positions, risk management and hedging techniques. ***As part of managing the Fund's risk, the team actively engages in various hedging techniques in the credit derivatives market, monitor and maintain adequate liquidity and look to minimize leverage while attempting to achieve the Fund's cash on cash targets***.[11]

142.    The hedging transactions into which the Management Defendants caused the Master Fund to enter were intended to and did give plaintiff and other Limited Partners comfort that the massively leveraged CDO investments would be protected from adverse market events. For example, during January and February 2007, at the time when the financial media began writing about the weakening CDO market, the Management Defendants reassured Limited Partners by claiming that the Master Fund's hedges would thrive in the softening market.

143.    However, by January 2007, and certainly no later than March 2007, the Management Defendants were aware that the Master Fund's investments were insufficiently

---

[10] PPM at 13.

[11] Emphasis added.

hedged.   Nevertheless, the Management Defendants continued to mislead Limited Partners regarding the hedges in investor calls and in PPM-mandated materials that they distributed to Limited Partners.

### C.   The High-Grade Master Fund's Transactions with Bear Stearns Entities

144.   The PPM provided that the Master Fund could transact with Bear Stearns entities, including using BSSC as its prime broker and custodian, and transacting with Bear Stearns entities as Repo Agreement counterparties.

145.   More significantly, the PPM provided that the Master Fund would invest in structured finance securities issued by SPVs and Repackaging Vehicles created by BSAM and other Bear Stearns entities and for which the Management Defendants or other Bear Stearns personnel were collateral managers.  PPM at 11-12.

146.   Permitting the Management Defendants to create and serve as collateral managers for Repackaging Vehicles in which the Master Fund invested gave the Master Fund access to the Management Defendants' supposed expertise in identifying attractive assets.   Through this arrangement, the Management Defendants would not be limited to picking through the securities of hundreds of already constructed CDOs being offered to the market; rather, they could purchase securities from CDOs that they created and populated with quality underlying assets based upon their ability to weigh the creditworthiness.

147.   Indeed, the August 2006 PPM touted that the risk associated with the Master Fund's investments in CDOs and Repackaging Vehicle Junior Interests could be reduced by the Management Defendants' successful selection of assets to underlie the Repackaging Vehicles:

> The returns of the Repackaging Vehicle Junior Interests will be generated primarily from the cash flow performance of the investment-grade ABS, investment-grade CDOs and other investment-grade assets selected by the

Investment Manager in its capacity as collateral manager of the Repackaging Vehicles.[12]

148.    This arrangement was beneficial to the Management Defendants in a number of ways.  First, Bear Stearns entities received commissions and management fees associated with arranging the structured finance vehicles and issuing the underlying securities.  Second, the Master Fund's role as a purchaser created a market for securities issued by Repackaging Vehicles, thereby enhancing the profitability of Bear Stearns' own investments in CDOs and allowing Bear Stearns to continue generating large fees for new CDO issues.

149.    In addition to the explicit assurances provided in the Partnership Documents, any potential conflicts of interest between Bear Stearns and the Master Fund caused by allowing Bear Sterns entities and employees to manage the Master Fund and to sell securities to it were supposed to be mitigated by the Management Defendants' fiduciary duties to act in the best interests of Limited Partners as well as the Independent Directors' approval of related-party trades and transactions.

150.    The principal-transactions began soon after the Fund was formed.  As discussed above, the Management Defendants caused the Master Fund to invest in BSAM's Repackaging Vehicle called KLIO, which the Management Defendants had created in April 2004 from a collection of other CDOs.  According to the August 2004 PPM, the Master Fund purchased 64% of KLIO's floating rate notes and 100% of its preferred shares (its equity securities).  After the August 2004 PPM, the Management Defendants never caused similar details of related-party transactions to be disclosed, including not in the later PPM when such transactions had escalated.

151.    Similar to KLIO, the Management Defendants created Parapet in September 2006 from already existing CDO securities that they repackaged as a new entity.  In the case of

---

[12] PPM at 11-12.

Parapet, the *new* CDO securities it issued were in two classes: (i) a $137 million floating rate note *rated* AA or the equivalent that was purchased by the Master Fund and Enhanced Master Fund; and (ii) $369 million of unrated equity classes that were dumped into another Bear Stearns fund (*i.e.*, Everquest, which is discussed at length below).

152.    These transactions were a prototypical BSAM Repackaging Vehicle transactions in that they gathered existing CDO securities with various ratings and stripped off the higher rated securities into one class and the *toxic waste* into another.   As with most of these transactions, the Master Fund got the short end.

153.    Unbeknownst to investors, the Master Fund ultimately became a dumping ground for illiquid equity classes of CDOs that Bear Stearns entities could not sell to investors on the open market.   During the relevant time period, the Management Defendants caused the Master Fund to purchase hundreds of millions of dollars worth of Bear Stearns structured finance securities in transactions that, in most cases, the Independent Directors either failed to meaningfully review or failed to review at all as required by law and by the Partnership Documents.   By December 31, 2006, a staggering 81% of the Master Fund's assets were securities created by Bear Stearns entities.

## V.    FIDUCIARY DUTIES AND OBLIGATIONS OF THE MANAGEMENT DEFENDANTS

### A.    The Management Defendants' Fiduciary Duties and Contractual Obligations to Limited Partners

154.    In addition to carefully outlining the Master Fund's investment strategy, the Partnership Documents provided a number of additional fiduciary and contractual obligations that the Management Defendants owed to each Limited Partner in connection with the operation of the Fund and the Master Fund.

1.      **The Management Defendants' Duty to Diligently Monitor the High-Grade Master Fund's Credit Risk**

155.    The PPM specifically provided that the Management Defendants would carefully and constantly monitor the Master Fund's credit risk with respect to all actual or contemplated investments:

> The primary focus of the Investment Manager will be to assess the credit risk inherent in every potential investment and to monitor the credit risk of the investments held by the Master Fund. The objective of the analysis is to determine how the frequency and severity of defaults of the underlying assets of each of the structured finance securities will impact the interest and principal payments on those securities.[13]

156.    Even though the CDO securities held by the Master Fund were complexly constructed investments, and the Master Fund often held more than 2,000 separate positions, the PPM assured investors that the Management Defendants would monitor the performance and credit risk of each of the Master Fund's investments using objective criteria:

> Because each of the investments held by the Master Fund is essentially a construct of a large and diversified collection of individual assets, it is possible to monitor the performance of the underlying assets in a quantitative way. Unlike investments in corporate fixed-income securities where the credit performance of the issue is binary (the bond is either current in its obligations to make interest and principal payments or is in default) the credit performance of a structured finance security is directly related to the observable cash flow characteristics of the underlying assets.[14]

157.    Moreover, the PPM described the process by which the Management Defendants would use unique proprietary models and valuation tools created by Bear Stearns to monitor the Master Fund's risk:

> Various models and valuation tools are used to quantify the likelihood of future payments on both the underlying assets held by a CDO or structured finance vehicle as well as securities issued by the CDO or structured finance vehicle. These tools are derived from internally constructed, broker-dealer and third-party

---

[13] PPM at 13.

[14] PPM at 13.

vendor analytical systems. [BSAM] also utilizes default modeling and credit-adjusted spread pricing applications to assess relative value opportunities in the structured finance market.[15]

158.    Once again, BSAM's AIMA Questionnaire reiterated its responsibility to use the

Bear Stearns unique corporate expertise to carefully monitor risk:

> There are three layers of risk management, the broker dealer, BSAM and the portfolio managers. The Fund's daily mark to market, which is done in house by Bear Stearns' repo desk and the team, keeps them in touch with any price movements that could foretell problems in any one of the Fund's investments. The team receives monthly marks on each of the Fund's investments from up to 15 broker dealers. The team monitors their positions through two main analytical systems . . . [which] allow them to monitor each deal, run stress tests, monitor monthly trustee reports on each deal and use technology to effectively monitor each position. In addition to the portfolio management team, Bear Stearns' and BSAM's risk management departments monitor the Fund's positions as well.

159.    In short, the Management Defendants explicitly promised, and were obligated

under the PPM, to monitor the credit risk of the Master Fund's Investments on a constant basis.

Indeed, credit monitoring was among the explicit fiduciary and contractual obligations that the

Management Defendants owed to plaintiff and other Limited Partners.

### 2.    The Management Defendants' Duty to Value Portfolio Assets Fairly

160.    Generally, the most accepted valuation method for financial assets is *mark to*

*market* accounting, which is essentially determining the current price an asset would obtain on

the open market.  For example, if a given asset is listed or traded on a stock exchange, it can be

valued at or near the official price on the principal exchange for such asset or by examining the

various prices at which similar assets are selling in various markets.

161.    However, in the case of the Master Fund, mark to market accounting was

discarded for the majority of its holdings because a ready market was not available for the

securities that the Management Defendants purchased, and prices were either unavailable or, in

---

[15] PPM at 12.

some cases, the Management Defendants sought to revalue the assets on their own.  Pursuant to the PPM, the Management Defendants were permitted to use *manager marks* to value assets assuming that they honored their fiduciary duties to plaintiff, other Limited Partners, and the Fund:

> If for specific assets the official close of business price does not, in the opinion of the General Partner or its designee, reflect their fair value or are not available, the value is to be calculated with care and good faith by the General Partner or its designee with a view to establishing the probable realization value for such assets as at the close of business on the valuation date.[16]

162.    The PPM provided the Management Defendants even more flexibility to value Repackaging Vehicles Junior Interests, which were typically illiquid investments for which there was no secondary market and no formal exchange.  Under the PPM, the Management Defendants promised to value such assets using the *fair-value methodology*. The methodology consisted of taking the present value of the future stream of projected cash flows to the Repackaging Vehicle Junior Interests over the projected life of the Repackaging Vehicle, with a discount "determined primarily by assessing the credit quality of the collateral pool of the repackaging vehicle."  PPM at 46.  In other words, valuation of the Repackaging Vehicle Junior Interests was done using the present value of cash flows adjusted by the likelihood of default over the life of the investment. Bear Stearns' claimed expertise in assessing credit risk in the market was not only relevant to investment decisions and post-investment monitoring, but also to the appropriate valuation of assets already held by the Fund.

163.    In practice, however, the Management Defendants' flexibility in valuing assets was almost limitless, except for other than the boundaries of good faith and reasonableness, which were ignored. As provided by the PPM:

---

[16] PPM at 45.

[T]he valuation of an asset . . . may reflect the amounts invested by the Partnership in such asset, notwithstanding that such amounts may not represent the market value of such asset. The General Partner or its designee may also follow some other prudent method of valuation other than that referred to above. . . . The General Partner is entitled to exercise its reasonable judgment in determining the values to be attributed to assets . . . and provided it is acting bona fide in the interest of the Partnership as a whole, such valuation is not open to challenge by current or previous investors.[17]

164.    In sum, the Management Defendants had nearly unlimited discretion to assign manager marks to investments, assets, and collateral in which they caused the Master Fund to have an interest.  In turn, these assets were often sold to the Master Fund by BSAM and other Bear Stearns entities.  The only limit on the manager marks was the Management Defendants' fiduciary duties to act in the best interests of the Fund and the Limited Partners -- under Delaware law and the Partnership Documents -- oversight by the Director Defendants, and review and approval by BSAM's pricing committee.

### 3.    The Management Defendants' Duty to Accurately Disclose the High-Grade Master Fund's Performance

165.    While the Management Defendants had the right to keep confidential from Limited Partners any information that they reasonably believed to be sensitive or in the nature of trade secrets, the Management Defendants were required to make information concerning the performance of the Partnership and the Master Fund available to Limited Partners on a periodic basis.

166.    Pursuant to the Partnership Documents, the Management Defendants were required to deliver a report to Limited Partners at the conclusion of each fiscal year concerning the Fund's operations during that year.  The year-end report was required to contain an audited balance sheet of the Fund as of the end of such fiscal year, as well as audited statements of Fund

---

[17] PPM at 46.

income and any changes in the financial position of the Fund during the course of the year. The annual audited financial statements also included schedules of investment for the Master Fund. The Management Defendants were also required to have quarterly reports delivered to each Limited Partner setting forth: (i) an unaudited statement of the rate of return of the Partnership for such fiscal quarter; and (ii) any other financial reports and information as BSAM may deem appropriate. In addition, within 30 days of the end of any calendar month, the Management Defendants were required to deliver an account statement to each Limited Partner containing information relating to the NAV of the Fund and each Limited Partner's Capital Account balance.

167.    As a non-public Delaware limited partnership and exempt Cayman Islands company, respectively, the Fund and Master Fund were not required to make filings or report to the SEC. Thus, Deloitte's annual audits of the Fund and Master Fund were typically the only time each year when eyes outside the insular world of Bear Stearns examined the finances of the Fund and Master Fund.

168.    Given the Management Defendants' nearly absolute control of the Fund and Master Fund, the yearly audits were designed to give comfort to Limited Partners that the financial condition of the Fund and Master Fund were independently reviewed by a disinterested party who (in theory anyway) would more critically view the returns. The audits were particularly important given that a central feature of the Master Fund's investment strategy was investing in illiquid and difficult to value securities issued by Bear Stearns affiliates.

169.    Moreover, during the life of the Master Fund, the Management Defendants held numerous investor conference calls during which they discussed the performance of the Master

Fund and, in some cases, the level of subscriptions and redemptions and the hedging transactions in which they had caused the Master Fund to enter.

170.    The Management Defendants also caused the Monthly Profiles to be issued to Limited Partners, which contained basic information on the state of the Master Fund including, but not limited to, the monthly rates of return of the Master Fund and Partnership, the *Ratings Distributions* of the portfolio, and the *Collateral Summary* of the collateral underlying the portfolio.  Defendants Cioffi, Tannin, and McGarrigal were involved in drafting the Monthly Profiles and at all times throughout the relevant time period were aware of their contents.

171.    In sum, the Management Defendants had specific fiduciary duties to disclose to Limited Partners information material to the Master Fund and its operations.  At the very least, the Management Defendants had fiduciary and contractual duties to ensure the accuracy of information provided to Limited Partners in year-end financials, during investor conference calls, and in Monthly Profiles.  As set forth herein, the Management Defendants wholly failed to properly discharge these duties and issued materials that misled Limited Partners as to virtually every aspect of the Master Fund's condition.

## 4.     The Management Defendants' Duty to Fairly Assess Fees and Profit Shares Paid to Them by the Fund

172.    The Management Defendants charged the Fund an Advisory Fee regardless of the performance of the Fund.  The Advisory Fee was equal to 2.0% per year of the balance of each Limited Partner's Capital Account and was paid in 1/12 increments as of the end of each calendar month (pro rata for periods of less than one month).  PPM at 37-38.  Because the Limited Partner's Capital Accounts reflected the value of their pro rata ownership of the Master Fund, the Advisory Fee was directly proportional to the NAV calculated by the Management Defendants.

173.    The PPM also provided that BSAM was allocated a Profit Share at the end of each relevant Accounting Period in an amount equal to 20% of net new income reflected in each Limited Partner's Capital Account, subject to a high water mark.  PPM at 47.  Again, the Profit Share was based on the NAV calculated by the Management Defendants.

174.    Pursuant to the Partnership Documents, the Fund paid BSAM's Advisory Fees and Profit Shares pro rata out of the Limited Partners' Capital Accounts.  Additionally, any expenses attributed to the operation of the Fund or the pro rata operational costs of the Master Fund, including fees paid to Walkers, were paid out of the Limited Partners Capital Accounts. PPM at 37-38, 47.

175.    On information and belief, defendant Cioffi split the Advisory Fees and Profit Shares equally with BSAM and paid defendants Tannin and McGarrigal, among others, from his half.  Because the Management Defendants' compensation was tied directly to asset valuations for which they themselves were responsible, the Management Defendants owed Limited Partners a heightened fiduciary duty to value assets and assess Advisory Fees and Profit Shares fairly, rather than inflating applicable values only to benefit themselves.

176.    The Advisory Fees and Profit Shares earned by BSAM were substantial.  For example, for the year ended December 31, 2006, the Advisory Fee totaled $5,001,025 and BSAM was allocated a Profit Share (or Performance Allocation) of $8,396,778.

177.    On information and belief, by 2006, BSAM was paying defendant Cioffi more than $10 million per year in total compensation.

**5.      The Management Defendants' Duty to Obtain Approvals for the Related-Party Transactions Involving the High-Grade Master Fund**

178.    As stated, the Management Defendants caused the Master Fund to invest in SPVs and Repackaging Vehicles that BSAM or other Bear Stearns entities arranged.  Because of the

possibility that the interests of the Master Fund and Bear Stearns would conflict, the PPM

recognized that BSAM, in its capacity as Investment Manager, owed a fiduciary duty to the Fund

in making investment decisions:

> The Partnership may invest in the securities of issuers affiliated with Bear Stearns
> or in which Bear Stearns has an equity or participation interest. The purchase,
> holding and sale of such investments by the Partnership may enhance the
> profitability of investments made by Bear Stearns or its affiliates. The General
> Partner has fiduciary responsibilities with respect to the Partnership and will make
> such investment decisions in a manner which is consistent with those
> responsibilities.[18]

179.    In addition to its fiduciary and contractual obligations with regard to selecting

investments, each time BSAM or the Management Defendants caused the Master Fund to

purchase securities issued by a SPV or Repackaging Vehicle developed by any Bear Stearns

entity, it was a *principal trade* under Section 206(3) of the Investment Advisers Act.  Thus, in

addition to its general fiduciary duties, the PPM acknowledged that in such cases BSAM was

required to obtain prior approvals for such transactions from the Independent Directors:

> Because the Investment Manager [BSAM] will serve as collateral manager of the
> Repackaging Vehicles, the purchase of the Repackaging Vehicle Junior Interests
> may be deemed to be a principal trade. [BSAM] will, therefore, make appropriate
> disclosure to, and obtain consent from, the members of the board of directors of
> the Master Fund who are not affiliated with [BSAM] prior to the investment. . . .[19]

180.    In other words, pursuant to the PPM's own procedure designed to satisfy the

Investment Advisers Act, the Management Defendants had the fiduciary responsibility to cause

the Independent Directors to review such transactions.  In addition, the Independent Directors

owed a fiduciary duty to the Limited Partners to meaningfully review the transactions.  These

various duties applied to any related transactions between the Master Fund and any Bear Stearns

entity.  As alleged herein, the Management Defendants and the Director Defendants completely

---

[18] PPM at 29-30.

[19] PPM at 29.

ignored these acknowledged responsibilities and dumped illiquid and ultimately valueless securities into the Master Fund in order to serve their own financial interests

**B.**     **Rights of Limited Partners**

181.    In addition to the fiduciary duties owed to each Limited Partner by the Management Defendants and Director Defendants under Delaware law and the Partnership Documents, each Limited Partner had a number of specific contractual rights under the Partnership Documents.

**1.**     **Each Limited Partner Had the Right to Rely on the Affiliated and Independent Directors to Oversee the High-Grade Master Fund**

182.    Pursuant to the Partnership Documents, the Master Fund had five Directors who were responsible for overseeing the Master Fund: the two Independent Director Defendants and the three Affiliated Director Defendants.  Even though the Directors delegated authority to make investment decisions to the Investment Manager and delegated responsibility for administration of the Master Fund to the Administrator, the Directors had ultimate authority over the Master Fund's operations.  PPM at 34-35.  The Limited Partners were entitled to rely on the Director Defendants to ensure that the Management Defendants were appropriately discharging their fiduciary and contractual duties to the Limited Partners.

183.    Moreover, the Limited Partners had the right to rely on the representation that any transactions between the Master Fund and any Bear Stearns affiliated entity would be (and were) reviewed and approved by Independent Directors of the Master Fund.  This approval process for related-party transactions was in lieu of notification to the Limited Partners under the "principal trades" provisions of the Investment Advisers Act and was required by the Partnership Documents.

2.      **Each Limited Partner Had the Right to Accurate and Complete Disclosures Regarding the Operation and Performance of the High-Grade Master Fund and the Fund**

184.    Each Limited Partner was entitled to disclosures from the Management Defendants regarding material changes to the business or financial condition of the Fund and Master Fund and to accept or reject changes to the Fund's or Master Fund's operations.

185.    According to the Partnership Documents, each Limited Partner had the right to periodically receive from BSAM "true and full information regarding the status of the business and financial condition of the Partnership and such other information regarding the affairs of the Fund as is just and reasonable."   Partnership Agreement at 27.   The Limited Partners were entitled to receive complete and accurate disclosures when the Management Defendants communicated, and were further entitled to receive prompt and accurate information concerning the performance of the Master Fund and the Fund.   The Partnership Documents also provided that the Limited Partners had the right to be notified and to determine whether to consent in writing before BSAM engaged in "any act that would make it impossible to carry on the ordinary business of the Partnership" or "possess Partnership Property for other than a proper Partnership purpose."  Partnership Agreement at 9.

186.    Finally, the PPM specifically provided that the Limited Partners were entitled to notification if the investment strategy materially changed:

> The Master Fund may engage in investment strategies and methods not described herein that the Investment Manager considers appropriate, provided, however, that the Limited Partners will receive advance notice of any material change in the Master Fund's overall strategy or approach.[20]

---

[20] PPM at 14.

187.    In sum, the Limited Partners had the right to full disclosure of facts regarding the Fund and the Master Fund if the Management Defendants intended to or did cause the Fund or Master Fund to engage in any activity inconsistent with their purposes.

## VI.    THE RISE AND FALL OF THE FUND

### A.    The Fund's Early Putative Returns

188.    From its launch in 2003 until the August 2006 PPM was issued, the Master Fund appeared to be an unqualified success.  According to the Monthly Profile distributed to the Limited Partners for August 2006, the Master Fund had positive returns in each of its first 35 months and had achieved a cumulative return of more than 35%.  Further, the Monthly Profiles reflected that the Master Fund's portfolio composition was typically at or near the 90% threshold for assets rated at least AAA/AA.  Neither the August 2006 Monthly Profile nor the August 2006 PPM gave any indication or mention of liquidity problems.

189.    The November 2006 Monthly Profile reflected continuing bullish returns.  It reported that consecutive positive growth had reached 38 months and that the Master Fund had returned approximately 46% cumulatively, attributing the continued growth in part to "stability in the credit markets."  The Monthly Profile did mention declines in the value of (RMBS) issued in 2006, but represented that the Master Fund had very limited long-exposure.

190.    The portrayal of positive results continued into February 2007.  The Monthly Profile for February 2007 reflected 41 consecutive positive monthly returns and represented that cumulative growth was over 52% for the lifetime of the Master Fund.  Moreover, the Monthly Profile listed the NAV of the Master Fund at more than $1.525 billion on total invested capital (actual capital from Limited Partner Subscriptions) of only $902 million.  In other words, NAV had purportedly grown more than *$600 million*.

191.    The Master Fund appeared to be achieving its returns with a steady diet of just the sort of highly rated low-risk assets the Management Defendants were purportedly experts at identifying.  The February Profile listed the *Ratings Distributions* of the Master Fund's assets as 90% at AA or above, with 10% below A, the precise breakdown provided for in the August 2006 PPM.

192.    In sum, as of the end of February 2007, it appeared as though BSAM and the Management Defendants' investment strategy was sound and their expertise in identifying assets priced attractively for high-returns versus credit risk was well-worth the Advisory Fees and Profit Shares paid by the Limited Partners.  BSAM's Advisory Fees and Profit Shares totaled approximately $13.4 million for calendar year 2006 alone.

193.    However, in truth (and as the Limited Partners would later learn) the positive performance information provided to the Limited Partners resulted from the Management Defendants' nearly constant practice throughout the life of the Master Fund of overvaluing assets and *smoothing* returns (the act of manipulating monthly returns to create the appearance of stability).  Moreover, by no later than the August 2006 PPM, and more likely as early as March 2006, the Management Defendants' systematic overvaluation of assets was creating a liquidity crisis so severe that it threatened to expose systematic mismanagement of the Fund and Master Fund.

194.    For example, in an email to defendant Tannin on September 17, 2006 concerning the Fund's liquidity problems, defendant Cioffi was already angling to close the fund to disguise its problems:

> What I was thinking was to build up 6 mos. of returns then send a letter to all the remaining investors and tell them we are closing the [Fund]. . . .

195.    Supported by a pattern of misrepresentations and non-disclosures, rather than appropriately valuing assets, the Management Defendants engaged in a series of schemes through which they attempted to hide the growing liquidity crisis.

**B.    Bear Stearns' Self-Dealing**

196.    Throughout the life of the Fund, from 2003 forward, the Bear Stearns Defendants consistently engaged in insider transactions, without regard to the independent director approval and requirements built into the Fund's governing documents.

197.    The Management Defendants failed to seek review and approval of many related-party transactions between the Master Fund and Bear Stearns entities as required by the Partnership Documents.   In so doing, the Management Defendants failed in their managerial, fiduciary, contractual, and legal obligations (under the Partnership Documents and the Investment Advisers Act) to protect the Limited Partners from potential self-dealing by BSAM and affiliated Bear Stearns entities.   Moreover, the Director Defendants (including the Independent Directors) breached their fiduciary duties of oversight when they failed to enforce the PPM's requirements regarding related-party transactions.

198.    As recognized by the PPM, potential conflicts of interest existed in the operation of the Fund and the Master Fund.   PPM at 26-31.   For example, the PPM indicated that the Master Fund would: (a) purchase securities from and through its prime broker BSSC; (b) rely on Bear Stearns' credit-risk management and pricing models; and, most importantly, (c) invest in structured finance securities issued by Repackaging Vehicles organized and managed by BSAM or other Bear Stearns entities.

199.    In exchange, BSAM, BSC, and other Bear Stearns entities would collect fees for brokerage services, commissions for trades, and fees for arranging and issuing these CDOs on top of the Advisory Fees and Profit Shares BSAM was already reaping.

200.    To comply with the Investment Advisers Act and to convince the Limited Partners that the Fund would be managed by prudent and responsible fiduciaries, the Management Defendants presented the following (false) assurances, among others, in the PPM regarding related-party transactions:

> [T]he Subscription Agreement of each Limited Partner provides that each Limited Partner consents and agrees that if any transaction, including any transaction effected between the Master Fund and the Investment Manager or its affiliates, is subject to the disclosure and consent requirements of Section 206(3) of the Advisers Act, such requirements will be satisfied with respect to the Master Fund and all Limited Partners *if disclosure is given to, and consent obtained from, the independent Master Fund Directors or such other advisory party.*[21]

201.    With regard to the Repackaging Vehicle Junior Interests into which the Management Defendants plunged an extraordinary amount of Master Fund and, therefore, the Fund's funds, the PPM promised:

> Because the Investment Manager will serve as collateral manager of the Repackaging Vehicles, the purchase of the Repackaging Vehicle Junior Interests may be deemed to be a principal trade. The *Investment Manager will, therefore, make appropriate disclosure to, and obtain consent from, the members of the board of directors of the Master Fund who are not affiliated with the Investment Manager prior to the investment by the Master Fund in Repackaging Vehicle Junior Interests.*[22]

202.    As with the other related-party transactions, the Management Defendants and the Independent Director Defendants failed to comply with either applicable law or the procedures promised to Limited Partners to ensure that the Management Defendants would honor their fiduciary and contractual obligations to not prefer and serve their own interests at the expense and to the detriment of Limited Partners and the Fund.

203.    As it turned out, the failure to obtain the required approvals for a substantial number of related-party transactions would become a major failure of the Management

---

[21] PPM at 29 (emphasis added).

[22] PPM at 29 (emphasis added).

Defendants central to the self-dealing and liquidity crisis that doomed the Master Fund.  If at any time the Independent Directors had meaningfully reviewed the numerous related-party transactions, they could have prevented or exposed a number of areas in which the Management Defendants mismanaged the Master Fund.

204.    According to a working draft of a chart of principal transactions prepared by BSAM Compliance during the summer of 2006, the Fund had engaged in more than 2,300 principal transactions since its inception less than three years earlier that required independent director approval prior to completion of such transactions.  Of the more than 2,300 transactions that required prior approval, 1,108 (or approximately 47%) of such transactions improperly were not approved prior to trade settlement as required by the Investment Advisors Act and the PPM, thus giving rise to over 1,100 separate violations of the Investment Advisors Act.

205.    Specifically, 78.95% of the transactions that required prior approval from by the Independent Directors were missing such approval in 2006.   Further, 58.66% of such transactions were missing the necessary approval in 2005, 29.73% were missing such approval in 2004, and 18% were missing such approval in 2003.

### 1.    The Management Defendants Failed to Obtain Required and Promised Approvals for a Multitude of Related-Party Transactions

206.    Despite the requirements of Section 203(3) of the Investment Advisers Act and the provisions of the PPM, from virtually the commencement of operations of the Fund and Master Fund, the Management Defendants failed to follow the procedures they had created and which were required for obtaining approvals for related-party transactions.  Indeed, by the date of the August 2006 PPM, a pattern had developed whereby hundreds, if not thousands, of related-party transactions had been completed without prior approval by the Independent

Directors or, with meaningless approvals based upon incomplete and, in many cases, late information.

207.   For example, on July 13, 2006, Jessica Borenkind (an assistant working for defendant Cioffi) emailed a letter to Tara Murphy (an unaffiliated director of the Master Fund who preceded defendants Lennon and Wilson-Clarke, on behalf of Ms. Pusateri) seeking approvals for 85 securities transactions with BS & Co. *that had already settled during the period from January 2006 through June 2006*. Ms. Murphy was an employee of PFPC International Ltd. (*PFPC*), a mutual fund advisor that provided independent directors for the Master Fund prior to Walkers.  From the beginning of the Master Fund, PFPC had provided a second independent director (Joan Kehoe) who resigned as a director in January 2006 due, on information and belief, to her concerns about BSAM's conduct that consistently violated the Investment Advisers Act and the Partnership Documents.

208.   This practice of obtaining meaningless approvals retroactively in connection with the Management Defendants' and the Independent Directors' supervision and administration of the Master Fund and the Fund was not an anomaly.  In fact, it was a pattern that had become progressively worse during the life of the Master Fund.  According to information compiled by the Massachusetts Secretary of State's Office, the Management Defendants caused the Master Fund to enter into 100 principal transactions in 2003 that were deemed to require prior approvals of the Independent Directors.  Of that number, 18% were executed without prior approval. In 2004, 29.73% of the 730 principal transactions were executed without prior approval.  The number rose to 58.66% out of 1,161 transactions and 78.95% of 342 transactions in 2005 and 2006, respectively.

209.    In total, from the commencement of fund operations until sometime in 2006, the Management Defendants caused the Master Fund to engage in at least 2,333 principal transactions with Bear Stearns entities.   Of those, only 47% were approved prior to the settlement date of the transaction.   As a result, almost half of the related-party transactions violated governing law and the Management Defendants' fiduciary and contractual obligations to Limited Partners. Of course, the Management Defendants earned fees on the inflated and unchecked putative value of the assets obtained in these transactions, as did other Bear Stearns entities.

210.    Moreover, from the inception of the Master Fund to 2006, the Management Defendants caused the Master Fund to enter into 224 transactions (nearly 10% of the total) where no approval was ever obtained, whether timely or retroactively.

211.    More significantly, even when approvals were obtained, either timely or retroactively, the Management Defendants did not provide enough information for the Independent Directors to meaningfully analyze the proposed transaction. Often the approval requests lacked the most basic information, including the names of the securities, notional amounts, settlement dates, and independent bids or asks (if any).

212.    Even when information was provided to the Independent Directors, it was insufficient to determine whether the proposed transactions were appropriate for the Master Fund.  For example, when Ms. Borenkind sought retroactive approval for 85 transactions in July 2006, she provided the Independent Directors with a spreadsheet that contained only the trade date, the transaction type (if the Master Fund was buying or selling), a nine digit number acting as the securities *name*, a word description amounting to a few abbreviations, the settlement date,

the price, and the total transaction amount.  None of this information could form the basis for anything more than a rubber-stamp approval.

213.    By the date of the August 2006 PPM, the Management Defendants were aware of the ongoing failure to obtain approvals.  In the summer of 2006, meetings were held between Barbara Keller (Chief Compliance Officer of BSAM), and BSAM employees working on the Master Fund concerning ongoing deficiencies in obtaining approvals for related-party transactions.  In fact, on August 9, 2006, defendant Cioffi sent an email to Ms. Pusateri acknowledging deficiencies in the system for obtaining approvals.

214.    Nevertheless, the Management Defendants caused the August 2006 PPM to be issued containing representations that BSAM would follow its procedures for review by the Independent Directors.  The procedures were not followed.

215.    In addition, the importance of independent approval of a principal or related-party transaction was pointedly summarized in a sworn declaration submitted by Simon Lowell Clayton Wicker in connection with the Master Fund's Chapter 15 bankruptcy proceedings before Judge Burton Lifland on September 21, 2007. Wicker, a partner of KPMG in the Cayman Islands, was appointed as joint provisional liquidator of the Master Fund.  In this capacity, Wicker swore that the Independent Directors of both Master Funds in the bankruptcy proceedings (the *Foreign Debtors* mentioned in the quote below) had, among other things, a "responsibility to review all Principal Transactions."  The funds:

> [r]egularly entered into a substantial number of securities-trading transactions (the "Principal Transactions") with entities affiliated with The Bear Stearns Companies, Inc. (collectively, "Bear Stearns"). Each Principal Transaction required the prior written approval of one of the two Independent Directors. Absent such approval, the Foreign Debtors were not authorized to proceed with any Principal Transaction.

64

216.    Mr. Wicker's sworn statements to Judge Lifland demonstrate that the Management Defendants knowingly entered into numerous impermissible transactions that were not at arm's-length and that the Independent Directors knew that they were responsible for approving such transactions, but failed to do so. The Management Defendants' and Independent Directors' wholesale disregard for the law and their contractual obligations to Limited Partners, as well as their duties to Limited Partners and the Fund, enabled the Management Defendants to elevate their interests above those of Limited Partners and the Fund and to saddle the Master Fund and the Fund with illiquid securities.

217.    Because of continued deficiencies in the approval process, Bear Stearns finally issued a moratorium in September 2006 that purportedly prevented the Master Fund from entering into any more transactions with Bear Stearns.  But the ban was cosmetic and toothless.

218.    On information and belief, the ban neither prevented the Management Defendants from continuing to cause the Master Fund to buy additional BSAM-issued securities nor attempted to unring the bell with respect to the hundreds of millions of dollars worth of Bear Stearns issued securities the Master Fund already owned.

219.    Nevertheless, the ban worried defendant McGarrigal because he saw it as isolating the Master Fund from a needed source of liquidity and a ready trading partner. On September 19, 2006, McGarrigal emailed defendants Cioffi and Tannin concerning the ban:

> Do we have an official mandate to terminate our relationship with Bear? This hurts our investors as it eliminates a repo counterparty (reducing liquidity) and eliminates a source of trading secondary CDOs. . . . Bear is #1 in MBAS and in the top 5 of CDO issuers. All bad for our investors. I think we should continue to work hard to put in place all necessary compliance procedures to allow [sic] to continue operating as we have to date.

Even though McGarrigal evidently felt it was harmful to investors, the prohibition was never disclosed to Limited Partners.

220.    In any case, related-party transactions continued between the Master Fund and other Bear Stearns entities, including Repackaging Vehicles arranged by the Management Defendants, and the problems obtaining approvals continued.  For example, 87 letters requesting approval were sent to the Independent Directors in March 2007 -- less than half complied with the new standards, and 21 were sent after the subject transactions had closed.

### 2.    The Independent Directors Were Not Truly Independent

221.    Even had the Management Defendants followed the protocol outlined in the PPM for obtaining approvals, BSAM had already violated the PPM by appointing Independent Directors who were independent in name only.

222.    Defendants Lennon and Walker-Clarke were appointed as the Independent Directors on or about the date of the 2006 PPM to replace Ms. Murphy, the lone director provided by PFPC after Ms. Kehoe resigned.  However, Walkers (which employed Lennon and Walker-Clarke) had a long history of providing services to Bear Stearns and its hedge funds. Walkers served as legal counsel to at least 16 Bear Stearns hedge funds that BSAM advised, and Walkers provided fund services for at least nine of BSAM's own funds.

223.    All told, during the during the relevant time period, the Independent Directors provided by Walkers approved at least 165 related-party transactions where the approval request was incomplete or submitted after the transaction had already occurred.  Even though they were putative experts in the hedge fund area, they did not raise any concerns about the process.  Thus, even had they been given the appropriate information, the Independent Directors would not have rejected any transactions and risked killing their employer's golden goose.

224.    Indeed, on information and belief, from the time of their appointment until the collapse of the Master Fund, defendants Lennon and Wilson-Clarke did not reject a single transaction between the Master Fund and any Bear Stearns entity or Repackaging Vehicle.

C.   **The Enhanced Fund is Formed to Conceal and Defray Liquidity Problems Within the Fund and the Master Fund**

225.   By March 2006, the Management Defendants had conceived of a new fund to alleviate and conceal liquidity problems they had created in the Master Fund and in the Fund. The new *enhanced leverage* fund would be marketed to existing Limited Partners and to new investors as an improved fund that would out-earn the Master Fund by using the same investment strategy but employing much greater leverage.

226.   The Management Defendants intended to create additional leverage through a new *master-feeder* structure, and adding a large financial institution as leverage counterparty between a new master fund (the High-Grade Structured Credit Strategies Enhanced Leverage Master Fund, or the *Enhanced Master Fund*), and its investors.

227.   In March 2006, the Management Defendants approached Barclays Bank Plc. (*Barclays*) to act as counterparty.  Barclays agreed to provide leverage to the fund and, what was then unknown to investors and Barclays, would be a source of much-needed liquidity.

228.   On August 1, 2006, the Management Defendants launched the Enhanced Fund in the Cayman Islands and created the Bear Stearns High-Grade Credit Strategies Enhanced Fund LP (the *Enhanced Fund*) as a Delaware limited partnership domestic feeder-fund.

229.   The Management Defendants promoted the Enhanced Master Fund as superior to the Fund because it would purportedly invest in the same highly-rated CDO classes and unrated Repackaging Vehicle Junior Interests, but would earn higher returns through increased use of leverage -- up to 27.5 times NAV.

230.   From the outset, the Management Defendants strongly encouraged Limited Partners to *exchange* or *roll over* their Partnership Interests for interests in the new Enhanced Master Partnership.  In fact, the Management Defendants even offered lower Advisory Fees and

Profit Shares for the Enhanced Master Fund as incentives for Limited Partners to move into the Enhanced Master Fund.

231.    The Management Defendants' plan to close the Master Fund without disclosing its failings depended upon their desperate effort to move investors into the Enhanced Master Fund.  In a September 17, 2006 email discussed above, defendant Cioffi emphasized the importance of getting Limited Partners to convert so the Management Defendants would not have to sell Fund assets, which he knew would expose their true value.

232.    Eventually, the Enhanced Master Fund received in-kind subscriptions from approximately 36% of Limited Partners and a corresponding percentage of the Master Fund's assets were transferred to comprise the assets of the Enhanced Master Fund.

233.    Like the Master Fund, the Enhanced Master Fund initially reported strong returns. Its February 2007 Monthly Profile reported positive growth in each of its first seven months of operation, and cumulative growth of 6.99%.

234.    However, even the new Enhanced Master Fund structure was apparently not enough to contain the growing but undisclosed liquidity problems with the Fund.  A month after the Enhanced Master Fund launched, the Management Defendants conceived of another vehicle that could be used to disguise problems with both Funds: Everquest Financial Ltd. (*Everquest*). As discussed below, Everquest was created in an audacious attempt to offload the most illiquid CDO assets from the balance sheets of Bear Stearns, the Master Funds and the Enhanced Master Fund.

**D.    The Management Defendants Create Everquest as an Additional Mechanism to Conceal Liquidity Problems at the Fund and the Master Fund**

235.    The Management Defendants caused BSAM to create Everquest in the Cayman Islands in September 2006.  Everquest was a specialty financing company which, like the Fund

and the Master Fund, had purportedly been formed for the purpose of investing in structured finance securities.  BSAM owned 67% of Everquest and served as co-manager.  Defendant Cioffi served as the Chief Executive Officer of Everquest.

236.    Unlike the Master and Enhanced Master Funds, Everquest was not a hedge fund populated by limited partners through feeder-funds.  Rather, Everquest was a company that would ostensibly invest in structured finance securities and in turn issue its shares to the public through an initial public offering to be underwritten by Bear Stearns.

237.    Soon after Everquest was formed, the Master Fund and Enhanced Master Fund sold approximately $555 million worth of their worst CDO assets (most of which were previously owned through Parapet, a BSAM Repackaging Vehicle) to Everquest in exchange for $150 million in cash and 16 million shares of Everquest, purportedly valued at $25 per share.

238.    Pursuant to a registration statement filed with the SEC on May 9, 2007, the Management Defendants planned to raise desperately needed liquidity through an initial public offering of Everquest shares.

239.    However, unbeknownst to the Limited Partners and undisclosed by the Management Defendants, the Everquest transaction and proposed IPO was another scheme through which the Management Defendants intended to hide the Master Fund's financial problems. The Management Defendants believed they could dump the assets on unsuspecting investors through the IPO, and the Master Fund would own shares that would have value as long as the investing public did not realize that Everquest's assets were worthless.

### E.    The Management Defendants' Misconduct and Breaches Devastated the Business and Financial Condition of the Fund and the Master Fund

240.    As described above, the Master Fund had apparently experienced steady growth from its inception into the fall of 2006, by which time it had cumulative gains of approximately

35%, purportedly through a diet of well-selected AAA/AA CDO securities. Moreover, its purported success had led to the creation of the Enhanced Fund, which promised even greater returns.

241.    However, even as the positive reported returns continued into the first few months of 2007, by January 2007, the Limited Partners were becoming skittish about the perceived weakening of the credit markets.  Increasingly, articles were appearing in the financial press that the market for CDOs, particularly those backed by subprime mortgages, was weakening due to increased defaults on the underlying collateral.

242.    The Management Defendants, nevertheless, reassured Limited Partners orally and in the Monthly Profiles that the Master Fund's portfolio was still primarily AAA/AA, had limited exposure to subprime debt, and was adequately hedged.  However, at the time, the Management Defendants had full knowledge that the Master Fund's investments were in crisis.

1.    **The Management Defendants Falsely Assure Investors that the Fund and the Master Fund Would Benefit from the Deteriorating Subprime Market**

243.    On January 18, 2007, amidst the growing market-wide concern regarding structured finance securities backed by subprime debt, defendants Cioffi and Tannin held an investor conference call.  During that call, Cioffi emphasized that, far from being troublesome, widening spreads in subprime debt would be favorable to the Master Fund's hedges because "we have proper hedges in place. We are short a significant amount of the subprime space."

244.    Defendant Tannin echoed Cioffi's statements that the Master Fund would benefit from a deteriorating market: "[T]he bottom line on our exposure is this, if the market were to continue to deteriorate, and spreads were to widen, we would do very well . . . . We have a very nice short position."

245.    The false statements by defendants Cioffi and Tannin to the Limited Partners concerning the Master Fund's hedges were reinforced by the February 2007 Monthly Profile. According to the Monthly Profile, the Master Fund's hedges had realized and unrealized returns of approximately +5.3% for February. This was of particular significance to Limited Partners because, while the February 2007 Monthly Profile still reported positive returns for the month, the gains were for the first time attributed only to hedges rather than the value of long-assets, which had lost "approximately 4.4%" (for a net loss of about 0.06%).   In the February 2007 Monthly Profile, the Management Defendants blamed volatility in the subprime CDO markets for the decrease in long-asset value:

> February was a volatile month in the structured credit markets, particularly in any credit associated with subprime mortgages. Over the course of February there were a number of failures in subprime originators as well as historically high levels of early delinquencies in subprime securitizations originated in 2006. The mass media carried many stories about potential disasters in the subprime market. The result of this was a rapid and severe widening in the subprime credit derivatives index which in turn led to a broad based widening of mortgage-backed assets up and down the capital structure. The Fund was well positioned for this spread widening because of the hedges put in place over the second half of 2006.

246.    The Limited Partners' concerns were mollified by the Management Defendants' assurances that the Master Fund was adequately hedged.  Moreover, the Monthly Profiles stated that the Master Fund's exposure to subprime debt was only approximately 6.0% of assets.

247.    However, in an email dated March 1, 2007, Cioffi told BSAM managers not to "talk about [the February results] to anyone or I'll shoot you . . . I can't believe anything has been this bad."

248.    In March 2007, the Monthly Profile stated that the Master Fund returned -3.71% (the first negative month in its lifetime). The Management Defendants blamed the results on overreaction in the subprime market, and again falsely assured the Limited Partners that the Master Fund remained well positioned due to its effective credit monitoring and hedging:

Performance suffered in March for two reasons: first, continued weakness in CDOs with exposure to subprime collateral caused additional mark downs in our long asset exposure; second, our short positions rose in price as many investors who were short the subprime credit default index covered their positions. We have attempted to add quality positions to the portfolio, monitor the credit performance of these positions over time, and have looked to sell positions at the first sign of credit deterioration. The widening in spreads we experienced in February and March was the result of fear of an unprecedented increase in cumulative losses these portfolios will suffer over time, not an actual deterioration in credit on the underlying bonds in our portfolio. This loss in structured credit confidence is what has generated the spread widening. The price action on the short side of our portfolio was driven by technicals rather than credit fundamentals as many macro short sellers covered positions in March to lock in profits. Thus, while the actual credit environment continued to deteriorate, the credit derivative indices rose with short covering. Our positions are based on credit fundamentals. . . . We have acted quickly to hedge or sell assets where we see that potential credit losses are unacceptable.

249.    Again, the March 2007 Monthly Profile listed the Master Fund's exposure to subprime debt at approximately 6.0% of assets.

250.    Unfortunately for the Limited Partners, the truth regarding the Master Fund's hedges and overall financial condition was far different from the Management Defendants' falsely optimistic portrayals.

251.    As early as January 2007, defendant Cioffi had recognized shortcomings in the Master Fund's hedging strategy.  For example, in an internal email in January 2007, Cioffi expressed concern that lack of liquidity in certain credit default swap markets could ruin the hedges.

252.    By mid-March, defendant Tannin was equally concerned about the Master Fund's hedges when, in an email to defendant McGarrigal with the subject-line "?????????????????", Tannin asked "is Ralph doing what he should be doing now [with respect to hedges]?"

253.    Moreover, betraying his positive public statements to investors and in the Monthly Profiles regarding the general prospects of the Master Fund, by mid-March 2007 Cioffi was panicked about the state of the subprime CDO market in general.  In fact, Cioffi revealed the

72

true extent of his concern in a March 15, 2007 internal email to a member of the BSAM investment team:

> I'm fearful of these markets. Matt [Tannin] said it's either a melt down or the greatest buying opportunity ever. I'm leaning more towards the former. As we discussed it may not be a meltdown for the general economy but in our world it will be. Wall Street will be hammered with law suits. Dealers will lose millions and the cdo business will not be the same for years.

254.   As the Limited Partners would later learn, the Management Defendants had cause for concern. In the Monthly Profiles for February 2007 and March 2007, the Management Defendants had massively understated the Master Fund's exposure to subprime debt. According to a BSAM internal risk-exposure report (*CDO Report*) on or about April 19, 2007, the truth was that by March 2007 the Master Fund's overall collateral including all asset classes was approximately "60% subprime," a staggering number that blatantly violated the investment parameters in the PPM. Yet, this information was concealed from the Limited Partners as the Management Defendants knew that increased requests for redemptions would quickly topple their irresponsibly leveraged house of cards that had illiquid and unsalable Bear Stearns-issued toxic equity tranche CDO securities at the core of its rotting foundation.

255.   As was their pattern and practice, the Management Defendants did not disclose to the Limited Partners the true exposure to subprime debt nor was it ascertainable from the Monthly Profiles. Instead, the Monthly Profiles listed subprime exposure as approximately 6%, which was just direct exposure. Indirect subprime exposure through CDOs and CDOs-Squared was listed under the catch-all asset classification *ABS* (Asset Backed Securities), which was 81% and 86% of collateral in February 2007 and March 2007, respectively.  In other words, it was impossible from the Monthly Profiles to ascertain the true exposure to subprime debt or that any of the ABS collateral actually included subprime mortgages.

256.     To make matters even worse, as they had through the life of the Master Fund, the Monthly Profiles misleadingly continued to report that the Master Fund's asset composition still was in compliance with the PPM's requirements that the portfolio be comprised of approximately 90% carefully selected securities with a credit rating of AAA/AA.

### 2.     The Management Defendants Fight Massive Redemptions

257.     Despite the Management Defendants' reassurances, due to increasing fears about the impact of subprime mortgage defaults on the CDO market, the Management Defendants began to receive increased redemption requests during the spring of 2007 and became aware that more and more of the Limited Partners were contemplating making redemptions.

258.     As discussed herein, most securities issued by CDOs are illiquid investments that typically cannot be sold quickly at or close to their *market price* to raise capital. The Management Defendants knew that the Master Fund's CDO positions, concentrated as they were in the virtually valueless equity classes of Bear Stearns' structured finance vehicles, did not have the liquidity necessary to meet even marginal redemption requests. More importantly, the Management Defendants were concerned that knowledge of large-scale redemptions would panic the other Limited Partners and cause a run on the Master Fund that would hasten its already seemingly inevitable failure.

259.     Thus, in March and April 2007, the Management Defendants engaged in a campaign to prevent the Limited Partners from submitting redemption requests. For example, on March 7, 2007, defendant Tannin told one investor that he personally was making an additional investment in the Fund to take advantage of favorable market conditions (which he knew to be unfavorable) and, rather than redeem, encouraged the investor to do the same.

260.     In addition, from about March 15 to March 18, 2007, Tannin told BS & Co. salespeople to tell investors that he was increasing his stake in the Fund.

261.    Similarly, on March 22, 2007, defendant Cioffi encouraged a BS & Co. salesperson to confront redemption requests by an investor with a suggestion that the investor should increase its investment in the Fund.  BS & Co. went along even though all of the Corporate Defendants knew the true state of the Master Fund's and the Fund's lagging performance.

262.    Needless to say, Cioffi and Tannin never had any intention to increase their personal exposure to the Master Fund.  Indeed, on or about March 23, 2007, Cioffi secretly redeemed $2 million of his interests in the Enhanced Fund.  By this point, Cioffi and Tannin were well aware of the catastrophic state of the Fund.

263.    For example, on April 19, 2007, Tannin reviewed a credit model that showed increasing losses on subprime linked assets.  Tannin agreed with the model's assignment and, in an email to Cioffi and McGarrigal on April 22, 2007, explained that the subprime market (and by extension the Master Fund) was finished:

> [T]he subprime market looks pretty damned ugly . . . [I]f we believe [the CDO Report] is ANYWHERE CLOSE to accurate I think we should close the funds now. The reason for this is that if the [CDO Report] is correct then the entire subprime market is toast . . . there is simply no way for us to make money – ever.

Tannin concluded that "caution would lead us to conclude the [CDO Report] is right and we're in bad shape."

264.    Defendant McGarrigal agreed with the assessment in a reply email and suggested that the best course was to create some form of a liquidating trust for the funds.

265.    Despite their full knowledge of the true state of the Master Fund, which led to suggestions to close down the Fund, the Management Defendants continued to indicate to the Limited Partners that all was well.  For example, on April 25, 2007, Cioffi and Tannin held a conference call with investors during which they encouraged the Limited Partners to increase

their stakes in the Fund.  During the call, and in an obviously indefensible about-face from internal panicked suggestions to close the Fund just three days earlier, Cioffi and Tannin dismissed the negative February and March 2007 returns and assured investors that the Master Fund was healthy and ready to take advantage of negative overreaction in the structured finance market:

> [W]e feel that we're in a position to do exactly what we've done all along and that the opportunities now, I mean, we were again quite cautious in 2006 and even 2005 because, on a risk-adjusted basis, it was not time to really take on significant amounts of risk. *Now is the time to do it*. So the fact that we've been so cautious in the prior periods means that we have the capacity and the flexibility to take advantage of spreads that are simply irrational. So, from a portfolio construction and from a market view, *we're quite comfortable with where we sit*. (Emphasis added.)

266.    During the call, Cioffi also addressed the concerns of the Limited Partners regarding swirling rumors of increased redemptions, but he did not to disclose to the Limited Partners the true volume of the requests:

> Obviously, the big question we've been getting from a number of investors are how do we look on a redemption subscription basis. The next big redemption date would be June 30th and, as of now, I believe we only have a couple million of redemptions for the June 30 date. So far we've gotten reasonable amounts of subscriptions . . . I believe we have about 45 million in subscriptions and 25 of that is from Bear Stearns.

In fact, by the April 25, 2007 call, defendants Cioffi and Tannin were aware that there were already tens of millions of pending redemption requests, including one for more than $50 million.  Moreover, additional subscriptions were far less than the $45 million quoted by Cioffi.

### 3.    The Fund 2006 Audit Report for the Fund Describes Bear Stearns' Self-Dealing

267.    On April 24, 2007, the Audit Report and Schedules for the Fund for year-end 2006 was issued. The report indicated, among other things, that approximately $616 million of the Master Fund's assets (approximately 70% of its NAV) were values assigned by the

Management Defendants that were materially different from what they would have been if market prices had been available.

268.    The 2006 Audit Report further indicated that by December 31, 2006, $751 million of the Master Funds' net assets were securities issued by Bear Stearns entities -- a staggering 81.96% of total assets.

269.    In addition, the Schedule of Investments provided line-items for more than *$2.2 trillion* worth of securities (gross ownership due to leverage) not identified by name in the Schedules.  For example, the Schedule provided that the Master Fund owned $529 million in *Asset Backed Securities*, and contained line items listing, among other things, the names of the Asset Backed Securities. But it listed $187 million (or 20.87%) under *Other Asset Backed Securities*.  It similarly listed $221 million of *Other Collaterized Loan Obligations Securities*, which was more than 60% of that asset class, and approximately $900 million of *Other Collateral Mortgage Obligation Securities*, which was approximately 80% of that asset class.

270.    Not surprisingly, the Schedule provided that the largest single asset class was CDOs, which consisted of approximately *$3.7 billion* of the Master Fund's gross assets, more than three times the next-largest asset class.  Of this total, the schedule listed more than *$1.19 trillion* as *Other Collaterized Debt Obligations Securities*.  In other words, nearly one-third of the investments in the Master Fund's largest asset class were not identified.

### 4.    The Truth Becomes Known

271.    Despite continued positive representations from the Management Defendants throughout April 2007 that the Master Fund was strong and its hedges working, the Management Defendants knew full well that the April 2007 returns were going to be a disaster, and as Tannin conceded in his April 22, 2007 email, the subprime market was "*toast*."

272.   Nevertheless, during the April 25 investor conference call, Cioffi gamely offered intra-month estimates for April stating that the Master Fund would lose only 0.06% and the Enhanced Master Fund only 0.07%.   Typically, the Management Defendants and the Bear Stearns entities computed the NAV and month-to-date return of the Master Fund daily but only provided preliminary estimates a few weeks after month-end.   Defendant Cioffi's intra-month estimates were at the time an unknown testament to his desperation and, as it would later become clear, were knowingly understated.

273.   Despite the Management Defendants' best efforts to perpetuate their false portrayals of the vitality and future prospects of the Master Fund and Fund, the truth began to emerge in May.   In a *Business Week* article published on May 11, 2007, the Everquest IPO was correctly identified as an attempt by BSAM to dump its most underperforming "assets" on the investing public:

> Never underestimate the ability of a Wall Street investment firm to find a new way to pawn off risky assets onto retail investors. The latest example? The initial public offering for Everquest Financial.

274.   Soon after, in an email to the Limited Partners on May 16, 2007, April 2007 losses were adjusted upwards to 1.78% and 6.75% for the Master Fund and Enhanced Fund, respectively.   Unbeknownst to investors, this was only the tip of the iceberg that Cioffi and Tannin were still intent on obscuring.

275.   By late May 2007, the Management Defendants were confronted with the long-anticipated final failure of the Master and Enhanced Master Funds, and the Everquest scheme to dump the worst assets on the investing public through the planned IPO had been exposed.   At this point, the Management Defendants and BSC, along with BSC's Co-President and Co-Chief Operating Officer Warren Spector, concocted one last scheme to rescue themselves: sell the Master and Enhanced Master Funds to a private buyer: leading private equity partnership

Cerberus Capital Partners, LP (*Cerberus*).  In a May 26, 2007 email to Cioffi and McGarrigal, Tannin mentions guidance they had received from Spector regarding the presentation to Cerberus, reinforcing the fact that BSC clearly knew of the Master Fund's problems.  In spite of Spector's participation, when Cerberus ultimately declined to buy the funds, the scheme collapsed and it appeared as if the Master Fund's true condition would finally become public to the Limited Partners.  However, defendant Cioffi was defiant until the end.  On May 31, 2007, as the official April 2007 returns were about to be released, a desperate Cioffi met with BSAM's pricing committee in an effort to gain permission to adjust some asset valuations upwards.  When Cioffi was unable to present evidence to support his desired valuations, the committee rejected his request and, in an email to a committee member, Cioffi conceded that it was "all academic anyway" because the April 2007 results were "***doomsday***."

276.   Nevertheless, defendants Cioffi and Tannin were still resistant to releasing the true results to investors. In an email after the pricing committee meeting on May 31, 2007, Tannin asked Cioffi whether investors should be given "the larger down April," meaning the final figure.  Cioffi responded that they should discuss it on the phone rather than by email.

277.   Finally, on June 8, 2007, the true April 2007 results were released to Limited Partners.  Disastrously, the Master Fund had lost 5.09% in April 2007 alone and its year-to-date return was -6.24%.  The Limited Partners were understandably shocked.  A mere two months before, in the February Monthly Profile, the year-to-date return had been reported as +2.54%. More incredibly, it was reported that the Enhanced Master Fund had lost more that 19% in April alone.

278.    Also on June 8, 2007, the Management Defendants finally disclosed to the Limited Partners that the Master Fund was inundated with redemption requests it could not meet. The Management Defendants suspended the Limited Partners' rights to redeem.

279.    On June 18, 2007, the SEC served document requests upon BSC, seeking a broad production of documents relating to the Fund and the Master Fund, among other things.

280.    Unable to sustain their investment, hedging, and valuation shell game any longer, the grim truth of the Master Fund's and the Fund's abysmal performance and liquidity crisis emerged.  On June 22, 2007, BSC announced it would provide $3.2 billion in secured financing in an attempt to stabilize the Master Fund.  Far from magnanimous, it was Bear Stearns' last-ditch effort to save its vaunted reputation with investors.  The same day, Merrill Lynch seized and sold $800 million of bonds being used as collateral for loans made to the Funds. Seizures from other lenders, including JPMorgan, followed and the bail out plan was later withdrawn.

281.    On June 25, 2007, Everquest withdrew its Registration Statement in connection with its proposed IPO.  The deal was dead and the Master Fund and Enhanced Master Fund were left with worthless shares of Everquest, which, as discussed below, contained the worst toxic classes of BSAM-issued CDO securities.

**5.      Defendants Are Forced to Admit That the Fund and the Master Fund are Worthless**

282.    On July 18, 2007, the Master Fund's collapse was complete. On that day, BSC sent a letter to the Limited Partners informing them that there was "very little value left for the investors in the High-Grade Fund as of June 30, 2007" and that "[i]n light of these returns, we will seek an orderly wind-down of the Funds over time."  The Master Fund was insolvent and nearly $1 billion of the Limited Partners' capital had evaporated.

283.    The letter stated:

Dear Client of Bear, Stearns & Co. Inc.:

Let me take this opportunity to provide you with an update on the status of the High-Grade Structured Credit Strategies and High-Grade Structured Credit Strategies Enhanced Leveraged Funds managed by Bear Stearns Asset Management.

A team at BSAM has been working diligently to calculate the 2007 month-end performance for both May and June for the funds. This process has been much more time-consuming than in prior months due to increasingly difficult market conditions.

As you know, in early June, the Funds were faced with investor redemption requests and margin calls that they were unable to meet. The Funds sold assets in an attempt to raise liquidity, but were unable to generate sufficient cash to meet the outstanding margin obligations.

As a result, counterparties moved to seize collateral or otherwise terminate financing arrangements they had with the Funds. During June, the Funds experienced significant declines in the value of their assets resulting in losses of net asset value.

* * *

Fund managers and account executives have been informing the Funds' investors of the significant deterioration in performance for May and June.

The preliminary estimates show there is effectively no value left for the investors in the Enhanced Leverage Fund and very little value left for the investors in the High-Grade Fund as of June 30, 2007. In light of these returns, we will seek an orderly wind-down of the Funds over time.

284.    In a final attempt to save its reputation, BSC's letter also conceded that investor confidence in BSAM had been seriously impaired, and that it had restructured its deeply flawed risk management function and instituted additional oversight:

In the past weeks Bear Stearns has taken action to restore investor confidence in BSAM. On June 29th, we announced that Jeff Lane was appointed chairman and chief executive officer of BSAM. Tom Marano, head of Bear Stearns' mortgage department, has been assigned to BSAM to aid in achieving orderly sales of the Funds' assets.

The risk management function at BSAM has been restructured so that it will now report up to Mike Alix, Bear Stearns' chief risk officer, creating an additional layer of oversight. Mike Winchell, former head of risk management for Bear

Stearns and most recently with Bear Wagner, has been engaged to consult with BSAM with regard to its hedge fund risk management function.

(Emphasis added.)

285.    The Fund's collapse was front-page news in virtually every financial publication in the world.  The financial press, financial institutions, and investors immediately speculated that it would, as Cioffi predicted in his internal March 2007 email, sound the death knell for the market for CDOs that were by then ubiquitous in the portfolios of major financial institutions on Wall Street.

286.    On August 5, 2007, it was announced that Mr. Spector had been sacked, with BSC acknowledging that "[i]n light of recent events concerning BSAM's High Grade and Enhanced Leverage funds, we have determined to make changes in our leadership structure."

287.    In an August 6, 2007 article concerning Mr. Spector's departure, entitled "A Top Official at Bear Stearns Ousted," THE NEW YORK Times observed that "the abrupt tightening of the credit markets recently has hit Bear Stearns particularly hard. In many ways *it was a crisis that Bear, with its long expertise in bonds, structured products and in particular mortgage-backed securities, should have seen coming*." (Emphasis added).

## VII.    THE MANAGEMENT DEFENDANTS BREACHED THEIR DUTIES

288.    After the Master Fund so rapidly collapsed in July 2007, taking with it approximately $925 million of the Limited Partner's investments and nearly $10 billion in gross assets, and setting off a global credit crisis that would cause billions of dollars in write-downs by the worlds' biggest banks, the question throughout global capital markets was: "What went wrong?"

289.    The financial community and the financial media immediately pointed to the near catastrophic failure of the subprime mortgage markets resulting from falling housing prices and

increased defaults.  However, what became clear to investors and the financial industry in the ensuing months is that almost from the beginning of the Master Fund, and certainly by the beginning of August 2006, the Management Defendants had engaged in a systematic pattern of self-dealing and mismanagement that virtually assured that the highly-leveraged Master Fund would collapse in the face of any adverse market conditions and its owners (the feeder-fund investors, including the Limited Partners) would lose their entire investments.

290.   As was subsequently revealed, the Master Fund was facing nearly constant liquidity concerns beginning no later than mid-2006. The Management Defendants had abandoned the investment edicts of the PPM that required 90% investment in high-grade CDO securities identified by careful credit analysis.  Moreover, in 2006, the Management Defendants began to make large bets on subprime mortgage-backed debt while, at the same time, engaging in a pattern of using manager marks to overvalue investments in illiquid CDO securities.  These unduly risky strategies, along with the overuse of leverage and failure to maintain adequate cash reserves, caused cash shortages that ultimately destroyed the Partnership.

291.   The Management Defendants were able to engage in a long pattern of undiscovered grossly negligent mismanagement because they had long been permitted to effectuate non-arms length related-party transactions between the Master Fund and BSAM and other Bear Stearns entities and affiliates without meaningful review from the "Independent Directors" (Lennon and Wilson-Clarke).  The Director Defendants and the Bear Stearns affiliates had long given the Management Defendants almost limitless freedom in exchange for revenues for BSAM.  The collective mismanagement enabled by the lack of meaningful supervision had long-weakened the Master Fund to the point that, when the market for subprime CDOs fell apart

and the Management Defendants' promised hedging transactions were nowhere to be found, it all collapsed.

### A.   The Management Defendants Deliberately Abandoned the Stated Fund Investment Strategy

292.   From the beginning, the stated investment strategy of the Master Fund was to achieve returns above LIBOR through the Management Defendants' careful construction of a portfolio of structured finance assets that were rated 90% AA or above.  The investment strategy was reinforced in the *Ratings Distributions* section of the Monthly Profiles sent to Interest Holders that routinely reported the Master Fund's assets as 90% at AA or above.  For example, as discussed in Section V.A, the February 2007 Monthly Profile listed the Master Fund's assets at exactly 90% AA or above, and the March 2007 Monthly profile listed the assets at 94% AA or better.

293.   As it turns out, by at least the beginning of 2006, and likely much earlier, the Management Defendants had secretly caused the Master Fund to abandon this strategy in favor of heavy bets on high-risk securities of CDOs and CDOs-Squared.  By at least August 2006, the Master Fund was consistently holding the majority of its investments in securities well below the 90% AAA/AA threshold.

294.   In fact, by late 2006, the Master Fund's portfolio was comprised of approximately 35% CDOs-Squared that combined highly-rated CDO tranches with junk or unrated CDO securities to create investments with a combined default risk unworthy of a true AAA/AA rating. In fact, defendant Cioffi acknowledged in an internal email that the CDOs-Squared held by the Master Fund "*were not really AAA*" because of the default risk of the underlying collateral.

295.   Moreover, in addition to increasingly and misleadingly allowing the portfolio composition to drop well below 90% AAA/AA, by August 2004, the Management Defendants

had all but abandoned the fiduciary and contractual obligations to perform thorough credit-analysis of potential investments in favor of pure volume purchases. In fact, by mid-2006, Cioffi had become the central character in the CDO market, using leverage to buy more than $30 billion in CDOs for the Master and Enhanced Master Funds.

296.    Thus, if it ever really existed, the vaunted expertise of the Management Defendants in identifying attractively priced securities versus credit-risk was cast aside by the Management Defendants to cause the Master Fund to make nearly indiscriminate leveraged purchases of massive amounts of securities issued by CDOs and CDOs-Squared, most of which were formed and/or managed by Bear Stearns entities.

297.    Needless to say, the Management Defendants did not disclose their wholesale breach of the PPM's investment guidelines, and when they did cause information to be released to the Limited Partners, it was misleading. For example, as discussed above, it was impossible to ascertain from the *Ratings Distribution* set forth in the Monthly Profiles that the Master Fund had made long-bets on junk, unrated, and illiquid securities issued by CDOs and CDOs-Squared.

**B.    The Management Defendants Made Grossly Negligent Bets on Subprime Mortgages**

298.    By early 2006, it had become clear to the Management Defendants that they could not maintain the early *successe*s achieved by the Master Fund by following the strategy promised to the Limited Partners in the PPM. As discussed herein, throughout the Master Fund's operation, the Management Defendants had been using manager marks to inflate the value of assets and to *smooth* returns. This was especially true in connection with the Management Defendants' purchase of Repackaging Vehicle Junior Interests from Bear-sponsored structured investment vehicles.

299.    The inflated manager marks, while increasing fees for BSAM and the Management Defendants, forced the Management Defendants to take irresponsible and misguided steps to portray positive returns.   Moreover, defendant Cioffi's almost insatiable appetite for lightly traded CDOs was driving down yields.  As it became increasingly difficult for the Management Defendants to generate returns, they ignored their fiduciary and contractual obligations to monitor credit-risk by plunging even deeper into equity classes of Bear-sponsored CDOs backed by subprime mortgages to achieve higher returns.   Thus, the Management Defendants generated fees for themselves on both sides of numerous transactions that left the Master Fund holding illiquid and immovable toxic trash.

300.    As the public is now painfully aware, subprime mortgages were home loans given to potential borrowers with poor credit ratings or limited credit histories.  The mortgages carried a greater risk of default due to the aforementioned credit risk characteristics and delinquent or non-existent underwriting undertaken with regard to the typical subprime borrower.

301.    With their higher yields (interest rates), subprime mortgages appeared golden to CDO arrangers.  They could gain exposure to higher yields and still spread the risk by bundling the loans into CDOs along with hundreds or even thousands of other subprime mortgages. Driven in part by the surge of CDOs containing these risky loans, in 2004 and 2005 the U.S. was in the midst of an almost unprecedented housing boom.  CDO arrangers bet that the level of defaults would remain low because borrowers who fell behind could easily sell or refinance into loans with better terms.

302.    By 2006, subprime loans were exploding.  By this time, subprime mortgages made up about 20% of all new mortgages, up from 2.5% in 1998.  Due to Bear Stearns' extensive mortgage background, the Management Defendants were uniquely aware of larger yields offered

by equity securities issued by CDOs backed by subprime debt. By August 2004, the Management Defendants had increasingly chased higher returns by aggressively purchasing CDOs that issued securities backed by subprime debt.

303. Moreover, Bear Stearns had enthusiastically expanded its own efforts into arranging and managing vehicles that issued securities backed by these high-risk mortgages. It seemed like a natural fit. Bear Stearns was one of the largest underwriters of mortgage bonds in the United States, and it was a leader in the structured finance securities market. Beginning in mid-2006 at the latest, the Master Fund was used as a willing purchaser of subprime CDO securities issued by Bear Stearns and BSAM.

304. However, even during the housing boom, the Management Defendants were well aware (yet concealed) that the Master Fund's investments in subprime debt violated their own investment guidelines in the PPM, which required them to carefully evaluate credit-risk and focus only on underlying collateral with stable likelihood of re-payment, which is why they concealed it.

305. The Management Defendants' pattern of non-disclosure of the Master Fund's actual subprime exposure began from the outset. In its AIMA Questionnaire distributed to the Limited Partners, BSAM stated that its general practice was to have no more than one-third of the Master Fund's assets in any single asset class. At the time the Questionnaire was distributed, the Management Defendants knew that the Master Fund's exposure to subprime backed assets was greater than one-third. Nevertheless, the Management Defendants caused the August 2006 PPM to be issued, and this core Partnership Document continued to represent that the focus of the Master Fund's investment strategy would be senior investment-grade securities.

306.    Moreover, the Management Defendants repeatedly caused Monthly Profiles to be provided to the Limited Partners that understated the Master Fund's subprime exposure by as much as 90%.  In Monthly Profiles provided to the Limited Partners between August 2006 and March 2007, the Collateral Summary section routinely listed the exposure to subprime residential mortgage backed securities at around 6%.  For example, the February 2007 Monthly Profile and the March 2007 Monthly Profile listed exposure to subprime RMBS at 6.1% and 6.0%, respectively.  Misleadingly, these numbers only reflected exposure to subprime debt through direct investments -- the Management Defendants had indirect exposure through the more complex CDOs and CDOs-Squared in the catch-all *Asset Backed Securities* category, which covered more than 80% of total assets.

307.    The truth was far different. In fact, the Management Defendants had bet so heavily on subprime backed CDO securities that, by December 31, 2006, BSAM was the third largest manager of CDOs backed by subprime mortgages in the world, and the Master Fund was one of BSAM's largest customers.

308.    In fact, the Master Fund's portfolio of subprime-backed CDO securities was so large that defendant Tannin himself began to get uneasy.  For example, in a February 5, 2007 email to defendant McGarrigal, Tannin expressed his concern about defendant Cioffi's increased appetite for subprime CDOs, stating: "*Unbelievable, he is unable to restrain himself*."

309.    Nevertheless, the Management Defendants' subprime feeding frenzy continued. According to the April 2007 CDO Report, by March 2007 the Master Fund collateral was approximately "60% subprime."

310.    By the end of 2006, the massive leverage and high-risk asset composition of the Master Fund virtually assured it would implode if the market for CDOs decreased or the housing

boom subsided and subprime defaults increased -- as the Management Defendants already knew was happening. The Management Defendants, however, never disclosed to the Limited Partners that they had abandoned the investment guidelines of the August 2006 PMM and their obligations to the Limited Partners to avoid high-risk CDOs like those backed by subprime exposure. Even worse, the overwhelming majority of the Master Fund's exposure to these CDOs was through purchases of illiquid equity-class securities, for which there was no secondary market. Despite these plain risks, the Management Defendants indiscriminately saddled the Master Fund and the Fund with toxic equity securities to provide an otherwise non-existent market for Bear-sponsored CDO equity. This tactic also increased the BSAM Defendants' fees from both the Fund and the Repackaging Vehicles from which the *toxic waste* was issued.

C.   **The Management Defendants Benefited Themselves by Consistently Overvaluing the Fund's Assets**

311.   As stated, much of the Management Defendants' appetite for increasingly risky investments in low-rated CDOs and CDOs backed by subprime debt was driven by the need to match the Master Fund's initial *success*. However, these *returns*, which were reported in the Monthly Profiles, were largely illusory gains created by a pattern of the Management Defendants overvaluing assets.

312.   The Management Defendants engaged in this conduct in order to increase the size of their bonuses (particularly millions of dollars for Cioffi and Tannin), and so that other Bear Stearns entities could improve their financial condition by unloading toxic waste investments onto the Master Fund -- in fact, as explained above, ***approximately 82% of the Funds' net assets were from Bear Stearns entities***.

313.   As discussed above, pursuant to the PPM, the Management Defendants had fiduciary and contractual duties to value the Master Fund's assets with the *mark to market*

method (which collected pricing information from the appropriate markets and exchanges, when possible).

314.     When market pricing was not available, as was the case with Repackaging Vehicle Junior Interests for which there was no exchange or secondary market, the PPM required the Management Defendants to value assets using the *fair-value* method, which took the present value of projected cash-flows over the life of the asset and adjusted it based on credit-risk, as determined by the Management Defendants.   As with the other valuation methods, the Management Defendants were required to act in "good faith" and assign values that were "fair and reasonable."  PPM at 46.

315.     However, as discussed above, the PPM also provided that the Management Defendants could use *manager marks* if, in the opinion of the Management Defendants, available market prices did not accurately reflect true value.

316.     Moreover, according to the PPM, the Management Defendants could use manager-marks to value assets to "reflect the amounts invested by the Partnership in such asset, notwithstanding that such amounts may not represent the market value of such asset."  PPM at 46.  In essence, the Management Defendants could value an asset at the amount it had caused the Master Fund to pay.  Moreover, the Management Defendants could also value assets using any "other prudent method of valuation other than that referred to [in the PPM]."

317.     In other words, the PPM allowed the Management Defendants almost limitless flexibility with respect to manager marks.  Even so, the Management Defendants were obligated by their fiduciary and contractual duties to fairly use manager marks.  Instead, the Management Defendants caused the Master Fund and the Fund to purchase, from BSAM and other Bear

page

affiliates, hundreds of millions of dollars of essentially worthless CDO scraps that the Master Fund and the Fund could never sell for value.

318.    In theory, the Management Defendants' manager marks were subject to review by BSAM's pricing committee (a group of BSAM professionals who were charged with overseeing the ultimate calculation of the Master Fund's NAV).  By 2006, however, Cioffi's funds had become the leading generator of revenue for BSAM.  Moreover, the assets were so complex and the structures often so Byzantine that the pricing committee put their heads in the sand and accepted the Management Defendants' calculations.

319.    Thus, almost throughout the life of the Master Fund, the Management Defendants were using the manager mark method consistently to inflate values and *smooth* returns.  The inflated values generated increased Advisory Fees and Profit Shares (which defendant Cioffi's team was sharing with BSAM 50/50) and the smooth returns gave the appearance of stability and attracted more subscriptions -- all in the midst of a liquidity crisis at the Master Fund and the Fund that found the Management Defendants scrambling to maintain their fiction of positive performance through the Enhanced Master Fund and Everquest.

320.    Use of manager marks did not improve over time.  Indeed, by December 31, 2006, more than 70% of the total assets of the Master Fund were being valued by manager marks.

321.    While the Management Defendants' deception attracted additional Limited Partners and forestalled what otherwise would have been a wave of Limited Partner redemption requests, over-reporting values had a number of unintended consequences.  First, as discussed herein, it created continuing expectations among the Limited Partners and the Fund that the Master Fund was going to generate returns and produce revenue, thus causing more pressure on

the Management Defendants to maintain the appearance of returns.  Second, it created liquidity problems because the Limited Partners could conceivably seek to redeem Interests that would be paid from profits that did not actually exist.  Third, the Master Fund entered into Repo Agreements using inflated assets as collateral.  If the true value of the collateral became clear, the Master Fund would be required to make margin payments that would cause the Master Fund and the Fund to crumble -- as they eventually did.

### D.    The Management Defendants' Gross Negligence Created a Constant Liquidity Crisis

322.    Hedge funds constantly need cash to satisfy redemption requests, to meet payment obligations and margin requirements for Repo Agreements, and to pay operating expenses.  The Master Fund was no different.  But the Management Defendants' inflated manager marks and increased investment in illiquid subprime-backed CDO securities only added to the Master Fund's liquidity problems, which were a nearly constant internal concern.

323.    As discussed herein, while ostensibly created to compound the *success* of the Fund and Master Fund, the Enhanced Fund and Enhanced Master Fund (and the inclusion of Barclays as leverage counterparty) were actually created secretly to alleviate liquidity problems in the Master Fund, stretching back at least to March 2006 when the Management Defendants first approached Barclays about serving as the leverage counterparty for the new *Enhanced* Funds.

324.    The Management Defendants' true motivation for creating the new Enhanced Funds is clear from a series of emails in September 2006 regarding their "liquidity game plan" -- a way to attempt to solve the Master Fund's and the Fund's crippling liquidity problems without telling investors.  On September 17, 2006, defendants Cioffi wrote to Tannin concerning how to transfer the Limited Partners into the more liquid Enhanced Fund:

What we need to figure out is how to get the majority of our LPs into the enhanced fund. That will take some time but once we do that we have an easy liquidity source and that's Barclays.

Tannin responded the same day:

I've been working on that too. There are three ways to roll our investors into Barclays: (although perhaps you can think of more). 1. Force them (I'm not really serious)

2. A sell out and sell in. This is sticky because it forces us to raise liquidity in [the Master Fund] – and over time we would increase the more illiquid investments.

3. We do an in-kind exchange. The issue here is that we have to get a "real" mark on all the assets.

Cioffi replied:

What I was thinking was to build up 6 mos. of returns then send a letter to all the remaining investors and tell them we are closing the [Partnership] and ask everyone to convert to the [Enhanced Partnership]. We'd have to handle it like we did a thru exchange of assets I would not want to have to sell everything. This is the riskiest way to go because you know some LPs will not convert but I feel comfortable that we can get almost all of them to.

325.    In addition to concerns about convincing the Limited Partners to move to the Enhanced Fund without disclosing the true motive behind the move, the concern of Cioffi and Tannin regarding a "real mark" for all assets demonstrates that they knew assets had been routinely overvalued and that the carrying values were indefensible.

326.    The new fund nonetheless completed in-kind subscriptions of 36.74%, and assets of the Master Fund were transferred to comprise the assets of the newly created Enhanced Master Fund.

327.    Needless to say, the Management Defendants failed to disclose to the Limited Partners the liquidity problems that led to the creation of the Enhanced Funds, even though the liquidity problems stretched back to at least March 2006.   Moreover, the Management

93

Defendants caused the August 2006 PPM to be issued with no mention of the liquidity concerns facing the Master Fund.

      **E.**      **The Management Defendants Failed to Adequately Hedge the Fund's Investments**

     328.    As stated above, amid growing concern about the state of the subprime market in the financial community in late 2006 and early 2007, the Management Defendants repeatedly assured the Limited Partners not only that exposure to subprime debt was minimal (which was completely untrue), but that the Master Fund's investments were adequately hedged against the softening market.  Hedging had been a central component of the investment strategy in the PPM, and the Limited Partners were encouraged to remain in the fund because the hedges would protect the Master Fund's positions.

     329.    As stated above, during a January 2007 conference call, Cioffi expressed confidence that widening spreads in subprime debt would be favorable to the Master Fund.

     330.    The following month, in February 2007, the Monthly Profile acknowledged negative growth in the long-positions of the Master Fund for the first time.  The Management Defendants, however, still expressed positive views on the Master Fund's hedging strategy.

     331.    Even the next month when the March 2007 Monthly Profile reported -3.71% returns (the first down month in the 42-week history of the Master Fund), the Management Defendants pointed to their hedging activity.  In fact, during an investor conference call the same month, Cioffi stated that his "bottom line" was that the Master Fund was "effectively able to hedge" the volatility of the subprime market.

     332.    In truth, the Management Defendants knowingly made massive investments in risky CDO-issued securities and had not satisfied their fiduciary and contractual obligations to adequately hedge the investments.  For example, Cioffi became concerned about the state of the

hedges in January 2007 at the latest, and defendants Tannin and McGarrigal emailed about hedging concerns in March 2007.

## VIII.   THE SEVERE REPERCUSSIONS OF THE MASTER FUND'S IMPLOSION

333.    The implosion of the Master Fund and the Enhanced Master Fund reverberated throughout both Bear Stearns' senior management and the global financial markets.

334.    In fact, Bear Stearns' lenders increasingly questioned the true extent of its exposure to loss.  As a result, they became unwilling to supply Bear Stearns the vast amounts of cash it needed to finance its daily operations and interest payments.

335.    The collapse of the Master and Enhanced Master Funds in the early summer of 2007 became the first visible sign that a brewing crisis with the market for subprime mortgages was ready to explode.

336.    In June 2008, the U.S. Attorney for the Eastern District of New York indicted Cioffi and Tannin.  The U.S. government's main charge is that Cioffi and Tannin deceived investors by not disclosing to them how badly their funds were doing in a desperate bid to keep fretful investors from heading for the exits. Prosecutors relied heavily on email exchanges between Cioffi and Tannin, painting a vivid picture of fear and desperation inside Bear Stearns as the firm grappled with a crisis that would eventually lead to its end as an independent investment bank.

337.    The indictment further charged that Cioffi's and Tannin's fraud caused $1.8 billion in losses to investors.  Cioffi and Tannin were formally arrested on June 19, 2008.  On the same day, the SEC filed a civil complaint against Cioffi and Tannin. The allegations in the SEC's civil suit were similar, but also focused on Cioffi's and Tannin's attempts to solicit additional contributions to the Funds when they knew the funds were failing.  Both the indictment and the SEC complaint allege that key documents, including Cioffi's calendar and

personal notes that could contain incriminating evidence, were destroyed by Cioffi and Tannin before the investigation began.

338.    The indictments of Cioffi and Tannin were the first to be brought against senior Wall Street executives linked to the credit crunch, which rattled global markets, led to hundreds of billions of dollars in write-offs, cost numerous executives their jobs, and culminated in the demise of Bear Stearns.

## IX.    DELOITTE'S UNIQUE ROLE IN THE WRONGDOING

### A.    Deloitte and the Bear Stearns Parties' Mutually-Beneficial Relationship

339.    Bear Stearns, at one time Wall Street's fifth largest investment bank, was one of Deloitte's largest and most significant customers.  James Farber, Bear Stearns' Senior Vice President of Finance and Controller at all relevant times, was previously a Deloitte partner.

340.    Deloitte and its related entities collected substantial fees from their Bear Stearns-related audit engagements, including over $1 million a year solely for their audits of certain Bear Stearns' funds.  In addition to the revenue from its audits of the Fund and Master Fund, Deloitte globally earned significant audit, tax and consulting fees from Bear Stearns as its provider of choice.  These fees were in excess of $20 million in fiscal year 2007, and totaled $18.7 million in fiscal year 2006.

341.    As a result, Deloitte was clearly willing to "look the other way" on the Bear Stearns Parties' wrongdoing in order to sustain its relationship with Bear Stearns.  In fact, Deloitte engaged in a wrongdoing parallel to that of the Bear Stearns Parties.

342.    As the auditor for the Fund and the Master Fund, Deloitte played a critical role in the entire financial reporting process by lending credibility and legitimacy to those funds' financial statements, and thereby lulling investors into a false sense of security that the funds' financial statements were accurately represented by the Bear Stearns Parties.  The annual audits

provided by Deloitte were an integral component of the wrongdoing set forth herein, as without Deloitte's unqualified, clean audit reports, the Bear Stearns Parties never would have been able to convince investors to continue to invest capital in the Fund and Master Fund.  In fact, investors reasonably relied on Deloitte's continued clean audit reports when deciding to invest and/or remain invested in the Fund and Master Fund, and because of such clean audits, did not take action to remove the Fund's and Master Fund's directors or BSAM and/or cause the Bear Stearns Parties to restructure or liquidate the Fund and Master Fund before the Fund and Master Fund collapsed.

343.    Deloitte's role as the Fund's and Master Fund's auditors gave Deloitte access to, and knowledge of, the Fund's and Master Fund's internal corporate, financial, operating and business information.  Deloitte personnel had ample opportunity to examine and analyze the Fund's and Master Fund's business and accounting practices, and to test and assess the transactions recorded in the Fund's and Master Fund's internal and publicly reported financial statements.

344.    In addition to auditing the financial statements for the Fund and Master Fund, and the other related funds, Deloitte also audited the financial statements of two Bear Stearns-related entities with substantial ties to the Funds.  As discussed earlier, one such entity was Everquest -- an entity created and controlled by BSAM to which the Fund transferred a significant portion of its assets in late 2006 in exchange for an equity interest in Everquest -- and for which Deloitte served as the auditor for the period from September 28, 2006 through December 31, 2006. Deloitte also served as the auditor for Parapet -- a BSAM-managed vehicle that created CDOs out of CDO-squared and other CDO securities, many of which were also from vehicles managed by BSAM -- for the period from September 28, 2006 through December 31, 2006.

345.    Through its audits of these various Bear Stearns-related entities over the years, Deloitte became intimately familiar with and had unique and superior knowledge of the business and operations of the Fund and Master Fund, and thus knowledge of the Bear Stearns Parties' wrongful conduct, none of which knowledge was available to investors in the Fund and Master Fund.

**B.      Bear Stearns Selected Deloitte to Audit the Fund, the Master Fund and All Other Related Entities**

346.    The Bear Stearns Parties' wrongdoing would not have succeeded without the substantial assistance and active participation of Deloitte.  One objective check on financial statements prepared by investment funds such as the Fund and Master Fund, and the ability of an investment manager such as BSAM to abuse the "manager mark" system, is that investment funds of this sort are subject to timely audits by a reputable "independent" third-party auditor. Without such audits, the Fund and Master Fund would be unable to attract investors.

347.    Accordingly, such funds frequently utilize "household name" auditors in an effort to acquire credibility by association -- in other words, the assumption is that engagement of Deloitte, or another "big four" auditor, will increase a fund's reputation than if the fund was to hire a lesser known auditor, by reason of the market perception that the brand name auditor will ensure that there are no material misrepresentations in respect of valuations or other material balance sheet items by management, whether deliberate or accidental.

348.    Bear Stearns thus caused the Fund and Master Fund to engage Deloitte -- the regular auditor for *all* Bear Stearns-related entities -- as the supposedly independent auditor for the Fund and Master Fund.  Deloitte, in turn, rendered audit reports to the shareholders of the Fund and Master Fund concerning the accuracy of their financial statements, including without limitation the Master Fund's investments and the valuations contained therein.

98

349.    Similarly, Bear Stearns retained Deloitte as the auditor for the Enhanced Fund, and the Enhanced Master Fund, and Deloitte and Deloitte's Cayman affiliate performed the audits of the Overseas Funds.

350.    Deloitte served as the independent auditors for the Fund and the Master Fund for each of the years ended December 31, 2003 through December 31, 2006, and during that time, Deloitte worked closely with the Bear Stearns Parties.  Deloitte performed and signed clean audit opinions for the Fund and Master Fund for each of those years.

### C.    Deloitte's Issued False and Misleading Audit Opinions

351.    As detailed below, each of the audit reports issued by Deloitte was "clean," and thus, represented that the financial statements presented fairly, in all material respects, the Fund's and Master Fund's financial position as of December 31, 2003, December 31, 2004, December 31, 2005 and December 31, 2006 in accordance with GAAP, and that Deloitte had performed its audits in accordance with GAAS.

352.    Deloitte's audit reports for all years were false, however, because the Fund's and Master Fund's financial statements did not conform with GAAP, contained material misstatements and omissions, failed to portray the Fund's and Master Fund's true financial condition, and because the audits had not been conducted in accordance with GAAS.  As discussed below, Deloitte knew that these financial statements, and its audit opinions concerning the financial statements, were false and misleading.  Its provision of these unqualified audit opinions assisted defendants with the breaches of fiduciary duties set forth herein.

353.    Deloitte owed the Fund and Master Fund duties under the applicable accounting and auditing standards.  As detailed below, however, there were a number of internal audit failings each year that demonstrate Deloitte's role in assisting defendants with their breaches of fiduciary duties owed to the Fund's Limited Partners.  These included Deloitte's failure (i) to

audit properly the manager marks and the models used to calculate the value of assets being marked by the Bear Stearns Parties, and (ii) to take appropriate action in light of the Bear Stearns Parties' failure to obtain appropriate approvals for insider transactions.

354.    Each of these failings by Deloitte, which began in 2003, continued to be material problems each fiscal year until the Fund's ultimate collapse, yet went uncorrected by Deloitte.

### 1.    Standards for a Proper Audit

355.    Deloitte was required to conduct its audits of the Fund's and the Master Fund's financial statements in accordance with GAAS.  These standards are established by the AICPA, and provide the basis to measure whether or not Deloitte fulfilled its professional and contractual obligations when performing its audits of the Fund's and Master Fund's financial statements. GAAS mandates that auditors exercise due professional care in the planning and performance of an audit and the preparation of an audit report.  AU § 230.  In complying with this standard, the audit firm is required to render its services with that degree of skill, care, knowledge and judgment expected from members of that profession, in accordance with accepted professional standards and in good faith without fraud or collusion.

356.    The objective of an audit is to express an opinion as to whether the financial statements fairly and accurately present, in all material respects, the financial condition, results of operations and cash flows of the company in accordance with GAAP.

357.    In an audit engagement, the auditor is responsible for planning and performing the audit to obtain reasonable assurances of whether or not the financial statements are free and clear of material misstatements, regardless of whether the misstatement has occurred as a result of error or fraud.  The audit is the process that provides the auditor the basis for expressing an opinion on the financial statements.  *See* AU § 508.  Thus, before it issued clean or unqualified audit opinions, Deloitte was required to properly plan and perform its audits.

358.    The prevailing auditing standards imposed, among others, the following duties upon Deloitte:

- Deloitte owed the Fund and Master Fund a duty to plan and perform its audits so as to detect material misstatements, caused by either fraud or error, and those acts having a direct and material impact on the determination of figures recorded in the financial statements and other reports. AU § 110.

- Deloitte owed the Fund and Master Fund a duty to maintain independence in mental attitude.  AU §§ 150, 220.

- Deloitte owed the Fund and Master Fund a duty to exercise due care and professional skepticism while performing its audits.  That is, Deloitte was required to perform its audit using reasonable care and diligence, while maintaining an attitude that included a questioning mind and a critical assessment of audit evidence. AU §§ 150, 230.

359.    Taken together, these and other auditing standards required Deloitte to assess and analyze critically all material assertions contained in the Fund's and Master Fund's financial statements and the attached notes.  Examples of these material assertions that Deloitte was obligated to analyze critically, and on which they were retained to opine, included the Bear Stearns Parties' representations concerning (i) each of the Fund's and Master Fund's NAVs for each year from 2003 to 2006; (ii) the realized and unrealized gain or loss on investment transactions; and (iii) the net increase or decrease in net assets resulting from operations.

360.    These standards also required Deloitte to determine whether or not the Fund's and Master Fund's financial statements were stated in accordance with GAAP and, to the extent they were not, Deloitte was required to include disclosure of such departures from GAAP in its audit report on the financial statements.  Under the circumstances, the auditing standards also required Deloitte to employ a heightened level of scrutiny to and critically analyze the manager marks with professional skepticism, as well as the numerous related party transactions between and

among the Fund and Master Fund and other Bear Stearns related entities, including Everquest and Parapet.

361.    Deloitte failed entirely to meet the applicable standards, despite its professional obligations and having agreed to do so in its retention agreement with the Fund and Master Fund. Deloitte's failures included, among other things, failing to disclose to anyone:  (i) the Fund's and Master Fund's non-compliance with the requirement to obtain approval from the Independent Directors for all related-party transactions; and (ii) that the pricing models used to value the unapproved related party transactions and the assets being "manager marked" were incomplete, not thoroughly tested, and did not incorporate all of the relevant factors bearing on the value of the underlying securities.

### 2.    Deloitte Failed to Comply with Applicable Auditing Standards

362.    Deloitte was retained by the Fund and Master Fund to audit its year-end financial statements, render an opinion on the Fund's and Master Fund's financial statements to the Fund's and Master Fund's Limited Partners, and as required by GAAS, report weaknesses in financial reporting controls, misstatements or other problems to the Fund and Master Fund and the Limited Partners of the Fund and Master Fund.  Deloitte was also required to report financial weaknesses to the management of BSAM and Bear Stearns Co., and possibly other Bear Stearns affiliated entities as these weaknesses most likely extended to these other entities that were audited by Deloitte as well.

363.    As detailed herein, Deloitte knew that the Bear Stearns Parties prepared false financial statements and engaged in improper conduct by, *inter alia*, inflating the Fund's and Master Fund's asset values and concealing losses on their portfolios.  Investors in the Fund and Master Fund were harmed as a result of theses false financial statements.

364.   Had Deloitte performed its audits in each of the years 2003 through 2006 in accordance with GAAS, including the standards of care imposed by the AICPA, and its contractual obligations to the Fund and Master Fund, Deloitte would have either (i) caused the Fund and Master Fund to report their true financial condition; (ii) issued a qualified or adverse opinion; or (iii) resigned as the auditor of the Fund and Master Fund and thus informed investors in the Fund and Master Fund that the financial statements were not stated in accordance with GAAP.   Had Deloitte done so, the Fund's and Master Fund's investors would have either obtained accurate financial statements, or would have known that they could not rely on the Fund's and Master Fund's financial statements as prepared and reported by the Bear Stearns Parties.

365.   Importantly, shares of the Fund and Master Fund were not publicly traded. Hence, there was no independently verified third-party financial information or analysis concerning the Fund and Master Fund or their performance available to any investor or prospective investor in the Fund and Master Fund other than the monthly NAV statements from PFPC and the financial statements covered by Deloitte's audit reports.   Indeed, Deloitte's audit reports for each fiscal year were addressed directly and prepared specifically for distribution to the Fund's and Master Fund's shareholders.

366.   Accordingly, Deloitte knew that its clean audit reports were material to investors' decision to invest in the Fund and Master Fund and/or to refrain from redeeming their investments or taking other actions, and that investors were placing substantial reliance on Deloitte's audit reports.

367.    Deloitte issued these clean audit reports to allow BSAM and the Fund and Master Funds directors to continue to breach their fiduciary duties owed to the Fund, so that BSAM would continue to use Deloitte as its auditor of choice.

**D.      The 2003 Audits and Financial Statements**

368.    On or about March 31, 2004, Deloitte issued its audit report for the Fund for the period from October 1, 2003 (the date of commencement of operations) to December 31, 2003, and for the related Master Fund for the period from September 12, 2003 (the commencement of operations) through December 31, 2003.

369.    The audit report for the Fund represented, among other things, that:

> We conducted our audit in accordance with auditing standards generally accepted in the United States of America. …In our opinion, the financial statements referred to above present fairly, in all material respects, the financial position of the Partnership as of December 31, 2003, the results of its operations, changes in its net assets and its cash flows for the period from October 1, 2003 (commencement of operations) through December 31, 2003, in conformity with accounting principles generally accepted in the United States of America.

370.    Deloitte's statements were false however because, among other things, Deloitte:

- was aware of illegal acts by BSAM involving unapproved related party transactions, and failed properly to ensure that such illegal acts were disclosed in the notes to, and the correspondent impact was reflected on, the Fund's financial statements or to report such illegal acts to appropriate parties;

- was aware of material weaknesses in the internal control structure of BSAM and the Fund relating to the valuation of securities by the Bear Stearns Parties and the failure to obtain approvals for related party transactions, and failed properly to account for and/or report such weaknesses to appropriate parties;

- failed to obtain sufficient competent evidential matter to support the assertions in the Fund's 2003 financial statements;

- did not have a reasonable basis to believe that the Fund's 2003 Fiscal Year financial statements were prepared in conformity with GAAP; and

- failed to exercise due professional care when conducting its audits.

371.     Beginning with its 2003 audits, Deloitte was aware of these material issues each year until the Fund's ultimate collapse, yet it took no corrective action.

### 1.      Deloitte Ignored Flaws Regarding Manager Marks

372.     Investment companies such as the Fund are required to report their investments at fair value.   AICPA Audit and Accounting Guide, Audits of Investment Companies, ¶ 2.28. Where manager marks are used to derive fair value, management is required to use its best estimate (under the direction of the Board of Directors) in good faith to arrive at fair value, which should be based on, among other things:

> the consistent application of a variety of factors in accordance with the valuation policy followed by the fund with the objectives being to determine the amount at which the investment could be exchanged in a current transaction between willing parties, other than in a forced liquidation sale.

*Id*.

373.     Auditing guidance further provides that when estimating fair value, the following factors, among others, should be taken into consideration:

- Financial standing of the issuer;

- Business and financial plan of the issuer and comparison of actual results with the plan;

- Cost at date of purchase;

- Size of position held and the liquidity of the market;

- Contractual restrictions on disposition;

- Reported prices and the extent of public trading in similar financial instruments of the issuer or comparable companies;

- Changes in the economic conditions affecting the issuer;

- A recent purchase or sale of a security of the company;

- Pricing by other dealers in similar securities; and

- Financial statements of investees.

AICPA Audit and Accounting Guide, Audits of Investment Companies, paragraph 2.37.

374.    Deloitte knew, from the inception of the Fund and Master Fund in 2003, that the Bear Stearns Parties were required to estimate the value of certain illiquid assets in the Fund's and Master Fund's portfolios.   Indeed, the Bear Stearns Parties' use of manager marks was disclosed in the offering materials and was continued throughout the entire life of the Fund.

375.    The systems and procedures for determining market or fair values for investment securities such as those held by the Master Fund, however, were flawed and often systematically over-valued those securities.   The flaws included, but were not limited to, the "models" used by the Bear Stearns Parties to value securities for which actual market prices were rare or non-existent.

376.    Those systems and procedures were used in both establishing the price at which CDOs and other securities were transferred to the Master Fund by other Bear Stearns-related entities, and for the "manager marks" used to mark such securities to market for purposes of establishing Net Asset Values and for financial reporting purposes.   The models were seriously flawed because, for example, relevant factors such as default risk on mortgage-related and other underlying debt securities were not used as elements of the models, and because the models were not appropriately "back tested" by comparison of actual arms-length market transactions to model results.

377.    Deloitte had an affirmative responsibility either to review and test the pricing and valuation process or to develop an alternative valuation methodology to test the reasonableness of the result.   Deloitte either willfully failed to perform the required audit tests or intentionally ignored the results of its testing in reaching its conclusion as to the reasonableness of the results.

378.    Subsequent analysis by the Securities and Exchange Commission's Office of Inspector General Office of Audits has confirmed that there were serious deficiencies in the models used by the Bear Stearns Parties to "mark" assets, including the inability and unwillingness to update the models quickly enough to keep up with changing circumstances.

### 2.    Deloitte Ignored Flaws Regarding Approval of Related Party Transactions and Illegal Acts Related Thereto

379.    AU § 334 requires auditors to engage in a heightened level of scrutiny in the presence of related party transactions, including transactions that are outside the ordinary course of business, and to employ procedures "directed toward obtaining and evaluating sufficient competent evidential matter" under the circumstances.

380.    Thus, in order for Deloitte to have issued its clean audit opinions, it had to employ a heightened level of scrutiny in evaluating the many related party transactions incorporated into the financial statements of the Fund, and it had to be free of any substantial doubt about the information presented in the Funds' financial statements.

381.    Nevertheless, Deloitte failed properly to test and report on the related party transactions, despite its knowledge of a clear red flag.  Specifically, from the inception of its engagement as auditors for the Fund, Deloitte knew that there were numerous improper and unauthorized related party transactions between the Fund and other Bear Stearns-related entities.

382.    The systems and procedures in place in the Fund also were not adequate to provide reasonable assurance that securities transactions between the Master Fund and other Bear Stearns-related entities were executed only after proper approval by the Independent Directors, as required by law and, with respect to the Master Fund, by its established governance procedures.  This was evidenced by the immediate 18% level of unapproved related party transactions in 2003.

383.    Coming as it did at the inception of the Fund, this failure of the Fund to comply with one of its most basic and highly-touted internal control functions -- namely the independent review and approval of related-party transactions -- on nearly one in every five transactions in 2003 was an immediate red flag to Deloitte that something was seriously wrong with the operations (and thus likely the accuracy of the financial statements) of the Fund.

384.    The notes to the 2003 financial statements reflect that approximately 40% of the trades executed on a principal basis by the Master Fund were with Bear Stearns Co. Nevertheless, Deloitte never disclosed or required the Fund to disclose that a material number of these trades were not properly approved by the Fund's Independent Directors or a majority of the investors, and were thus likely not "arms length" by any reasonable definition.

385.    Further, BSAM's failure to obtain the requisite approval for related party transactions violated Rule 206(3) of the Investment Advisors Act of 1940, and therefore was illegal.  In addition, the failure to obtain proper approval of related party transactions violated the Fund's COMs, as well as Deloitte's engagement letter.

386.    Despite the existence of a significant percentage of improper unapproved related party transactions and the problems they foretold, and despite their obligation to do so, Deloitte not only failed to disclose that this was occurring, but also failed to report these illegal acts to the appropriate parties.  AU § 317.17 mandates that an auditor assure itself that the audit committee, or others with equivalent authority and responsibility, is adequately informed regarding illegal acts that come to the auditor's attention during the course of the audit.

387.    Moreover, AU § 317.18 provides that where the auditor concludes that an illegal act has a material effect on the financial statements, and the act has not been properly accounted for or disclosed, the auditor should express a qualified opinion or an adverse opinion on the

financial statements taken as a whole depending on the materiality of the effect on the financial statements.

388.    Deloitte did nothing to cause the Fund to change its practices in this regard, nor did it alert investors or Bear Sterns' senior managers or directors to the problem despite assurances in the offering materials concerning the presence of independent directors to approve such transactions.

389.    Further, while Deloitte knew that the Fund's financial statements did not incorporate the effects of these illegal acts, the required disclosures were not made in the notes to the Fund's 2003 financial statements.

390.    As set forth above, Deloitte was required to employ heightened scrutiny when reviewing these related-party transactions and knew that the Bear Stearns Parties were ignoring the requirement that the Independent Directors or a majority of the investors approve such transactions in nearly one out of every five instances from the very beginning of operations of the Fund in 2003.

391.    Notably, in its engagement letter, and consistent with the requirements of AU § 316, Deloitte explicitly represented that it would "report to the Funds' senior management any fraud of which we become aware that involves senior management, and any fraud (whether caused by senior management or other employees) of which we become aware that causes a material misstatement of the financial statements."

392.    Professional standards also required Deloitte (i) to refrain from issuing unqualified opinions until they obtained satisfaction that the illegal acts were disclosed in the notes to, and the impact incorporated into, the financial statements, or (ii) in the absence of such disclosure, to provide an adverse opinion.  Ultimately, in light of the materiality of BSAM's

illegal acts, which raised significant questions concerning BSAM's integrity and the integrity of its representations, Deloitte should have withdrawn from the engagement.

393.    By failing to do so, Deloitte's intentional conduct damaged the Fund by (i) falsely lending credibility to the financial statements that, in fact, was absent; (ii) causing the Fund and its investors to believe that Deloitte had brought discipline to the financial reporting process that a GAAS-compliant audit is supposed to provide; and (iii) falsely leading the Fund's Limited Partners believe that Deloitte knew of no reportable illegal acts.

394.    The Fund was further harmed by Deloitte's conduct in that the illegal transactions between the Master Fund and Bear Stearns-related entities were rescindable transactions, both because of their illegality and because the transfer prices were in excess of fair value.  At a minimum, the Fund's 2003 financial statements should have disclosed that the Fund could rescind the unlawful principal trades, as required under GAAP and GAAS (*see* Statement of Financial Accounting Standards ("SFAS") No. 5, "Accounting for Contingencies," paragraph 17.b., and AU § 317.15), which it did not.

395.    Deloitte's intentional audit failures allowed Defendants to continue to breach their fiduciary duties to the Fund's Limited Partners actions and prevented corrective action from being taken by or on behalf of the Fund concerning the illegal related party transactions.

### 3.    Deloitte Ignored Material Weaknesses in Internal Controls

396.    Deloitte was aware of at least two material weaknesses that existed in the Fund's structure as early as 2003: (i) flaws in the systems and procedures for determining values for investment securities marked by management; and (ii) flaws in the systems and procedures for ensuring that transactions between the Fund and other Bear Stearns-related entities were executed only after proper approval by Independent Directors.

397.     Despite this knowledge, Deloitte failed to:  (i) insist on corrective measures; (ii) report the material weaknesses to the Board of Directors of the Fund, the audit committee or other supervisory body; (iii) obtain a legal opinion as to which Bear Stearns entities were in violation of the Investment Advisor Act and other laws and undertake an analysis of the ramifications of such violations on the Fund's books and records and financial statements, including reducing the asset value of each of the unapproved insider transactions; (iv) design audit procedures to address the risks posed by the internal control weakness, such as obtaining independent fair value opinions on all improper unapproved insider transactions; (v) caused the Fund's financial statements, including the disclosures, to be corrected to reflect the impact from these control weaknesses; or (vi) issue a qualified or adverse audit opinion.  Deloitte's conduct assisted in the defendants' breach of their fiduciary duties to the Fund's Limited Partners.

**4.      Deloitte Failed to Obtain Competent Evidential Matter (AU § 326)**

398.     Deloitte also failed to comply with its obligation to gather sufficient evidential matter regarding the manager marks and related party transactions before issuing its "clean" opinions of the Fund's 2006 financial statements.   The authoritative GAAS guidance for requirements of evidential matter is found in AU § 326, which recognizes that "[m]ost of the independent auditor's work in forming his or her opinion on financial statements consists of obtaining and evaluating evidential matter concerning the assertions in such financial statements."

399.     Accordingly, AU § 326.01 mandates that an independent auditor obtain sufficient competent evidential matter "through inspection, observation, inquiries, and confirmations to afford a reasonable basis for an opinion regarding the financial statements under audit."  AU § 326.25 describes the independent auditor's requirements for evaluating evidential matter as follows:

In designing audit procedures to obtain competent evidential matter, he or she should recognize the possibility that the financial statements may not be fairly presented in conformity with generally accepted accounting principles or a comprehensive basis of accounting other than generally accepted accounting principles. … To the extent the auditor remains in substantial doubt about any assertion of material significance, he or she must refrain from forming an opinion until he or she has obtained sufficient competent evidential matter to remove such substantial doubt, or the auditor must express a qualified opinion or a disclaimer of opinion.

400.    Further, specific procedures for auditing fair value estimates and disclosures are detailed in AU § 328, which provides in relevant part that the auditor should consider "information available to the auditor at the time of the audit," and requires that "valuation methods incorporate assumptions that marketplace participants would use in their estimates of fair value whenever that information is available without undue cost and effort."  AU § 328.06.

401.    AU § 328 mandates that an auditor obtain an understanding of the entity's process for determining fair value measurements and disclosures and of the relevant controls sufficient to develop an effective audit approach.  When obtaining such an understanding, the auditor should consider the following:

- Controls over the process used to determine fair value measurements, including, for example, controls over data and the segregation of duties between those committing the entity to the underlying transactions and those responsible for undertaking the valuations;

- The expertise and experience of those persons determining fair value measurements;

- The significant management assumptions used in determining fair value; and

- The controls over the consistency, timeliness and reliability of the data used in valuation models.

402.    When there are no observable market prices and the entity estimates fair value using a valuation method, the auditor is required to evaluate whether the entity's method of measurement is appropriate under the circumstances, which includes obtaining an understanding

of management's rationale for utilizing a particular method. The auditor is also required to test the entity's fair value measurements and disclosures, which may involve (i) testing management's significant assumptions, the valuation model and the underlying data; (ii) developing independent fair value estimates for corroborative purposes; or (iii) reviewing subsequent events and transactions. AU § 328.23.

403. Finally, when testing the entity's fair value measurements and disclosures, the auditor must evaluate whether: (i) management's assumptions are reasonable and reflect, or are not inconsistent with, market information; (ii) the fair value measurements were determined using an appropriate model; and (iii) management used relevant information that was reasonably available at the time. AU § 328.26. To be reasonable, the assumptions on which the fair value measurements are based, individually and as a whole, need to be realistic and consistent with the general economic environment, as well as the environment of the specific industry, and incorporate existing market information. AU § 328.6.

404. Deloitte failed to comply with the requirements of AU §§ 326, 328 and 334 before issuing its audit opinions on the Fund's 2003 financial statements because Deloitte knew that the Fund's and Master Fund's NAVs were significantly overstated as a result of the improperly calculated manager marks and improper unapproved related party transactions, and were therefore materially false.

405. Deloitte should have, at a minimum, required -- but did not require -- that the Fund and Master Fund revise the NAVs or make proper disclosures that would have alerted investors or potential investors in the Funds that the assets in the Funds which resulted, in part, from unapproved related party transactions were not properly reported on the financial

statements of the Fund and Master Fund and/or that the Fund and Master Fund had significant internal control failures which precluded Deloitte from issuing clean audit opinions.

406.    Because Deloitte knew that the Bear Stearns Parties were not following the Fund's and Master Fund's internal guidelines, Deloitte should also have taken one or more of the following actions, which it failed to do:

- require that the notes to the Fund's financial statements disclose the unapproved insider transactions and explain the impact on the financial statements;

- report the internal control deficiencies to their clients, the Fund;

- issue an adverse audit opinion on the Fund's financial statements; and/or

- withdraw from the engagement.

407.    Clearly Deloitte disregarded its obligations and the standards imposed on it relating to the disclosures and representations made in the Fund's financial statements, which Deloitte audited.  Had Deloitte taken the required actions, investors in the Fund could have declined to invest or taken appropriate action early on and preserve value in the Fund.  Deloitte's conduct assisted in the defendants' breaches of their fiduciary duties to the Fund's Limited Partners.

**5.    Deloitte Did Not Have a Reasonable Basis
to Conclude That The Financial Statements Conformed with GAAP**

408.    For the reasons set forth above, Deloitte also did not have a reasonable basis to believe that the 2003 financial statements were prepared in conformity with GAAP, and in fact they were not.

409.    Significantly, Deloitte knew that the fair value of the assets in Fund being manager marked was overstated since the marks were based on a flawed model.  In addition,

Deloitte knew that a significant number of related party transactions had not been properly approved.

410.    Accordingly, Deloitte knew that its opinion, that the 2003 financial statements complied with GAAP was false.   Deloitte's intentional conduct assisted in the defendants' breaches of their fiduciary duties to the Fund's Limited Partners.

### E.    The 2004 Audits and Financial Statements

411.    On or about April 15, 2005, Deloitte issued its audit reports for the Fund and the Master Fund for the year ended December 31, 2004.

412.    The audit report for the Fund represented, among other things, that:

> We conducted our audit in accordance with auditing standards generally accepted in the United States of America. …In our opinion, the financial statements referred to above present fairly, in all material respects, the financial position of the Partnership as of December 31, 2004, the results of its operations, changes in net assets, and its cash flows for the year then end, in conformity with accounting principles generally accepted in the United States of America.

413.    Deloitte's statements were false and its "clean" audit opinions assisted defendants with their breaches of fiduciary duties owed to the Limited Partners.   As set forth above beginning with its audit of the 2003 financial statements, and continuing thereafter, Deloitte was aware of, among other things, (i) illegal acts by BSAM involving unapproved related party transactions, which it failed to disclose in the notes to the Fund's financial statements (or otherwise take into account) or report to appropriate parties; and (ii) material weaknesses in BSAM's and the Fund's internal controls, for which it failed to properly to account for and/or report to appropriate parties.   Thus, similar to its audits of the 2003 financial statements for the Fund and Master Fund, Deloitte (i) failed to obtain sufficient competent evidential matter to support the assertions in the Fund's 2004 financial statements, especially those relating to the

valuation of assets; and (ii) did not have a reasonable basis to believe that the 2004 financial statements were prepared in conformity with GAAP.

414.   Notably, the percentage of insider transactions that was consummated without prior independent director approval in 2004 increased substantially from approximately 18% in 2003 to nearly 30% in 2004.

415.   As with its opinions for the 2003 financial statements, by failing to disclose these illegal acts and their material impact on the Fund's financial statements, Deloitte's opinions for the 2004 financial statements were knowingly false.

416.   Additionally, as in 2003, Deloitte's audit reports for 2004 did not contain any reference to the manager marks being utilized by the Bear Stearns Parties to inflate the Funds' NAVs for the 2004 Fiscal Year.

417.   Deloitte's conduct assisted in defendants' breach of their fiduciary duties to the Fund's Limited Partners by (i) lending credibility to the financial statements that, in fact, was absent; (ii) causing the Limited Partners to believe that Deloitte had brought discipline to the financial reporting process that an audit complying with GAAS is supposed to provide; and (iii) falsely representing to the Limited Partners that Deloitte knew of no reportable illegal acts.

418.   The Fund was directly harmed by Deloitte's conduct in that the illegal transactions between the Master Funds and Bear Stearns-related entities were rescindable transactions, both because of their illegality and because the transfer prices were in excess of fair value.  At a minimum, the Fund's 2004 financial statements should have disclosed that the Fund could rescind the unlawful principal trades, as required under GAAP and GAAS (*see* SFAS No. 5, "Accounting for Contingencies," paragraph 17.b., and AU § 317.15), which it did not.

419.   Deloitte's intentional audit failures allowed Defendants to continue to breach their fiduciary duties to the Fund's Limited Partners actions and prevented corrective action from being taken by or on behalf of the Fund concerning the illegal related party transactions.

**F.   The 2005 Fiscal Year Audits and Financial Statements**

420.   On or about April 11, 2006, Deloitte issued its reports for the Fund and the Master Fund for the year ended December 31, 2005.

421.   The audit report for the Fund represented, among other things, that:

> We conducted our audit in accordance with auditing standards generally accepted in the United States of America. …In our opinion, the financial statements referred to above present fairly, in all material respects, the financial position of the Partnership as of December 31, 2005, the results of its operations, changes in its net assets, and its cash flows for the year then end, in conformity with accounting principles generally accepted in the United States of America.

422.   Deloitte's statements were false and its "clean" audit opinions assisted defendants with their breaches of fiduciary duties owed to the Limited Partners.  As set forth above beginning with its audit of the 2003 financial statements, and continuing thereafter, Deloitte was aware of, among other things, (i) acts by BSAM involving unapproved related party transactions, which it failed to disclose in the notes to the Fund's financial statements (or otherwise take into account) or report to appropriate parties; and (ii) material weaknesses in BSAM's and the Fund's internal controls, for which it failed to properly account and/or report to appropriate parties. Thus, similar to its audits of the 2003 and 2004 financial statements for the Fund and Master Fund, Deloitte (i) failed to obtain sufficient competent evidential matter to support the assertions in the Fund's 2005 financial statements; and (ii) did not have a reasonable basis to believe that the 2005 financial statements were prepared in conformity with GAAP.

423.    Notably, the percentage of insider transactions that was consummated without prior independent director approval in 2005 increased substantially from approximately 30% in 2004 to over 58% in 2005.

424.    Nevertheless, Deloitte again failed to make any changes to the Fund's financial statements, or any disclosures to anyone, including the Fund's Limited Partners, concerning the improper practices concerning related party transactions.

425.    In 2005, Deloitte's opinion on the Master Fund's 2005 financial statements contained, for the first time, a reference to the percentage of assets being marked by BSAM:

> As described in Note 2, 49.22% of the Master Fund's net assets represents securities which were fair valued by the Master Fund's management.  The Master Fund's management has estimated the fair value of these securities in the absence of readily ascertainable market values.

426.    Deloitte had previously certified the Master Fund's financial statements without explanation or disclosure regarding the use of manager marks.  The only explanation for this new disclosure (which, as noted above, was contained only in the audit report for the Master Fund) is that Deloitte had by this time, and undoubtedly sooner, developed material concerns about the issues created by Bear Stearns' ever-increasing use of manager marks, but failed to take the necessary steps to properly address the situation in connection with its audits.

427.    Indeed, while manager marks had been used since the inception of the Fund without disclosure or comment by Deloitte, the ever-increasing percentage of manager marks -- now close to 50% -- highlighted the increasing illiquidity of the Fund's portfolio which, standing alone, required closer scrutiny by Deloitte, further disclosure, and/or a write-down of these positions to account for the significant portion of the portfolio for which there was no established market.

428.    Even though Deloitte included an explanatory paragraph in its 2005 audit opinion for the Master Fund relating to the use of manager marks, Deloitte nonetheless continued to improperly opine that the financial statements presented fairly the Master Fund's financial position in accordance with GAAP.  As detailed above, such opinion was improper due to, among other reasons, the significant number of assets that were incorrectly manager marked using seriously flawed valuation models and the high percentage of unapproved related party transactions.

429.    AU § 508.11 makes clear that the inclusion of an explanatory paragraph is not intended to provide auditors a free-pass or an "out" if the evidence reveals that the assets are not reported at fair value.  For Deloitte to have issued a clean opinion, it was required to obtain sufficient competent evidential matter -- including sufficient evidential matter to test properly and fully the manager marks.  At a minimum, in order for it to sign off on BSAM's manager marks, Deloitte needed to fully understand and examine the inputs to the model used to calculate those marks, and incorporate all information available as of the date of their report.  They improperly failed to do so, which reflects that Deloitte was well aware of the breaches of fiduciary duties when it issued the clean audit opinions that assisted with those breaches.

430.    The disclosures regarding manager marks in the 2005 financial statements raised additional issues.  As discussed above, in its audit opinion for the Master Fund, Deloitte notes that "[a]s described in Note 2, 49.22% of the Master Fund's net assets represents securities which were fair valued by the Master Fund's management."  However, Note 2 -- which was prepared by or under the direction of BSAM, the fund manager -- states that "approximately 17.98% of net assets are fair valued by the Investment Manager."  Deloitte's issuance of a clean audit opinion, without any explanation of this discrepancy, is further evidence of Deloitte's

awareness of the improper conduct of the BSAM Parties with respect to manager marks, and Deloitte's willingness to permit the Master Fund's financial statement to contain misleading statements.

431.    As set forth above, by failing to properly test the manager marks and disclose the illegality of the unapproved related party transactions and their material impact on the Fund's financial statements, Deloitte's clean audit opinion for 2005 was knowingly false.

432.    Deloitte's conduct assisted in the Management Defendants' breaches of their fiduciary duties to the Fund's Limited Partners by (i) lending credibility to the financial statements that, in fact, was absent; (ii) causing the Limited Partners to believe that Deloitte had brought discipline to the financial reporting process that an audit complying with GAAS is supposed to provide; and (iii) falsely representing to the Limited Partners that Deloitte knew of no reportable illegal acts.

433.    The Fund was directly harmed by Deloitte's conduct in that the illegal transactions between the Master Fund and Bear Stearns-related entities were rescindable transactions, both because of their illegality and because the transfer prices were in excess of fair value.  At a minimum, the Fund's 2005 financial statements should have disclosed that the Fund could rescind the unlawful principal trades, as required under GAAP and GAAS (*see* SFAS No. 5, "Accounting for Contingencies," paragraph 17.b., and AU § 317.15), which it did not.

434.    Deloitte's intentional audit failures allowed Defendants to continue to breach their fiduciary duties to the Fund's Limited Partners actions and prevented corrective action from being taken by or on behalf of the Fund concerning the illegal related party transactions.

G.      **The 2006 Audits and Financial Statements**

435.    On or about April 24, 2007, Deloitte issued its audit reports for the Fund and Master Fund for the year ended December 31, 2006.

120

436.   The audit report for the Fund represented, among other things, that:

We conducted our audit in accordance with auditing standards generally accepted in the United States of America. …In our opinion, the financial statements referred to above present fairly, in all material respects, the financial position of the Partnership as of December 31, 2005, the results of its operations, changes in its net assets, and its cash flows for the year then end, in conformity with accounting principles generally accepted in the United States of America.

437.   Deloitte's statements were false and its "clean" audit opinions assisted defendants with their breaches of fiduciary duties owed to the Limited Partners.  As set forth above beginning with its audits of the 2003, 2004 and 2005 financial statements and continuing thereafter, Deloitte was aware of, among other things, (i) illegal acts by BSAM involving unapproved related party transactions, which it failed to disclose in the notes to the Fund's financial statements (or otherwise take into account) or report to appropriate parties; (ii) was aware of and/or recklessly ignored material weaknesses in BSAM's and the Fund's internal controls, for which it failed to properly report to appropriate parties.  Thus, similar to its audits of the 2003, 004 and 2005 financial statements for the Fund and Master Fund, Deloitte (i) failed to obtain sufficient competent evidential matter to support the assertions in the Fund's 2005 financial statements; (ii) did not have a reasonable basis to believe that the 2005 financial statements were prepared in conformity with GAAP; and (iii) failed to exercise due professional care in conducting its audit.

438.   By the summer of 2006, the overwhelming majority -- approximately 79% -- of the related party transactions were consummated without the necessary approvals, a fact known to Deloitte, which clearly evidenced material internal control failures at the Fund and Master Fund, or much worse, called into question the integrity of the Fund's and Master Fund's managers and the accuracy of the Fund's and Master Fund's financial statements.

439.    This startling fact, standing alone, should have caused Deloitte, among other things, to: (i) insist on corrective measures; (ii) report the material weaknesses to the Board of Directors of the Fund and Master Fund; (iii) obtain a legal opinion as to which Bear Stearns entities were in violation of the Investment Advisor Act and other laws and undertake an analysis of the ramifications of such violations on the Fund's and Master Fund's books and records and financial statements, including reducing the asset value of each of the unapproved insider transactions; (iv) design audit procedures to address the risks posed by the internal control weakness, such as obtaining independent fair value opinions on all improper unapproved insider transactions; and/or (v) issue a qualified or adverse audit opinion.  Deloitte took none of these actions.

440.    In contrast to 2005, in 2006, Deloitte included a disclosure in the financial statements for the Master Fund **and** the Fund concerning the manager marks utilized by the Bear Stearns Parties to value assets held by the Master Fund, and thus ultimately by the Fund and Master Fund:

> As described in Note 2 of the Master Fund's financial statements, $616,023,080, 70.19% of the Master Fund's net assets represent securities which were fair valued by the Master Fund's management.  The Master Fund's management has estimated the fair value of these securities in the absence of readily ascertainable market values.  These values may differ from the values that would have been used had a ready market for these investments existed, and the differences could be material.

441.    Despite including these explanatory paragraphs, Deloitte nonetheless again delivered "clean" audit opinions on each of the Fund's and Master Fund's financial statements for 2006, just as it had with respect to the Fund's and Master Fund's financial statements for each of the preceding years.

442.    The inclusion of the explanatory paragraphs concerning manager marks in Deloitte's audit reports for the Fund and Master Fund is significant for several reasons.  First, the

risks inherent in valuing the Master Fund's illiquid assets had not changed.  They always presented opportunities for conflicts of interest and fraud, and were so described in the Fund's and Master Fund's offering materials with the significant caveat that such transactions would be approved by independent outsiders and audited by Deloitte.  What had changed was, at a minimum, the percentage of assets being so marked, as well as the information in Deloitte's possession in late 2006 and the first four months of 2007 indicating that the actual values of the illiquid assets in the Fund's and Master Fund's portfolios were far less than the values ascribed to those assets by the Bear Stearns Parties and being reported in the Fund's financial statements.  Once again, Deloitte lacked a reasonable basis for assessing the values because of BSAM's insufficient valuation models.

443.    Thus, for example, Deloitte knew, but disregarded at this time that (i) the housing and subprime mortgage industry had declined significantly in the first quarter of 2007; (ii) the original estimate of Everquest's December 2006 NAV had been reduced, as detailed below; and (iii) there were even more numerous improper related party transactions between the Funds and other Bear Stearns-related entities.

444.    Accordingly, Deloitte decided to change significantly its approach to disclosing the use of manager marks because it knew that there was a problem with the marks ascribed by the Bear Stearns Parties to the assets in the Fund's and Master Fund's portfolios.  Indeed, the ever-increasing percentage of those marks again highlights the increasing illiquidity of the Fund's and Master Fund's portfolio which, standing alone, required closer scrutiny by Deloitte, further disclosure, and/or a writedown of these positions.

445.    Deloitte was trying to distance itself from the manager marks scheme since it knew that:  (i) the U.S. housing boom had begun to fizzle such that the values estimated by the

Bear Stearns Parties of the assets in the portfolio were overstated; (ii) a significant portion of the Fund's and Master Fund's assets were backed by mortgage-backed securities, including securities backed by risky subprime mortgages; and (iii) the Fund's and Master Fund's financial statements in all years did not present fairly, in all material respects and in accordance with GAAP, the financial position of the Fund.

446.   Indeed, if the disclosures in 2003 and 2004 (namely, none) and 2005 (Master Fund only) for the Fund had been sufficient, there would have been no reason for Deloitte to include an emphasis paragraph in its audit opinion letters for both the Fund and the Master Fund for the 2006 financial statements unless there was new information it discovered in connection with its audits of the 2006 financial statements (which was not disclosed).

447.   Further, while the explanatory paragraphs state that the manager marks "may differ from the values that would have been used had a ready market for these investment existed," they do not make clear whether those differences would be positive or negative from the Fund's and Master Fund's perspective, which Deloitte could and should easily have clarified. Indeed, the most logical inference to draw from Deloitte disclosure is that the differences would be positive (that is, beneficial to the Fund and Master Fund) as the manager marks should have been estimated conservatively so as to reflect the discount to fair value due to the illiquidity in the marketplace as compared to the fair values that would be obtained in a liquid and "ready" market.

448.   Deloitte's 2006 audit reports also were affirmatively misleading because the "emphasis" paragraph focused attention on the manager marks, but failed to disclose that those marks had no reasonable basis.

449.    Accordingly, in order to continue its lucrative relationship with the Bear Stearns Parties and cover up its prior wrongdoing, Deloitte issued clean audit opinions on the 2006 financial statements for the Fund and the Master Fund, as it had in each and every prior year, and unjustifiably certified that the Fund's and Master Fund's financial statements complied with GAAP, in violation of its contractual and other obligations, to the detriment of investors who reasonably relied on Deloitte's audit opinions, and to the detriment of the Fund itself.

450.    Nevertheless, Deloitte knew that asset amounts and thus the corresponding NAVs presented in the Fund's and Master Fund's 2006 financial statements were false and misleading, and that the assets had been acquired in transactions which did not have the proper approvals, particularly in light of the factors set forth below which existed at or about the time of Deloitte's audits of the 2006 financial statements.

### 1.    The Everquest Debacle and the Overstatement of Year End 2006 NAVs

451.    As set forth above, in or about September 2006, in a continuing effort to conceal their losses, the Bear Stearns Parties transferred the Fund's and Master Fund's highest-risk assets out of the Fund and Master Fund and into Everquest.

452.    In essence, the Bear Stearns Parties were able to "freshen up" the Fund and Master Fund in the Fall of 2006 -- just as the sub-prime market was beginning to weaken -- by transferring some of their worst-performing assets out of the Fund and Master Fund and into Everquest in exchange for the falsely valued shares of Everquest.  This maneuver had the added benefit to the Bear Stearns Parties of allowing them to keep these toxic assets off of Bear Stearns' own balance sheets while "propping up" the Fund and Master Fund at the same time the Bear Stearns Parties were actively marketing and recruiting new investors for the Enhanced Master Fund.

453.    Deloitte was intimately involved in the highly suspicious Everquest transaction. Conveniently for the Bear Stearns Parties, Deloitte audited Everquest and Parapet.  In fact, Deloitte completed its audit of Everquest's financial statements for the period ended December 31, 2006, and issued its clean audit report relating to those financial statements, on April 5, 2007, approximately three weeks before Deloitte issued its audit opinion on the Fund and Master Fund. Even assuming the information concerning Everquest's December 2006 NAV was not available until the date Deloitte signed the Everquest audit opinion, such information was available as of the date when Deloitte issued its audit report for the Fund and Master Fund.  The same Deloitte entity (Deloitte's Philadelphia, Pennsylvania office) audited both Everquest and the Fund. Moreover, at a minimum, Deloitte undoubtedly discovered the revision to Everquest's 2006 NAV while employing heightened scrutiny and paying particular attention to the Fund's and Master Fund's 2006 investment in and valuation of Everquest, a related party, as required by AU § 334.

454.    Nevertheless, the revised information concerning Everquest's December 2006 NAV was not included in the Fund's and Master Fund's 2006 financial statements, even though Deloitte knew the material impact it would have on the Fund's and Master Fund's financial statements.  That Deloitte possessed information concerning the material impact of the revised 2006 NAV for Everquest on the Fund's and Master Fund's 2006 NAV is evident from the fact that the Bear Stearns Parties revised the December 2006 NAV for the Fund and Master Fund *less than three weeks* after Deloitte signed its "clean" audit report for the Fund and Master Fund.

455.    Indeed, on March 29, 2007, prior to the release of Deloitte's audit opinion on the Fund's and Master Fund's 2006 financial statements, BSAM notified the Fund's and Master Fund's investors by letter that the Fund's and Master Fund's 2006 NAV was being revised

*upward* as "a result of the audit performed by Deloitte & Touche of a position held by both Fund and Master Fund, where it was decided that the valuation of that position should be adjusted slightly upwards." Upon information and belief, the position referenced in the March 29, 2007 letter was Everquest. Because of the revisions to the Fund's and Master Fund's December 2006 NAVs due to the impact of the Fund's and Master Fund's investment in Everquest, it is clear that the Bear Stearns Parties simply were playing games with their valuation of the Everquest investment in order to inflate the NAVs reported in the 2006 financial statements. Deloitte knew about these manipulations when issuing the clean audit opinions for the 2006 financial statements.

456.    Moreover, the 2006 financial statements disclosures relating to Everquest are misleading and incomplete. The financial statements for the Master Fund, though noting that the investment in Everquest was an "investment in a related party," refer readers to "Note 5 for additional information." Note 5, however, relates to "Securities Sold Under Agreements to Repurchase and Securities Repurchased Under Agreements to Resell," and does not disclose the nature of the Everquest transaction (*i.e.,* the sale of certain of the Fund's and Master Fund's CDO investments in exchange for an equity interest in Everquest with a made-up valuation).

457.    SFAS No. 57, "Related Party Disclosures," states that the disclosures concerning related party transactions shall include the nature of the relationships involved, a description of the transactions, and such other information deemed necessary to an understanding of the effects of the transaction on the financial statements. The Everquest-related disclosure mandated by the applicable accounting standards is absent from the Funds' financial statements for 2006.

458.    In any event, Deloitte should have required the Bear Stearns Parties to lower, instead of increase, the December 2006 NAV for the Fund and Master Fund before issuing its clean audit opinions.

459.    The Bear Stearns Parties suspended redemptions in the Fund and Master Fund in June 2007.  Had Deloitte's audit report reflected the true financial condition of the Fund and Master Fund, investors would have been able to redeem their interests in the Fund and Master Fund before redemptions were suspended or attempted to remove the Fund's and Master Fund's directors and replace them with directors who would have tried to maximize investor recoveries.

460.    The Bear Stearns Parties knew that a downward revision in the Fund's and Master Fund's 2006 NAV would cause some, if not all, investors to redeem their investments, particularly since the Fund's and Master Fund's performance had not been as expected.  The Bear Stearns Parties and Deloitte withheld the foregoing information from the 2006 audit reports and financial statements to avoid redemptions.  Notably, investors did not receive Deloitte's audit reports for 2006 until at least May 9, 2007, over two weeks after the April 25, 2007 investor conference call on which Cioffi and Tannin assured investors that they remained confident in the Fund's and Master Fund's performance.  As noted above, Deloitte's opinion letters for the years all were dated in late March or early April of the relevant year -- well before April 24 of any year.  At a minimum, the additional delay with the 2006 audit indicates that Deloitte had additional concerns which it failed to address and resolve properly before issuing its unqualified audit opinion.

461.    Due to Deloitte's failure to include information relating to Everquest's revised 2006 NAV in its opinions, the Bear Stearns Parties were not required to modify the Fund's and Master Fund's December 2006 NAV to accurately reflect the Everquest investment until after

investors received Deloitte's clean audit opinions.  By the time of that revision, and unknown to investors at that time, redemptions were no longer possible.

462.    Thus, Deloitte's failure to require accurate disclosure of this information was extremely detrimental to investors in the Fund and Master Fund who relied on Deloitte's audit reports for 2006 when deciding not to redeem their investments or take other actions in early May 2007.   Deloitte's actions intentionally aided the Bear Stearns Parties in violating the fiduciary they owed to investors.  When investors finally learned the truth, it was too late because their investments were subject to a 40-day notice period and redemptions were suspended less than 40 days later.

### 2.    Subsequent Events (AU § 560)

463.    In connection with at least the 2006 audit, Deloitte also failed to comply with the guidance provided in AU § 560 for independent auditors, entitled "Subsequent Events."  This section recognizes that although an auditor's report ordinarily is issued in connection with financial statements that purport to present an entity's financial position as of a stated date on the entity's balance sheet, "events or transactions sometimes occur subsequent to the balance-sheet date, but prior to the issuance of the financial statements, that have a material effect on the financial statements *and therefore require adjustment or disclosure in the statements*."  AU § 560.01 (emphasis added).

464.    AU § 560 describes two types of subsequent events which require evaluation by the independent auditor, both of which are applicable here to Deloitte.  The first type consists of events that provide additional evidence with respect to conditions that existed *at the date of the balance sheet* and affect estimates inherent in the process of preparing the financial statements.

465.     When such events exist, management and the independent auditor are required to make an adjustment to the year-end financials to account for the subsequent events.  Specifically, AU § 560 mandates as follows:

> All information that becomes available prior to the issuance of the financial statements should be used by management in its evaluation of the conditions on which the estimates were based.  ***The financial statements should be adjusted for any changes in estimates resulting from the use of such evidence.***

AU § 560.03 (emphasis added).

466.     The second category of subsequent events requiring evaluation by the independent auditor is events that did not exist as of the date of the balance sheet ***but arose subsequent to that date*** and before the auditor issues its report.  While the second category of subsequent events does not require that the balance sheet be adjusted, AU § 560 does mandate disclosure of such events when necessary to "keep the financial statements from being misleading."

467.     Thus, under AU § 560, Deloitte was required to advise the Fund and Master Fund to make appropriate disclosure of facts discovered after the balance sheet date (*i.e.*, December 31, 2006) but before the date of Deloitte's audit report (*i.e.*, April 24, 2007) that provided additional evidence of conditions existing as of the balance sheet date and their impact on the financial statements (including their impact on the estimates made by the Bear Stearns Parties of the Fund's and Master Fund's net asset values) to persons known to be, or likely to be, relying on the financial statements and the accompanying auditor's reports.  This disclosure should have consisted of issuing, as soon as practical, revised financial statements and auditor's reports and/or notification disclosing the impact of subsequent events on the financials statements in order to prevent the statements from being misleading.

468.    Instead of following the requirements detailed in AU § 560, when Deloitte knew of the existence of material subsequent information that negatively impacted the estimates prepared by the Bear Stearns Parties to determine the portfolios' value, Deloitte did not require that the Funds and Master Funds restate their financial statements or disclose the material subsequent information of which it was aware, and which was necessary, to prevent the financials statements for 2006 from being misleading.

469.    As discussed below, Deloitte knew as of the date of its April 24, 2007 audit reports, if not months before then, that (i) the major decline in the housing and subprime-mortgage industry was negatively impacting the estimates prepared by the Bear Stearns Parties of the Fund's and Master Fund's NAVs since, as Deloitte knew that a majority of the Fund's and Master Fund's investments were backed by residential mortgage-backed securities, including a significant number of subprime mortgages; and (ii) the original estimate of the NAVs as of December 2006 for Everquest -- which represented a significant investment of the Fund and Master Fund -- had been reduced to such an extent *based on Deloitte's own audit* that it should have (and ultimately did) require a downward revision to the Fund's and Master Fund's NAV as of December 2006.  Deloitte also knew that defendant Cioffi had redeemed $2 million of his personal investment from one of the Funds and Master Funds within weeks of Deloitte's April 24, 2007 audit reports -- a significant fact that was not disclosed to investors.

470.    Deloitte's intentional failure to comply with the standards imposed by GAAS allowed the Bear Stearns Parties to grossly overstate the true value of the assets in each of the Fund's and Master Fund's portfolios and mislead the Fund and Master Fund and their investors to their detriment.

131

3.      The Overstatement of Assets
        in the 2006 Financial Statements

471.    As noted above, Deloitte opinion letters for the 2006 financial statements reported that more than 70% of the Master Fund's net assets represented securities which were valued by the Fund's and Master Fund's management in the absence of a readily ascertainable market.  As a result of its audits, however, Deloitte also knew that a majority of the underlying assets in the Master Fund's portfolios (and thus in the Fund's and Master Fund's portfolios as well) being estimated by management related to residential mortgage-backed securities, including a significant portion of subprime-backed mortgages which, as detailed below, should have been more closely checked and ultimately reduced in value by Deloitte.

472.    The subprime housing market began to decline in 2006.  However, between December 31, 2006 and April 24, 2007 -- the date of Deloitte's audit reports -- that market was in sharp decline because of increasing default rates on residential and subprime mortgages, resulting in declining values of residential and subprime mortgage-backed securities.  Indeed, various sources of information known to Deloitte at the time it issued its audit report indicated that the inputs to the model used by the Bear Stearns Parties to calculate the "marks" and thus the NAVs for the Fund and Master Fund should have been revised to reflect the status of subprime debt in the industry and the increasing default rates at the time.  Significantly, the increasing default rates on residential mortgages indicated that a negative shift had occurred in the marketplace, and that as a result the Fund's and Master Fund's investments, including its CDO investments, would be worth less than the amount estimated by management.

473.    While Deloitte should have required the Bear Stearns Parties to revise their estimates to reflect accurately the effect the downturn in the subprime market necessarily had on

the Bear Stearns Parties' estimates in the financial statements or at least require appropriate disclosures, it failed to do so.

4.     **The ABX Index**

474.   The ABX index serves as a benchmark for the market for securities backed by subprime mortgages.  It is based on the rating of the underlying subprime-backed securities, ranging from AAA to BBB-minus, and is calculated every six months to reflect the 20 largest securitizations issued during that period.

475.   Consequently, movement in the ABX index is a strong indication of movements in the prices not only of the securities it represents, but of other securitizations with similar characteristics.  Accordingly, the ABX index is considered by participants in the financial markets to be a fair proxy of the value of subprime-backed securities with similar average lives and characteristics.

476.   The ABX index for many vintages had been declining in late 2006, but was in sharp decline in early 2007, plunging approximately 30% in the first ten weeks of 2007.  Thus, the models used by the Bear Stearns Parties to estimate the value of the Fund's and Master Fund's portfolios, which contained significant subprime assets, should have been revised to reflect accurately the decline in the ABX index for purposes of estimating the Fund's and Master Fund's asset values at the end of 2006.

477.   Indeed, as Deloitte instructed at a February 23, 2007 Deloitte Dbriefs Webcast entitled "Subprime Consumer Finance: Know Your Blind Spots for 2007," when using a model to estimate asset values, it is important to remember that a statistical model is only as good as the data it was built on and that many models do not account for current conditions in the market.

478.   Had the models used by the Bear Stearns Parties to estimate the values of the assets in the Fund's and Master Fund's portfolios for 2006 been revised to incorporate this

information, as they should have been consistent with Deloitte's protocols and duties, investors in the Fund and Master Fund would have received a more accurate picture of the Fund's and Master Fund's financial condition.   Investors with accurate information could have redeemed their investments before redemptions were suspended or required the Bear Stearns Parties to replace the directors and/or restructure the Fund and Master Fund.

### 5.    Subprime Lenders Face Significant Problems

479.    In addition to (and consistent with) the sharp decline in the ABX index in the first quarter of 2007, several of the largest subprime-mortgage lenders were facing extreme financial difficulty in the period preceding April 24, 2007.  By the end of March 2007, several of these subprime-mortgage lenders were reporting losses on their own asset portfolios, were selling off portions of their mortgage portfolio assets *at a discount*, and many, including New Century Financial Corp. ("New Century"), NovaStar Financial Corp. ("NovaStar") and General Electric's WMC Mortgage unit, had cut jobs significantly in order to defray losses suffered on their portfolios.

480.    For example, on or about February 7, 2007, rising defaults prompted New Century, the nation's second largest subprime-mortgage lender at the time, to project a fourth-quarter 2006 loss and state that it would restate earnings downward for the first nine months of 2006.  By March 2, 2007, New Century had announced that it (i) had to restate most of its results from 2006 because of mistakes in how it accounted for losses on repurchased loans, (ii) was facing a federal criminal probe relating to accounting errors, and (iii) slashed its forecast for loan production because early-payment defaults and loan repurchases had led to tighter underwriting guidelines.  New Century's stock plunged 84% in four weeks by the end of March.  Ultimately, on April 2, 2007, New Century filed for Chapter 11 protection, joining two other large lenders -- ResMae Mortgage and Mortgage Lenders Network -- which had sought Chapter 11 protection in

February 2007.  Recently on April 1, 2009, the liquidating trustee appointed in the New Century bankruptcy commenced a lawsuit against New Century's former auditors, KPMG LLC, asserting claims for negligence and aiding and abetting breach of fiduciary duty, and seeking damages of at least $1 billion.  All of this was well publicized and known to Deloitte.  Notably, investments in New Century comprised a significant percentage of the Fund's assets.

481.    Similarly, OceanFirst Financial Corp., the holding company for OceanFirst Bank, announced on March 12, 2007 that its earnings for the year ended December 31, 2006 would be revised from the earnings results the company previously reported in a January 18, 2007 press release after it received additional information relative to the incidence of early payment defaults on subprime loans sold by the company's mortgage banking subsidiary.  Reportedly, the result of this revision was that instead of a $4.6 million profit, the bank reported a $1.6 million loss for 2006.

482.    Subprime-mortgage lender NovaStar announced in February 2007 that it projected that it would not produce any income through 2011.  At the same time, NovaStar posted a fourth quarter 2006 loss of $14.4 million, compared with a profit of $28.1 million a year earlier.  Deloitte was also NovaStar's auditor.

483.    As a result of the significant decline in the subprime market in late 2006 and continuing into the first quarter of 2007, other financial institutions with subprime mortgage-related investments began calculating losses on their portfolios for 2006.  For example, on or about February 7, 2007, HSBC Holdings, Europe's largest bank, announced that it would take a charge for bad debts of more than $10.5 billion for 2006 due to problems with its U.S. mortgage portfolio.

484.   Deloitte clearly was aware of the downturn in the residential and subprime-mortgage industries beginning in 2006 and continuing into 2007.  For example, in a Deloitte Financial Services Newsletter from March 2007, individuals employed by Deloitte identified a number of challenges already facing the subprime-mortgage industry at that time requiring "immediate attention," including the following:

- Increasing delinquency and foreclosures -- Deloitte noted that the foreclosure rate on subprime loans had doubled since 2002 to 20% and that, according to a report, subprime loans made in 2006 were defaulting at a rate 50% faster than loans originated in 2005;

- Pullback by investors -- Deloitte noted that in 2006 the only category that saw a negative flow of funds in the hedge funds market was in subprime mortgage-backed securities, and that investors were increasingly leaving this area due to the increase in defaults;

- Lenders forced to declare bankruptcy -- Deloitte noted that lenders without significant liquidity were facing problems because investors were forcing them to buy back defaulted loans and that, as a result, some of the lenders had been forced to declare bankruptcy;

- Depreciating housing market -- Deloitte noted that the combination of aggressive lending practices in 2004 and 2005 and a slow sales market in 2006 with depreciating home values had diminished the effectiveness of property sales, forcing customers and lenders to divest from defaulted loans; and

- Decreasing profits and increasing loan loss reserves -- Deloitte noted that an additional repercussion of higher defaults was that institutions were being forced to make greater allowances for loan losses, which in turn reduced their profits.

485.   Despite the losses reported by the subprime mortgage lenders and financial institutions with investments in subprime-backed investments, the Fund's and Master Fund's financial statements for 2006 reflected minimal losses from writedowns of the Fund's and Master Fund's investments, even though a significant number of the Fund's and Master Fund's investments were backed by residential and subprime mortgages.  In fact, the Bear Stearns Parties' use of manager marks (as opposed to marks to market) to value an increasing percentage

of the funds' portfolios in 2006 should have indicated to Deloitte that the market for the funds' assets had become illiquid, which ordinarily would suggest that the value of the assets had declined.

486.   Based on the foregoing, Deloitte possessed information indicating that the decline in the subprime-mortgage market would have a material negative impact on the model and the inputs to that model used by the Bear Stearns Parties to estimate the Fund's and Master Fund's NAVs as presented in their financial statements for 2006.  Nevertheless, Deloitte failed to fulfill its obligations under AU § 560 by failing to require the Bear Stearns Parties to adjust the financial statements for 2006 to incorporate this information so that the financial statements would not be misleading.

### 6.   Deloitte Failed to Advise That the Fund and Master Fund Lacked the Ability to Continue as Going Concerns (AU § 341)

487.   Deloitte also did not comply with its obligation under GAAS, in light of the information available to it at the time of its audits, to test appropriately that the Fund and Master Fund would be able to continue as going concerns.  Guidance on the applicable requirement is set forth in AU § 341, which provides that an auditor has a responsibility "to evaluate whether there is substantial doubt about an entity's ability to continue as a going concern for a reasonable period of time, not to exceed one year beyond the date of the financial statements being audited." AU § 341.02.

488.   Generally, there is an assumption in financial reporting that an entity will be able to continue as a going concern absent significant information to the contrary.  AU § 341 instructs, however, that this assumption is contradicted where information indicates that the entity being audited will be unable "to continue to meet its obligations as they become due

without substantial disposition of assets outside the ordinary course of business, restructuring of debt, externally forced revision of its operations, or similar actions."

489.    The Fund and Master Fund ceased to exist as going concerns in or about July 2007.  Deloitte should have seen this inevitable result coming based on the information it obtained or should have obtained during its audits of the Fund and Master Fund in early 2007 -- and certainly by mid-April 2007 when the 2006 audits were completed -- including the fact that the assets in the Fund's and Master Fund portfolios were illiquid and the valuations were overstated.

490.    The evaluation required by AU § 341 includes reviewing, among other things, subsequent events and the terms of debt and loan agreements.  If the auditor concludes based on its evaluation that there is substantial doubt, AU § 341.12 instructs that the auditor must include an explanatory paragraph in the audit report to reflect its conclusion.

491.    Based on the information available to Deloitte at the time it issued its clean opinions on the Fund's and Master Fund's financial statements for 2006, including information concerning the negative effect the subsequent events discussed above would have on the Fund's and Master Fund's financing arrangements, Deloitte should have conducted an evaluation of the Fund's and Master Fund's ability to continue as going concerns and, as a result, concluded that it was appropriate to include a going concern explanatory paragraph in its audit reports.

492.    Significantly, at the time Deloitte completed its audit, a majority of the Fund's and Master Fund's financing was through repo financing arrangements, with the securities in the Fund's and Master Fund's portfolio serving as collateral.

493.    Beginning in early 2007, an overwhelming majority of the assets in the Funds' portfolio had been posted by the Bear Stearns Parties as collateral on repo financing

arrangements with lenders to the Fund.  As a result of its repo financing arrangements with these lenders, the assets in the Fund's portfolios were subject to significant risk of being seized by the lenders and sold.

494.    In fact, the result of these repo financing arrangements was that when the subprime market declined in 2007 and the repo lenders made margin calls requiring payment, which the Bear Stearns Parties were unable to meet, the Fund was forced to liquidate its assets to satisfy its obligations to the Fund's repo lenders.  Because the market for the Fund's assets at the time of the margin calls was in steep decline, the market values of the Fund's assets was significantly less than the values which had been ascribed to those assets based on the estimates made by the Bear Stearns Parties and as reflected in the Fund's 2006 financial statements.

495.    Deloitte knew at the time it issued its April 24, 2007 audit reports that more than 80 percent of the assets in the Fund's portfolio served as collateral on repo financing arrangements, and would, in fact, result in a fire sale of those assets to satisfy obligations to the repo lenders in 2007 due to a declining market.  As a result, Deloitte should have included a going concern paragraph in its audit reports for the Master Fund's and Fund's financial statements for 2006, yet it failed to do so.

### 7.    Deloitte Was Familiar With the Requirements of AU § 560

496.    Although Deloitte failed to disclose the impact of the aforementioned subsequent events on the Fund's and Master Fund's financial statements during the 2006 Fiscal Year as required by AU § 560, Deloitte clearly was aware of its obligations under that auditing standard.

497.    In or about the last week of August 2007, Deloitte reportedly advised NovaStar, a company audited by Deloitte, that it would not participate in NovaStar's efforts to sell approximately $150 million in preferred stock unless NovaStar restated its 2006 financial statements to include disclosures regarding the company's problems related to the subprime

market.  Deloitte further advised the company that their reissued report on such financials also would include a paragraph expressing the Deloitte's uncertainty as to NovaStar's ability to continue as a going concern.

498.    Deloitte thus apparently went much further toward fulfilling its obligations in connection with the NovaStar engagement than it did on its engagement with the Fund and Master Fund.

## X.    THE WALKERS DEFENDANTS' UNIQUE ROLE IN THE WRONGDOING

499.    The Walkers Defendants also contributed materially to the Fund's collapse.

500.    Walkers had a long and lucrative relationship with Bear Stearns.  As discussed above, Walkers served as legal counsel to at least 16 Bear Stearns hedge funds that BSAM advised, and Walkers provided fund services for at least nine of BSAM's own funds.

501.    BSAM selected Walkers to perform services for the Master Fund that would ultimately be paid for by the Fund and the other feeder funds.  Walkers was retained to provide Independent Directors to replace the PFPC directors, ostensibly to correct the wholesale failure to comply with the related-party transaction approval process required under the Investment Advisers Act and the Partnership Documents.

502.    By its retention in summer 2006, Walkers was aware or should have been aware of the problems with approvals of related-party transactions.  As a global provider of hedge and mutual fund services, including providing independent directors, Walkers was (or clearly should have been) aware of Section 206(3) of the Investment Advisers Act.

503.    Nevertheless, defendants Lennon and Wilson-Clarke (the "Independent" Directors provided to the Master Fund) completely neglected their duties to the Master Fund, the Fund, and to other feeder-funds.  As stated above, the Independent Directors approved at least 165 related-party transactions where the approval request was incomplete or was submitted after the

140

transaction was already completed. Walkers entirely failed to supervise the Independent Directors or ensure that they were effectively discharging their duties.

504. Bear Stearns long had the reputation for an independent culture, and senior managers basically ran their own fiefdoms as they saw fit. Provided they were hitting their revenue targets, there was little oversight. The Management Defendants were generating significant revenue for BSAM and, as a result, they were given almost limitless autonomy. Had any of the prices, asset composition, values, volume, or credit-risk of the Master Fund's investments been independently examined, the Master Fund would not have become the primary purchaser of Bear Stearns otherwise illiquid securities.

505. As stated above, pursuant to the PPM, the Management Defendants were permitted to value assets based on the price they had caused the Master Fund to pay for them. In other words, when later queried by Interest holders or BSAM's pricing committee regarding valuations, the Management Defendants could point to the purchase price paid as a de facto mark to market valuation. Independent review of many related-party transactions would have acted to control the Management Defendants' inflated manager marks.

506. Similarly, as evidenced by defendant McGarrigal's September 19, 2006 email mentioned above, the Master Fund frequently engaged Bear Stearns entities as lending counterparties in the Repo Agreements used to create leverage. As discussed above, Repo Agreements involved the Master Fund transferring collateral and making margin payments if the posted collateral decreased in value. In other words, Bear Stearns (as counterparty) was assigning actual monetary values for the asset-collateral and monitoring changes to its value. Had the Independent Directors examined the Repo Agreements between Bear Stearns and the Master Fund, they would have discovered that Bear Stearns was valuing the assets differently

than the Management Defendants' manager marks. The Independent Directors were grossly negligent in failing to even attempt to carry out the basic responsibilities entrusted to them. The Management Defendants' failure to require such independent review was a breach of their fiduciary and contractual duties to the Fund and the Limited Partners.

507.   Independent review of related-party transactions also would have uncovered that the Management Defendants were causing the Master Fund to abandon its measured approach to investing in AAA/AA securities. Over the life of the Master Fund, BSSC engaged in literally hundreds of transactions with the Master Fund.

508.   Upon information and belief, meaningful examination of these transactions would have uncovered that the Master Fund was increasingly investing in junk or unrated securities.

509.   Finally, and perhaps most importantly, meaningful Independent Director review would have instantly uncovered the Management Defendants' nearly compulsive investments on behalf of the Master Fund in risky CDO securities issued by Bear Stearns and backed by subprime debt. As discussed at length herein, the Master Fund (by design) was permitted to invest in structured finance securities and Repackaging Vehicle Junior Interests arranged and managed by BSAM and other Bear Stearns entities. When the Management Defendants increasingly began to direct the Master Fund to junk and unrated CDO securities, a proper review of the transactions by the Independent Directors would have uncovered that the Management Defendants were investing outside the parameters of the PPM and breaching their contractual and fiduciary duties to the Limited Partners and the Fund.

510.   In addition, the Independent Directors would have discovered that by fall 2006, the Management Defendants had turned the Master Fund into a de facto purchaser of last-resort

(and, likely the only *willing* buyer) for troublesome equity securities issued by BSAM (CDOs backed by subprime debt).

511.    For example, the 2006 Audit Report and attached schedules indicated that the Master Fund owned nearly $2.5 billion of ***Collateralized Debt Obligation Securities***.  Of these, it appears that at least $655 million (or approximately one-quarter) were securities issued by SPVs that Bear Stearns arranged and/or managed.

512.    In another example, according to the Schedule, the Master Fund owned $281 million worth of CDOs securities issued by Tahoma CDO Ltd (*Tahoma*).   Although not indicated on the Schedule, Tahoma was a Repackaging Vehicle managed by BSAM.

513.    Similarly, the Master Fund owned $120 million of securities issued by Tallship Funding Ltd (*Tallship*).   Tallship was also managed by BSAM, although this fact was not disclosed in the Schedule.  Indeed, it was impossible to know for certain which CDO securities were issued by Bear Stearns entities because the Schedule only indicated the issuer of the CDO securities it identified, and left another $1.193 billion in CDO securities unidentified.

514.    On information and belief, the majority of the $655 million in CDO securities identified in the Schedule were equity securities issued by Bear Stearns Affiliates and backed by subprime debt.  Moreover, as evidenced by the Master Fund's transaction with Everquest (which, upon information and belief, was not approved by the Independent Directors), the Management Defendants populated the Master Fund with the Bear Stearns entities' riskiest securities.  Even after the Master Fund *sold* troubled CDO securities to Everquest (it actually still owned them through its ownership of part of the $400 million in Everquest shares owned by the Funds), the Master Fund retained at least two large CDO positions in common with Everquest.

515.    In sum, although the Fund ostensibly hired Walkers to provide another level of oversight, Walkers wholly failed to perform its duties to the Limited Partners and the Fund and allowed the Management Defendants' breaches of fiduciary duty to occur.

## XI.    DERIVATIVE ACTION ALLEGATIONS

516.    Plaintiff brings this action derivatively on behalf of and for the benefit of the Fund to redress injuries suffered by the Fund as a direct and proximate result of the breaches of fiduciary duty and other legal violations alleged herein.  The Fund is named as a nominal defendant solely in a derivative capacity.

517.    As discussed above, plaintiff was a partner, a beneficial owner, an assignee of a partnership interest, and/or an equitable owner of a Limited Partnership Interest as of the date of the filing of this action (and the other actions described above), at the time of the transactions of which it complains, and intends to retain such interest throughout the duration of this litigation.

518.    Plaintiff will adequately and fairly represent the interests of the Partnership and the Limited Partners in this litigation, and has retained competent and experienced counsel to assist it in that endeavor.

519.    This is not a collusive action designed to confer jurisdiction on this Court that it would not otherwise have.  Plaintiff did not purchase the Partnership Interests in order to maintain a derivative action.

520.    The wrongful actions complained of herein were unlawfully concealed from the Limited Partners.

## XII.    DEMAND EXCUSED ALLEGATIONS

521.    Plaintiff did not make a demand upon BSAM prior to instituting this action regarding the claims because such demand is excused.  *See Navigator Capital Partners, LP v. Bear Stearns*, 07 CV 7783 (AKH), Transcript at 13 (S.D.N.Y. Feb. 24, 2009) ("there is demand

futility with regard to the Bear Stearns directors and officers and companies and that there need not be an obligation of demand").

522.    In addition, and as set forth below, plaintiff did not make a demand upon the Fund's Joint Liquidators prior to filing this Complaint because such demand is also excused. *See Navigator v. Bear Stearns*, Transcript at 22 ("there is no precondition of demand with regard to the liquidators.").

523.    A pre-suit demand on either BSAM or the Joint Liquidators would have been unlikely to succeed given that (a) BSAM is subject to a substantial likelihood of liability and is a conflicted entity that could not have exercised its disinterested and independent business judgment in responding to such demand, and (b) the conduct of the Joint Liquidators to date demonstrates that they are neither disinterested nor independent.

### A.    BSAM is Neither Disinterested nor Independent

524.    BSAM, as the General Partner of the Fund, was the entity with authority to bring derivative claims on behalf of the Fund.  Plaintiff did not make a pre-suit demand on BSAM because BSAM participated in, approved, and/or acquiesced in the wrongdoing alleged herein, and therefore is not capable of exercising its disinterested or independent business judgment in responding to such demand.  A pre-suit demand on BSAM was futile for at least the additional reasons set forth herein.

### 1.    Demand is Excused Because BSAM Faces Substantial Likelihood of Liability for Its Breaches of Fiduciary Duties

525.    There is a substantial likelihood that BSAM faces liability for its integral role in the egregious activities upon which plaintiff's derivative claims are based. This substantial likelihood of liability disabled BSAM from assessing a pre-suit demand as a disinterested and independent party.

526.     A pre-suit demand on BSAM would have subjected it to an irreconcilable conflict of interest since it is one of the primary wrongdoers in the underlying derivative claims alleged herein. BSAM acted willfully, in bad faith, and/or with gross negligence and faces a substantial likelihood of liability for its breaches under the express provisions of the Partnership Documents and Delaware law.

527.     The PPM explicitly provides that "[BSAM] has fiduciary responsibilities with respect to the Partnership and will make investment decisions in a manner consistent with those responsibilities." The Partnership Documents do not limit or restrict the fiduciary duties BSAM owed to the Fund under Delaware law. Under Delaware law, BSAM owed the Fund the highest obligations of loyalty, due care, good faith, candor, and fair dealing in conducting the Fund's business, including refraining from engaging in grossly negligent or reckless conduct, intentional misconduct, or a knowing violation of the law.

528.     Additionally, and as described in greater detail above, the Partnership Documents set forth explicit duties owed by BSAM to the Fund, including, but not limited to, the obligations to:

    (a)    Ensure that the Master Fund executed the investment strategy stated in the Partnership Documents;

    (b)    Carefully and constantly monitor the Master Fund's credit risk with respect to its every investment;

    (c)    Fairly value all of the assets held in the Master Fund's portfolio;

    (d)    Fairly assess BSAM's fees and profit shares to be paid by the Fund through the Capital Accounts of Limited Partners; and

    (e)    Obtain approvals from the Independent Directors of the Master Fund for related-party transactions involving the Master Fund.

529.     The Complaint alleges that BSAM, through the actions of defendants Cioffi, Tannin, and McGarrigal, engaged in a knowing, grossly negligent, and/or bad faith abdication of

each of these expressly delineated fiduciary duties to the Fund, as well as the fiduciary duties imposed by Delaware law.

530.    Specifically, BSAM, as General Partner and Investment Manager of the Fund, knowingly, systematically, and continuously breached its fiduciary duties to the Fund and the Limited Partners by, among other actions:

(a)    Causing the Fund and Master Fund to make investments inconsistent with the terms of the Partnership Documents;

(b)    Failing to sufficiently analyze and adequately assess the credit risk inherent in the Fund's and Master Fund's investments as provided in the Partnership Documents;

(c)    Causing the Fund and the Master Fund to enter into harmful and self-interested principal trades with other Bear Stearns entities without obtaining promised and legally required approvals from the Independent Directors;

(d)    Assigning inflated values to Fund assets to increase BSAM's own fees and falsely portray positive performance;

(e)    Failing to adequately hedge the Fund's investments as provided for in the Partnership Documents; and

(f)    Failing to manage or monitor and, in fact, benefiting from acknowledged conflicts of interest in the Fund;

531.    BSAM is not protected from liability for the foregoing breaches under the express provisions of the Partnership Documents or Delaware law.

532.    The "exculpatory" clause in the Partnership Documents does not shield BSAM from liability for its breach of these fiduciary duties. The clause explicitly provides that BSAM is subject to liability for acts or omissions resulting from "fraud, bad faith, gross negligence, or willful misconduct." The Complaint asserts that BSAM breached its various fiduciary duties provided for in the Partnership Documents and under Delaware law with knowledge, bad faith,

and/or gross negligence. Accordingly, only non-exculpated derivative claims are pled against BSAM.

533.     At the time the Complaint was filed, the willful and/or grossly negligent nature of BSAM's breach of fiduciary duties (and therefore, the non-exculpated nature of the derivative claims) was reinforced by the SEC's investigation into securities fraud claims against defendants Cioffi and Tannin as managing directors of BSAM.  This investigation commenced in June 2007, and BSAM knew that it was the target of broad regulatory scrutiny at that time.  The regulatory scrutiny has now ripened into formal SEC enforcement proceedings and criminal charges against Management Defendants Cioffi and Tannin.

534.     In sum, BSAM faces a substantial likelihood of liability for the derivative claims. The collapse of the Fund and the Master Fund caused by BSAM's breach of fiduciary duties has resulted in a loss of over $900 million. The substantial likelihood that under the Partnership Documents and Delaware law BSAM will be held liable for these losses disabled BSAM from exercising disinterested business judgment in responding to a pre-suit demand.

## 2.     Demand is Excused Because BSAM Received Substantial Financial Benefit From its Breaches of Fiduciary Duties

535.     Demand on BSAM is excused because it had a direct pecuniary interest in the wrongdoing alleged herein which was not shared by the Fund or the Limited Partners. BSAM is therefore not a disinterested party to a derivative claim seeking to challenge the conduct giving rise to such unwarranted financial benefits.

536.     As noted herein, BSAM received financial remuneration in the form of Advisory Fees and Profit Shares based on the NAV of the Master Fund, which in turn, was based on the valuations BSAM assigned to the assets held by the Master Fund and the Fund. The assets held,

and investments made by the Master Fund and the Fund were also determined by BSAM as Investment Manager of both.

537.    The BSAM Advisory Fees and Profit Shares were paid directly out of the Limited Partners' Capital Accounts. Accordingly, BSAM received a material financial benefit from its knowing, systematic, and continuous breach of fiduciary duties to the Fund and the Limited Partners.

538.    The material financial benefits BSAM enjoyed from its ongoing breach of fiduciary duties were not shared by the Limited Partners or the Fund. Indeed, since BSAM's fees were taken directly from the Limited Partners' Capital Accounts, it realized substantial profits at the expense of the Limited Partners.

539.    BSAM's Advisory Fees and Profit Shares were also exorbitant and out of proportion to any services it rendered to the Fund.  As an example, for the year ended December 31, 2006, the Advisory Fee totaled $5,001,025 and BSAM was allocated a Profit Share (or Performance Allocation) of $8,396,778. Rather than being the product of prudent investment decisions which increased the actual NAV of the Master Fund and the net new income for the Limited Partners, BSAM's significant remuneration was based on its intentional and erroneous overvaluation of the Master Fund's NAV. BSAM therefore reaped millions in unwarranted fees through its knowing breach of fiduciary duties to the Fund.

540.    BSAM would have no incentive to commence a suit on behalf of the Fund that challenges such lucrative fee arrangements resulting from BSAM's knowing, continuous, and systematic breach of fiduciary duties.  Indeed, the Fund still owed BSAM substantial fees as of the time of the Fund's collapse. BSAM would receive no benefit, and as explained above, would

suffer a detriment from responding affirmatively to a demand to bring a lawsuit against such fees.

541.    Moreover, BSAM's inability to commence litigation on behalf of the Fund under these circumstances was effectively admitted in the PPM. In this regard, the PPM provided:

> The General Partner as general partner has an apparent conflict of interest between its fiduciary duty to the Partnership as general partner and its selection of itself as the Partnership's General Partner. Prospective investors must recognize that the Partnership has been formed specifically as an investment product to be managed by the General Partner, and that the General Partner will not appoint any other investment manager for the Partnership or the Master Fund even if doing so might be in the Partnership's best interests.

542.    Clearly, facing liability for the implosion of the Fund and the eradication of almost $1 billion in value, BSAM could not be expected to abandon its previously expressed inclination to prefer its own interests over those of the Fund. Accordingly, BSAM was an interested party incapable of impartially assessing a pre-suit demand.

### 3.    Demand is Excused Because BSAM Engaged in Self-Dealing Transactions

543.    A pre-suit demand was also excused because BSAM engaged in self-dealing by failing to obtain approvals for related-party transactions between the Master Fund and Bear Stearns entities. BSAM faces a substantial likelihood of liability in connection with these transactions, which violated the Investment Advisers Act.

544.    The PPM contemplated that the Master Fund would invest in securities issued by Repackaging Vehicles organized and managed by BSAM or other Bear Stearns entities. In return, BSAM and other Bear Stearns entities would collect fees for brokerage services, commissions for trades, and fees for arranging and issuing the CDO securities purchased.

545.    To address the potential for abusive self-dealing through these transactions, the PPM set forth a process, ostensibly consistent with the requirements of the Investment Advisers

Act, whereby BSAM was required to submit such transactions to the Master Fund's Independent Directors for prior approval.

546.    BSAM failed to follow these approval procedures for the related-party transactions almost from the very inception of the Fund and the Master Fund. By the time the August 2006 PPM was issued, hundreds, if not thousands of related-party transactions had been completed without prior approval from the Master Fund's Independent Directors. In 2004, 29.73% of the 730 principal transactions were executed without prior approval. The number rose to 58.66% out of 1,161 transactions and 78.95% of 342 transactions in 2005 and 2006, respectively. Those transactions directly violated, among other things, § 206(3) of the Advisers Act, exposing BSAM and the other Management Defendants to liability.

547.    BSAM reaped enormous benefits from this concerted and continuous self-dealing through substantial fees and the appearance of a thriving business operation at the expense of the Fund, which took on increasingly unstable assets. Indeed, the assets acquired by the Fund through BSAM's self-dealing ultimately led to the Fund's collapse.

548.    BSAM's self-dealing made it an interested party unable to exercise its disinterested or independent business judgment in responding to a demand to pursue claims challenging this very same conduct on behalf of the Fund.

**4.      Demand is Excused Because BSAM is Not Independent**

549.    BSAM is not independent, and was therefore incapable of making an objective business decision on the merits of asserting or not asserting the derivative claims alleged.

550.    BSAM is a wholly-owned subsidiary of BSC, and as such, its corporate decision making is beholden to the dictates of BSC as its parent company. BSC had the legal authority to hold BSAM accountable for meeting BSC's financial objectives, and to otherwise conduct its

business affairs in a manner that was deemed acceptable by BSC. In short, BSAM owed its continued corporate existence to BSC, and BSC alone.

551.    Given this relationship, BSAM would have been incapable of exercising independent business judgment in deciding whether to bring the aiding and abetting breach of fiduciary duty claims against BSC. Instead, as a wholly-owned subsidiary dominated and controlled by BSC, BSAM's decision to commence suit against BSC would have been compromised by extraneous considerations having nothing to do with the merits of the suit, such as BSAM's concern for subjecting its parent company to legal liability. BSAM could not have exercised its independent discretion in weighing such claims against BSAM.

**B.    The Fund's Joint Liquidators Are Neither Disinterested Nor Independent**

552.    On Saturday, November 17, 2007, BSAM issued a Notice of Dissolution of the Fund and, simultaneously therewith, appointed Heis and Milsom of KPMG (Canada) as liquidators thereof.

553.    Upon their appointment, Heis and Milsom, as liquidators, assumed control of the fund.  It is thus Heis and Milsom of KPMG who would be required to respond to a demand that they bring the derivative claims against the Bear Stearns Defendants, Deloitte and the Walkers Defendants described herein.

554.    For the reasons set forth below, demanding that Heis and Milsom bring these derivative claims against the Bear Stearns Defendants, Deloitte and/or the Walkers Defendants would be futile, because Heis and Milsom, and their employer KPMG, are neither independent, impartial nor disinterested.

555.     First, Heis and Milson's employer, KPMG, has significant business and other relationships with BSAM and the other Bear Stearns Defendants. Indeed, KPMG was hand-picked by BSAM to serve as liquidators not only of the Fund, but also of all the other Funds

managed by BSAM, including the Master Fund. BSAM's appointment of KPMG as liquidators of all of these funds it managed makes clear that BSAM expected that KPMG would do its bidding, and indeed it was an attempt to hide BSAM's and the Fund's problems.

556.   Second, KPMG itself faces potential liability based upon the collapse of the Funds. KPMG served as auditor of subprime lender New Century -- which as has been well-publicized, spiraled into bankruptcy in April 2007 amidst allegations of flagrant financial fraud. KPMG's work as auditor for New Century has been widely and fiercely criticized -- including in a 500+ page report prepared by an independent investigator of the circumstances of New Century's bankruptcy. Notably, investments in New Century comprised a significant percentage of the Fund's assets. Thus, KPMG itself also faces possible liability in connection with the collapse of the Fund.

557.   There is thus a reasonable doubt that Heis and Milsom and their employer KPMG could and would exercise independent and disinterested business judgment in responding to a demand that they bring this derivative claim against BSAM and the other defendants. Indeed, their conduct demonstrates that they are anything but independent and disinterested.

558.   As representatives of KPMG have acknowledged, a liquidator has the duty to "take independent control" of the entity in question and ensure that it is liquidated in an orderly manner, maximize realizations for the benefit of its shareholders, and independently examine whether or not any causes of action exist with respect that entity and the circumstances leading to its liquidation. Yet despite the fact that they clearly are aware of and acknowledge these specific duties of a liquidator, as detailed below, the KPMG liquidators have not fulfilled them.

559.   For example, despite the fact that they were in their positions as liquidators of the fund for almost eight months, Heis and Milsom commenced absolutely no proceeding against

any party or entity who worked with, advised, or otherwise performed services for any of the domestic funds. Indeed, Heis and Milsom have not even sought discovery of parties potentially responsible for the collapse of the funds – for example by issuing subpoenas or similar requests. Their KPMG counterparts who serve as liquidators for the Master Fund similarly have failed to take any action to identify and prosecute those persons responsible for the demise of the funds. This is in sharp contrast to the conduct of other parties (not beholden to Bear Stearns) such as the Massachusetts Attorney General, who commenced an investigation of BSAM during the summer of 2007 shortly after the funds' collapse.

560.   In fact, KPMG has sought to preclude any independent investigation of the collapse of the funds. Thus, one of the very first actions the liquidators of the Master Fund (namely Simon Whicker and Kristin Beighton of KPMG Cayman) took upon their appointment was to seek to bar any such actions or proceedings aimed at investigating and holding liable those responsible for the collapse of the Master Fund – specifically by having the liquidation of the funds recognized as foreign main proceeding in the United States.

561.   In August 2007, shortly after their appointment, Whicker and Beighton filed a petition in the Bankruptcy Court in New York to have the liquidation proceedings pending in the Cayman Islands with respect to the Master Fund recognized as "foreign main proceedings" or "foreign nonmain proceedings" pursuant to Chapter 15 of Title 11 of the United States Bankruptcy Code.  Notably, in the Chapter 15 Petition, Whicker and Beighton sought entry of an order:

> (i) Staying execution against the Funds' assets, (ii) prohibiting all persons from commencing or continuing any litigation or any other proceeding, including, without limitation, appeals, mediation or any judicial, quasi-judicial, administrative or regulatory action, proceeding or process whatsoever, or taking any other actions against or involving [the liquidators], the Funds, and their

property in the United States, and (iii) entrusting the administration or the realization of the Funds to the [liquidators].

If they were truly independent and disinterested, clearly Whicker and Beighton and their employer KPMG would not have sought to preclude any and all such suits against or involving the Master Fund, as such suits would likely bring to justice those persons and/or entities responsible for the collapse of the Master Fund. Their swift filing of the Chapter 15 Petition in order to bar any actions arising from the collapse of the Master Fund demonstrates that they – and their employer KPMG – are in fact anything but independent.

562.    In sum, in light of the fact that:

- KPMG has significant relationships with BSAM and the other Bear Stearns Defendants;

- KPMG was hand-picked by the Bear Stearns Defendants to serve as liquidators for not only the Master Fund, but each of the other funds managed by BSAM;

- KPMG itself faces potential liability in connection with the collapse of the funds;

- the conduct of KPMG's appointees to date in fact demonstrates their clear lack of independence; and

- a court in the Cayman Islands has already determined that KPMG is not the proper party to represent the interests of the Overseas Funds,

there is significant doubt that Heis and Milsom could and would independently and impartially consider a demand that they bring this derivative claim against the Bear Stearns Defendants, Deloitte, and/or the Walkers Defendants based on their fiduciary breaches and other acts of misconduct alleged herein. Rather, any such demand would be futile, and plaintiff should be allowed to proceed with the claims herein derivatively on behalf of the Fund and Master Fund.

## XIII.   JURISDICTION AND VENUE

563.   The Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 (federal question jurisdiction).  On August 25, 2009, this Court held that issues related to the Investment Advisers Act raise federal questions under all counts in this action, such that the Court has federal question jurisdiction.

564.   Venue is proper in this District pursuant to 28 U.S.C. § 1391(a), because a substantial part of defendants' conduct giving rise to the cause of action occurred in this District.

## XIV.   CAUSES OF ACTION

### <u>COUNT I</u>

### <u>Derivative Claim for Breach of Fiduciary Duties</u><br><u>Against the Management Defendants</u>

565.   Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

566.   This claim is asserted derivatively against the Management Defendants on behalf of the Fund.

567.   Each of the Management Defendants owed and owes a fiduciary duty to the Fund and its Limited Partners.  By reason of their fiduciary relationships, the Management Defendants all owed and owe to the Fund and its Limited Partners the highest obligation of care, skill, full and candid disclosure, loyalty, and the highest good faith, integrity, and fair dealing.

568.   As provided in the Partnership Documents, the General Partner owed fiduciary responsibilities to the Fund.  BSAM, as the General Partner, and defendants Cioffi, Tannin, and McGarrigal as the General Partners' designees, thus owed fiduciary duties to the Fund under the Partnership Documents and Delaware law.

569.   As also was provided in the Partnership Documents, defendants BSAM, Cioffi, Tannin, and McGarrigal had fiduciary responsibilities to direct the Master Fund's investments and to manage the Master Fund's portfolio.  The Management Defendants thus owed the Fund, as owner of the Master Fund, fiduciary duties under Partnership Documents and Delaware law.

570.   Under the Partnership Documents, the General Partner and the other Management Defendants are not relieved of liability resulting from, among other things, errors in judgment or any act or omission where they were grossly negligent, engaged in willful misconduct, or acted fraudulently or in bad faith.

571.   Under Delaware law, the Management Defendants owed to the Fund the highest obligations of due care, good faith, candor, loyalty, and fair dealing.

572.   Acting with bad faith, willful misconduct, and/or gross negligence, the Management Defendants breached their fiduciary duties to the Fund by, among other things:

> (a)   causing the Master Fund to make investments inconsistent with the terms of the Partnership Documents;
>
> (b)   failing to adequately analyze and assess the credit risk of Master Fund's investments as provided in the Partnership Documents;
>
> (c)   causing the Master Fund to enter into principal trades with other Bear Stearns entities without getting required approvals from the Independent Directors;
>
> (d)   assigning inflated values to the Master Fund's assets to increase their own fees; and
>
> (e)   failing to adequately hedge the Master Fund's investments as provided for in the Partnership Documents.

573.   All Management Defendants, singly and in concert, engaged in the aforesaid conduct in intentional breach and/or reckless disregard of their fiduciary duties to the Fund.

574.   The Management Defendants conspired to abuse, and did abuse, the control vested in them by virtue of their positions in the Fund.

575.     By reason of the foregoing, the Management Defendants have breached their fiduciary obligations to the Fund and the Limited Partners.

576.     The Fund and its Limited Partners have suffered damages proximately caused by the Management Defendants' intentional breach and/or reckless disregard of their fiduciary duties to the Fund.  Plaintiff, as Limited Partner and representative of the Fund, seeks damages in an amount to be proven at trial, but believed to be no less than approximately $1 billion.

577.     Moreover, the Management Defendants are liable for, and the Fund is entitled to, punitive damages in an amount also to be determined at trial attributable to conduct by the Management Defendants that was reckless, willful, wanton, and without regard to the rights of the Fund or the special fiduciary relationship between the parties under the Partnership Documents and Delaware Limited Partnership Law.

578.     As discussed above, plaintiff did not make a pre-suit demand on BSAM or the Joint Liquidators because as set forth herein, such demand was excused as futile.

## COUNT II

### Derivative Claim for Breach of Fiduciary Duties
### Against the Director Defendants

579.     Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

580.     This claim is asserted derivatively against the Director Defendants on behalf of the Fund.

581.     Each of the Director Defendants owed and owes a fiduciary duty to the Fund and its Limited Partners.  By reason of their fiduciary relationships, the Director Defendants all owed and owe to the Fund and its Limited Partners the highest obligation of care, skill, full and candid disclosure, loyalty, and the highest good faith, integrity, and fair dealing.

582.     As provided in the PPM, the Director Defendants had ultimate authority over the Master Fund's operations.   While the Director Defendants were entitled to and did delegate authority to make investment decisions to the Investment Manager of the Master Fund, under the Partnership Documents and the Delaware Limited Partnership Act, the Director Defendants were ultimately responsible for overseeing and supervising all aspects of the Master Fund's operations.

583.     In addition, under the Partnership Documents and the Investment Advisers Act, the Independent Directors were required on behalf of the Fund, as owner of the Master Fund, to meaningfully review and approve or reject any proposed transactions between the Master Fund and Bear Stearns entities.

584.     The Director Defendants, as the ultimate authority over the Master Fund, thus owed fiduciary duties to the Fund, as owner of the Master Fund, as well as pursuant to the Partnership Documents and the Delaware Limited Partnership Act.

585.     As alleged herein, the Director Defendants breached their fiduciary duties by, willfully, in bad faith, and/or acting with gross negligence, among other things:

   (a)     failing to meaningfully supervise and oversee the Management Defendants' activities with respect to the Master Fund;

   (b)     abdicating their authority over the Master Fund's operations to the Management Defendants;

   (c)     enabling the Management Defendants to manage the Master Fund in a manner inconsistent with the best interests of the Fund;

   (d)     failing to cause the Management Defendants to obtain the necessary approvals for related-party transactions; and

   (e)     failing, on the part of the Independent Directors, to review and approve all related-party transactions.

586.     All Director Defendants, singly and in concert, engaged in the aforesaid conduct in intentional breach and/or reckless disregard of their fiduciary duties to the Fund.

587.     The Director Defendants conspired to abuse, and did abuse, the control vested in them by virtue of their positions in the Fund.

588.     By reason of the foregoing, the Director Defendants have breached their fiduciary obligations to the Fund and the Limited Partners.

589.     The Fund and its Limited Partners have suffered damages proximately caused by the Director Defendants' intentional breach and/or reckless disregard of their fiduciary duties to the Fund.  Plaintiff, as Limited Partner and representative of the Fund, seeks damages in an amount to be proven at trial, but believed to be no less than approximately $1 billion.

590.     Moreover, the Director Defendants are liable for, and the Fund is entitled to, punitive damages in an amount also to be determined at trial attributable to conduct by the Director Defendants that was reckless, willful, wanton, and without regard to the rights of the Fund or the special fiduciary relationship between the parties under the Partnership Documents and Delaware Limited Partnership Law.

591.     As discussed above, plaintiff did not make a pre-suit demand on BSAM or the Joint Liquidators because as set forth herein, such demand was excused as futile.

## COUNT III

### Derivative Claim for Breach of Fiduciary Duties
### Against The Walkers Defendants

592.     Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

593.     This claim is asserted derivatively against the Walkers Defendants on behalf of the Fund.

594.    Each of the Walkers Defendants owed and owes a fiduciary duty to the Fund and its Limited Partners.  By reason of their fiduciary relationships, the Walkers Defendants all owed and owe to the Fund and its Limited Partners the highest obligation of care, skill, full and candid disclosure, loyalty, and the highest good faith, integrity, and fair dealing.

595.    As independent directors of the Master Fund (the shares of which were the primary investments and/or assets of the Fund), Lennon and Wilson-Clarke owed the Fund a fiduciary duty of care, skill, and loyalty. Furthermore, based on the fact that as represented in the PPM, Lennon and Wilson-Clarke were charged with reviewing all related-party transactions between the Fund and BSAM or other Bear entities, Lennon and Wilson-Clarke owed the Fund a fiduciary duty of care, skill, and loyalty.

596.    Lennon and Wilson-Clarke breached the fiduciary duties they owed to the Fund and Master Fund in a number of ways, including: (i) failed to ensure that BSAM was following the stated investment guidelines; (ii) failed to in any way monitor, investigate, or critically assess the Bear Stearns Defendants' "manager marks" valuations; (iii) failed to independently assess the audits provided by Deloitte; and (iv) failed on hundreds, if not thousands of occasions, to fulfill their duty of reviewing related party transactions between the Fund and BSAM and other Bear Stearns entities for fairness.

597.    As Lennon and Wilson-Clarke's employer, Walkers is responsible for the fiduciary breaches by them described above, which occurred in the course of their employment at Walkers.

598.    The Fund and its Limited Partners have suffered damages proximately caused by the Walkers Defendants' intentional breach and/or reckless disregard of their fiduciary duties to

the Fund.  Plaintiff, as Limited Partner and representative of the Fund, seeks damages in an amount to be proven at trial, but believed to be no less than approximately $1 billion.

599.    Moreover, the Walkers Defendants are liable for, and the Fund is entitled to, punitive damages in an amount also to be determined at trial attributable to conduct by the Walkers Defendants that was reckless, willful, wanton, and without regard to the rights of the Partnership or the special fiduciary relationship between the parties.

600.    As discussed above, plaintiff did not make a pre-suit demand on BSAM or the Joint Liquidators because as set forth herein, such demand was excused as futile.

### COUNT IV

**Derivative Claim for Aiding and Abetting Breach of
Fiduciary Duties Against the Corporate Defendants**

601.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

602.    This claim is asserted derivatively against the Corporate Defendants on behalf of the Fund.

603.    The Management, Director and Walkers Defendants owed fiduciary duties to the Fund, including uncompromising fiduciary duties of care, skill, full and candid disclosure, loyalty and the highest good faith, integrity and fair dealing.

604.    The Corporate Defendants knew that the Management, Director and Walkers Defendants owed fiduciary duties to the Fund and Master Fund.

605.    The Management and Director Defendants breached their fiduciary duties to the Fund and Master Fund by, among other things, engaging in the manager marks scheme and numerous acts of self-dealing described above.  The Walkers Defendants breached their fiduciary duties to the Fund and Master Fund by, among other things, failing on at least many

162

hundreds of occasions to review related party transactions between the Funds and BSAM and other Bear Stearns entities for fairness.

606.    The Corporate Defendants knowingly participated and substantially assisted in the Management, Director and Walkers Defendants' breaches of their fiduciary duties.

607.    As alleged herein, the Fund and the Master Fund were conceived of and sponsored collectively as an investment vehicle that carried the imprimatur of BSC and was marketed based on Bear Stearns' expertise in structured finance securities and risk-management capabilities. Among other things, BSC, itself and through its subsidiaries, knowingly and materially participated in and assisted the Management Defendants' breaches of fiduciary duty by, among other things:

(a)    performing the Master Fund's daily mark-to-market through BSC's repo desk and the portfolio management team, which were represented in the Partnership Documents as responsible for informing the Management Defendants of any price movements that could foretell problems with any of the investments; and

(b)    monitoring the Master Fund's positions and material components of the Master Fund's investments such as minimum rating requirements, overall and net leverage and portfolio concentrations, and meeting with the portfolio management team to discuss their positions, risk management and hedging techniques.

608.    BSSC knowingly participated in the Management, Direct and Walkers Defendants' breaches of fiduciary duties in its role as custodian and prime broker to the Master Fund.   BSSC, among other things, executed related-party transactions and trades, and was counterparty to related-party transactions and trades, that BSSC knew were not being reviewed by Independent Directors as required by the Partnership Documents and the Investment Advisers Act.

609.    BS & Co. knowingly participated in the Management, Director and Walkers Defendants' breaches of fiduciary duties in its role as the provider of placement services to the

Master Fund.  In addition, BS & Co. facilitated, or was a party to, numerous related-party trades and transactions between itself, other Bear Stearns entities and the Master Fund that BS & Co. knew were not being reviewed by the Independent Directors as required by the Partnership Documents and the Investment Advisers Act.

610.    The Fund has suffered damages proximately caused by the knowing participation by BSC, BSSC and BS & Co., and in the foregoing breaches of fiduciary duties by the Management, Director and Walkers Defendants.

611.    Accordingly, BSC, BSSC and BS & Co., are liable to the Fund for aiding and abetting the Management, Director and Walkers Defendants' breaches of their fiduciary duties in an amount to be proven at trial, but believed to be not less than approximately $1 billion.

612.    As discussed above, plaintiff did not make a pre-suit demand on BSAM or the Joint Liquidators because as set forth herein, such demand was excused as futile.

## COUNT V

**Derivative Claim for Aiding and Abetting Breach of Fiduciary Duties**
**Against Deloitte**

613.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

614.    This claim is asserted derivatively against Deloitte on behalf of the Fund.

615.    The Management, Director and Walkers Defendants owed fiduciary duties to the Fund, including uncompromising fiduciary duties of care, skill, full and candid disclosure, loyalty and the highest good faith, integrity and fair dealing.

616.    Deloitte knew that the Management Director and Walkers Defendants owed fiduciary duties to the Fund and Master Fund.

617.     The Management and Director Defendants breached their fiduciary duties to the Fund and Master Fund by, among other things, engaging in the manager marks scheme and numerous acts of self-dealing described above. The Walkers Defendants breached their fiduciary duties to the Fund and Master Fund by, among other things, failing on at least many hundreds of occasions to review related party transactions between the Funds and BSAM and other Bear Steams entities for fairness.

618.     By virtue of its role as auditors of the Fund and Master Fund, Deloitte had actual knowledge that the Bear Steams Parties and Walkers Defendants committed these numerous breaches of their fiduciary duties.

619.     Deloitte knowingly participated and substantially assisted in the Management, Director and Walkers Defendants' breaches of fiduciary duties.

620.     As alleged herein, Deloitte provided substantial assistance to the Management, Director and Walkers Defendants by providing clean audit opinions and failing to fulfill its obligations to the Fund and Master Fund -- particularly, by failing to conduct its audit in accordance with GAAS, failing to properly evaluate the manager marks, and failing to require disclosure of unapproved related party transactions.

621.     The Fund has suffered damages proximately caused by the knowing participation by Deloitte in the foregoing breaches of fiduciary duties by the Management, Director and Walkers Defendants.

622.     Accordingly, Deloitte is liable to the Fund for aiding and abetting the Management, Director and Walkers Defendants' breaches of their fiduciary duties in an amount to be proven at trial, but believed to be not less than approximately $1 billion.

623.    As discussed above, plaintiff did not make a pre-suit demand on BSAM or the Joint Liquidators because as set forth herein, such demand was excused as futile.

## COUNT VI

### Derivative Claim for Gross Negligence
### Against the Management Defendants

624.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

625.    This claim is asserted derivatively against the Management Defendants on behalf of the Fund.

626.    As alleged herein, the Management Defendants conceived of and created the Fund and the Master Fund as a collective investment vehicle through which they would seek on behalf of investors high current income and capital appreciation through their expertise in selecting structured finance securities.  Under the Partnership Documents, the Management Defendants had responsibility for managing and operating the Fund and the Master Fund to achieve this stated purpose.  Thus, under the Partnership Documents and the Delaware Limited Partnership Act, the Management Defendants were required to perform their duties to the Fund with the utmost due care commensurate with their authority.

627.    The Management Defendants were grossly negligent in performing the duties owed to the Fund by knowingly, in bad faith, and/or recklessly, among other things:

(a)    causing the Master Fund to make investments inconsistent with the terms of the Partnership Documents;

(b)    failing to adequately analyze and assess the credit risk of the Master Fund's investments as provided in the Partnership Documents;

(c)    causing the Master Fund to enter into principal trades with other Bear Stearns entities without getting required approvals from the Independent Directors;

      (d)     assigning inflated values to Master Fund's assets; and

      (e)     failing to adequately hedge the Master Fund's investments as provided for in the Partnership Documents.

628.    The Fund and its Limited Partners have suffered damages proximately caused by the Management Defendants' gross negligence.  Plaintiff, as Limited Partner and representative of the Fund, seeks damages in an amount to be proven at trial, but believed to be no less than approximately $1 billion.

629.    Moreover, the Management Defendants are liable for, and the Fund is entitled to, punitive damages in an amount also to be determined at trial attributable to conduct by the Management Defendants that was reckless, willful, wanton, and without regard to their duties to, and the interests of, the Fund.

630.    As discussed above, plaintiff did not make a pre-suit demand on BSAM or the Joint Liquidators because as set forth herein, such demand was excused as futile.

## COUNT VII

### Derivative Claim for Breach of Contract
### Against BSAM

631.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

632.    This claim is asserted derivatively against BSAM on behalf of the Fund.

633.    Defendant BSAM owed contractual obligations to the Fund as Investment Manager pursuant to BSAM's professional management and/or service agreement.

634.    Pursuant to that agreement, BSAM was obligated to provide the Fund with accurate and reasonable customary management advice and services.

635.   BSAM breached its contractual obligations to provide such management advice and services when it engaged in, and failed to advise the Fund of, the deceptive and improper practices engaged in by the Bear Stearns defendants vis-à-vis the Fund, as outlined herein.

636.   While BSAM breached its obligations to the Fund, the Fund fulfilled its contractual duties by paying substantial fees to BSAM.

637.   As a direct and proximate result of BSAM's breaches of its contractual obligations to the Fund, the Fund suffered damages in an amount to be determined at trial, but believed to be not less than approximately $1 billion.

638.   As discussed above, plaintiff did not make a pre-suit demand on BSAM or the Joint Liquidators because as set forth herein, such demand was excused as futile.

**COUNT VIII**

**Gross Negligence**
**Against the Walkers Defendants**

639.   Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth below.

640.   As discussed above, Lennon and Wilson-Clarke agreed to, and did in fact, serve as the Independent Directors of and otherwise provide services to the Fund and Master Fund.

641.   As the Independent Directors of the Fund and Master Fund, Lennon and Wilson-Clark had a duty to use such skill, prudence and diligence as directors of ordinary skill and capacity commonly possess and exercise in the performance of their services for or on behalf of entities such as the Fund and Master Fund.

642.   For the reasons set forth herein, the Walkers Defendants failed to use the requisite skill, prudence and diligence in the services they provided to the Fund and Master Fund.  Indeed, the Walkers Defendants' conduct was of such a high and extreme departure from professional

168

standards that it amounted to gross negligence on the part of the Walkers Defendants.  Although they delegated authority to make investment decisions to the Investment Manager, as represented in the Articles of Association and COMs, the Walkers Directors had ultimate authority over and responsibility for the Fund's and Master Fund's operations, including any failings by the Investment Manager.

643.    As Lennon and Wilson-Clarke's employer, Walkers SPV and Walkers FS are responsible for the wrongdoing committed by them described above, which occurred during the course of their employment by Walkers SPV and Walkers FS, and for their benefit.

644.    But for the Walker Defendants' failure to perform their duties as the Independent Directors, the Fund and Master Fund would not have suffered the damage that occurred.  In particular, and without limitation, had Lennon and Wilson-Clarke fulfilled their obligation as the Independent Directors to review each related party transactions, (i) the Bear Steams Parties would not have been able to consummate the numerous related party transactions discussed above which were detrimental to the Fund and Master Fund; and (ii) the size and volume of these related party transactions would have been a red flag to the shareholders and the investment community, and would have resulted in the termination of the Bear Steams Parties' wrongdoing at a point in time before the Fund and Master Fund lost all of its value.

645.    As a direct and proximate result of the wrongdoing by the Walkers Defendants described above, the Fund and Master Fund suffered damages in an amount to be determined at trial, but which are believed to be not less than $1.1 billion, for which the Walkers Defendants are jointly and severally liable to Plaintiff.

646.    Moreover, the conduct of the Walkers Defendants, in flagrantly disregarding their duties to, and the interests of, the Fund and Master Fund was willful, purposeful, knowing,

malicious, and without regard for the rights and interests of the Fund and Master Fund and departed in the extreme from the norms expected of fiduciaries.  Accordingly, Lennon, Wilson-Clarke and Walkers FS should, in addition, be liable for punitive damages in an amount to be determined at trial.

## COUNT IX

### Unjust Enrichment
### Against the Walkers Defendants

647.   Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth below.

648.   As a result of the wrongdoing described above and participated in by Deloitte and the Walkers Defendants, the Fund and Master Fund have been rendered worthless, yet the Walkers Defendants, individually and collectively, have reaped substantial fees and bonuses.

649.   The Walkers Defendants have therefore been unjustly enriched and should be forced to disgorge to plaintiff an amount to be determined at trial.

## XV.   PRAYER FOR RELIEF

WHEREFORE, plaintiff prays for judgment as follows:

1.    determining that this action is a proper derivative action maintainable under law and demand is excused;

2.    declaring plaintiff to be the exclusive representative for the Fund in connection with the derivative claims alleged herein;

3.    declaring that the Management Defendants, Director Defendants, and Walkers Defendants and each of them have violated their fiduciary duties to the Fund and to plaintiff;

4.    declaring that the Corporate Defendants and Deloitte aided and abetted the above-mentioned breaches of fiduciary duties;

5.     declaring that BSAM breached its contractual duties to plaintiff and to the other Limited Partners;

6.     ordering defendants, jointly and severally, to account to the plaintiff and the Fund for all damages suffered or to be suffered by them as a result of the defendants' actions complained of herein;

7.     awarding plaintiff and the Fund damages in an amount to be proven at trial, including pre- and post-judgment interest;

8.     awarding plaintiff the costs and disbursements of the action, as well as reasonable attorneys' fees and experts' fees; and

9.     granting such other and further relief as this Court may deem just and proper.

## XVI.   JURY DEMAND

Plaintiff demands a jury trial on all applicable issues.

Dated:  October 6, 2009                    Respectfully submitted,

                                           BROWNE WOODS GEORGE LLP


                                           By: _____
                                              Lee A. Weiss
                                              Brian C. Kerr
                                              49 West 37th Street, 15th Floor
                                              New York, New York 10018
                                              Tel: 1.212.354.4901
                                              Fax: 1.212.354.4904


                                           LAW OFFICES OF BRENT A. BURNS
                                              Brent A. Burns
                                              87 Ruckman Road, Suite 102
                                              Alpine, New Jersey 07620-1098
                                              Tel: 1.201.768.2700
                                              Fax: 1.201.731.9750

                                           *Attorneys for Plaintiff*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| STILLWATER MARKET NEUTRAL<br>FUND II LP,<br><br>           Plaintiff,<br><br>      -against-<br><br>BEAR STEARNS ASSET MANAGEMENT INC.,<br>RALPH CIOFFI, MATTHEW TANNIN,<br>RAYMOND MCGARRIGAL, THE BEAR<br>STEARNS COMPANIES, INC., BEAR STEARNS<br>SECURITIES CORPORATION, BEAR STEARNS<br>& CO. INC., BARRY JOSEPH COHEN, GERALD<br>R. CUMMINS, DAVID SANDELOVSKY, GREG<br>QUENTAL, WALKERS FUND SERVICES<br>LIMITED, SCOTT LENNON, MICHELLE<br>WILSON-CLARKE, and DELOITTE & TOUCHE<br>LLP,<br><br>           Defendants,<br><br>      - and -<br><br>BEAR STEARNS HIGH-GRADE STRUCTURED<br>CREDIT STRATEGIES FUND, LP,<br><br>          Nominal Defendant. | Case No.  09 Civ 4223 (AKH)<br><br>(N.Y. Supr. Ct. Index No. 09-600954)<br><br><u>ECF Case</u> |

## <u>VERIFICATION</u>

Stillwater Market Neutral Fund II, L.P. ("Stillwater"), a derivative plaintiff in the above-captioned action, by its general partner,, having been duly sworn, ;deposes and says as follows:

1.     I am authorized to give this verification on behalf of Stillwater.  I have read the Amended Complaint in this action dated October 6, 2009, and know the contents thereof.  The contents of the Amended Complaint are true to my own knowledge, except as to those matters stated to be alleged on information and belief, and as to those matters, I believe them to be true.

2.      As detailed in the Amended Complaint, Stillwater was a partner, a beneficial owner, an assignee of a partnership interest, and/or an equitable owner of a limited partnership interest in Bear Stearns High-Grade Structured Credit Strategies Fund, L.P. during the entire relevant time frame, continues to hold such limited partnership interests as of the date hereof, and will retain such limited partnership interests through the course of this litigation.

3.      This action is not a collusive one to confer jurisdiction that the Court would otherwise lack.

4.      As detailed in the Amended Complaint, demanding that the Bear Stearns High-Grade Structure Credit Strategies Fund, L.P., its General Partner, its Directors, or the Joint Liquidators assert the claims in the Amended Complaint on behalf of the partnership would be futile.

_____
Jack Doueck
Managing Principal
Stillwater Capital Partners LLC
General Partner of
Stillwater Market Neutral Fund II LP

Sworn to before me this
6 th day of October, 2009

_____
Notary Public

JENNIFER GOLDMAN
NOTARY PUBLIC, STATE OF NEW YORK
Registration No. 01GO6155871
Qualified in Kings County
Commission Expires Nov. 20, 2010

- 2 -

## CERTIFICATE OF SERVICE

I hereby certify that on October 6, 2009, I caused a true and correct copy of the foregoing Amended Complaint to be served on the following parties by U.S. Mail:

Barry H. Berke
Kerri Ann Law
Marjorie E. Sheldon
Kramer Levin Naftalis & Frankel LLP
1177 Avenue of the Americas
New York, New York 10036
Tel: 212.715.9100
Fax: 212.715.8000

*Attorneys for Defendants Bear Stearns Asset Management Inc., The Bear Stearns Companies, Inc., Bear Stearns Securities Corporation, Bear Stearns & Co. Inc., Barry Joseph Cohen, Gerald R. Cummins, David Sandelovsky, and Greg Quental*

Theresa Trzaskoma
Nina M. Beattie
Brune & Richard LLP
80 Broad Street
New York, New York  10004
Tel: 212.668.1900
Fax: 212.668.0315

*Attorneys for Defendant Matthew Tannin*

Martin L. Seidel
Cadwalader, Wickersham & Taft LLP
One World Financial Center
New York, New York 10281
Tel: 212.504.6000
Fax: 212.504.6666

*Attorneys for Defendants Walkers Fund Services Ltd., Scott Lennon, and Michelle Wilson-Clarke*

Marc A. Weinstein
Lisa Cahill
Hughes Hubbard & Reed LLP
One Battery Park Plaza
New York, New York 10004
Tel: 212.837.6000
Fax: 212.422.4726

*Attorneys for Defendant Ralph Cioffi*

Catherine L. Redlich
Driscoll & Redlich
521 Fifth Avenue, Suite 3300
New York, New York 10175
Tel: 212.986.4030
Fax: 212.986.4050

*Attorneys for Defendant Raymond McGarrigal*

Max R. Shulman
Stephen Potenza
Cravath, Swaine & Moore LLP
Worldwide Plaza
825 Eighth Avenue
New York, New York 10019
Tel: 212.474.1000
Fax: 212.474.3700

*Attorneys for Defendant Deloitte & Touche LLP*

Dated: October 6, 2009
       New York, NY

Jennifer Wagner